# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

In Re:

**ARC MANAGEMENT GROUP, LLC,**

Debtor.

CASE NO. 23-61742-WLH

CHAPTER 11

## EXPEDITED MOTION FOR APPROVAL OF SETTLEMENT AGREEMENT

The above captioned debtor and debtor-in-possession ARC Management Group, LLC ("**Debtor**"), pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure ("**Rule 9019**"), files this *Expedited Motion for Approval of Settlement Agreement* (the "**Motion**") by and between Debtor, Flock Financial, LLC ("**Flock**"), and Irwin Bernstein (the "**Receiver**"). In support hereof, Debtor shows as follows:

### JURISDICTION, VENUE, AND BACKGROUND

1.      Debtor filed voluntary petition for relief under chapter 11 of title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") on November 28, 2023 (the "**Petition Date**").

2.      No creditors' committee has been appointed in this case and no trustee or examiner has been appointed. Debtor remains debtor in possession.

3.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Debtor consents to the entry of final orders or judgments by the Bankruptcy Court.

4.      Prior to the Petition Date, Debtor and Flock entered into a series of Joint Investment Agreements and related Security Agreements (collectively, the "**JIAs**"), which were executed between July 28, 2022, and February 27, 2023. Under each of the JIAs, Flock provided funding

for a percentage of the purchase price of certain consumer debt portfolios (the "**Portfolios**"). Debtor also provided funding for the purchase of each of the Portfolios. Each JIA included a security agreement that granted to Flock a security interest in each Portfolio to secure performance by Debtor under the JIAs. Debtor is the owner of the Portfolios.

5.      Prior to the Petition Date, disputes arose between Debtor and Flock regarding the JIAs.

6.      On August 8, 2023, Flock filed a lawsuit in a civil action styled *Flock Financial, LLC v. ARC Management Group, LLC*, Case No. 23-1-6126-69, Superior Court of Cobb County, Georgia (the "**Cobb County Action**"). On October 9, 2023, Debtor filed an answer and counterclaim in the Cobb County Action.

7.      On October 24, 2023, the Superior Court entered an agreed order with the Receiver acting as receiver over the Portfolios.

8.      On November 29, 2023, Debtor filed in this Case an *Emergency Motion for Authority to Use Cash Collateral* [Doc. No. 6] (the "**Cash Collateral Motion**"). The Cash Collateral Motion was heard on an expedited basis on December 1, 2023. An interim order (the "**Interim Order**") granting the Cash Collateral Motion was entered on December 5, 2023. The Interim Order also scheduled a further hearing to be held on December 14, 2023.  [Doc. No. 27].

9.      On December 14, 2023, a consent order was entered continuing the hearing on the Cash Collateral Motion to January 9, 2024.  [Doc. No. 44]. At the January 9 hearing, the Court granted Debtor's request to continue the use of cash collateral. The Court entered the Second Interim Order Authorizing Use of Cash Collateral on January 16, 2024 [Doc. No. 70].

10.      On November 30, 2023, the Receiver filed a Motion of State Court Receiver to Excuse Turnover or for Other Protections ("**Receiver Motion**") [Doc. No. 16], which was

scheduled for hearing on December 1, 2023. The next hearing was scheduled for December 14, 2023 but was continued to January 9, 2024.

11.     On January 4, 2024, Flock filed its *Objection to Debtor's Emergency Motion for Authority to Use Cash Collateral* [Doc. No. 55] (the "**Cash Collateral Objection**").

12.     Debtor, Flock, and the Receiver appeared before the Court at the January 9, 2024 hearing, and announced a settlement of the Parties' dispute regarding the JIAs, including, but not limited to, the claims and counterclaims in the Cobb County Action and the matters raised in the Cash Collateral Motion, Cash Collateral Objection, and the Receiver Motion.

13.     Debtor, Flock, and the Receiver have conferred and finalized an agreement resolving the Cash Collateral Objection, the Receiver Motion, the State Court Action, and all claims therein. The terms of the agreement are incorporated into a settlement agreement (the "**Settlement Agreement**"), a true and correct copy of which is attached hereto as **Exhibit A**.[1]

## RELIEF REQUESTED AND NOTICE

14.     By this Motion, Debtor requests that the Court enter an order substantially in the form of the proposed order attached hereto as **<u>Exhibit B</u>** approving the Settlement Agreement and granting related relief.

15.     Debtor has given notice of this Motion to all creditors, including all merchant cash advance finance companies who may assert claims against Debtor, and the United States Trustee pursuant to Rule 9019.

## BASIS FOR RELIEF REQUESTED

16.     Debtor requests that the Court approve the Settlement Agreement pursuant to Rule 9019. Under Rule 9019, the Court has discretionary authority to approve a compromise of a

---

[1] All capitalized terms not defined herein shall have the meanings ascribed to them in the Settlement Agreement.

controversy or dispute. *See Protective Comm. for Independent Stockholders of TNT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Continental Airlines, Inc. v. Airline Pilots Ass'n Infl. (In re Continental Airlines, Inc.)*, 907 F.2d 1500, 1508 (5th Cir. 1990).

17.     Whether to approve a proposed compromise is a matter within the sound discretion of the Bankruptcy Court and pre-trial settlements are favored by the courts. *See In re Munford, Inc.*, 97 F.3d 449, 455 (11th Cir. 1996); *In re AWECO, Inc.*, 725 F.2d 293, 297 (11th Cir. 1984); *In re Grot*, 291 B.R. 204, 208 (Bankr. M.D. Ga. 2003). Bankruptcy settlements are a "normal part of the bankruptcy process" and "desirable and wise methods of bringing to close proceedings otherwise lengthy, complicated and costly." *TNT Trailer*, 390 U.S. at 424 (1986).

18.     According to the Eleventh Circuit Court of Appeals, in deciding whether to approve a proposed settlement, a bankruptcy court should evaluate: (a) the probability of success in litigation, with due consideration for the uncertainty of the facts and the law; (b) the difficulties, if any, to be encountered in collecting on a judgment; (c) the complexity and likely direction of the litigation and any attendant expense, inconvenience and delay; and (d) the paramount interest of the creditors and a proper deference to their reasonable use. *See In re Justice Oaks II, Ltd*., 898 F.2d 1544, 1549 (11th Cir. 1990).

19.     Whether a proposed settlement is a product of an arms-length negotiation is a factor bearing on the wisdom of the compromise. *In re Cajun Elec. Power Co-Op, Inc.*, 119 F.3d 349, 356 (5th Cir. 1997); *In re Foster Mortgage Corp.*, 68 F.3d 914, 918 (5th Cir. 1995). Additionally, determining whether the settlement is in the best interest of the estate is an important consideration. *See, e.g., Cajun Elec.*, 119 F.3d at 356. Generally, the role of the Bankruptcy Court, when evaluating a proposed settlement is not to decide the issues in dispute by conducting a mini-trial. Instead, the bankruptcy court should determine whether the settlement is fair and equitable as a

whole. *See, e.g., Cajun Elec.,* 119 F.3d at 355-56; *In re Joiner*, 319 B.R. 903, 907 (Bankr. M.D. Ga. 2004); *Grot*, 291 B.R. at 208 (2003).

20.     Here, Debtor has considered (i) the cost of litigation, (ii) the risk of not prevailing on the Motions, (iii) the temporal and organizational strain on Debtor caused by the involvement of its officer, Bill Wilson, in the litigation, and (iv) other factors justifying the prompt and efficient resolution of the matter. Debtor has determined that the terms are fair to both parties, and that the resolution of the State Court Action and the Cash Collateral Objection resolves the most substantial litigation involved in this Debtor's case.

21.     Debtor believes that approval of the Settlement Agreement is in the best interest of the estate and creditors and will be beneficial to the restructuring process.

WHEREFORE, having filed this Motion, Debtor prays the Motion be granted, the Settlement Agreement be approved, and that the Court grant Debtor such other and further relief as it may deem just and proper.

Dated: January 18, 2024                    ROUNTREE LEITMAN KLEIN & GEER, LLC

                                          */s/ Ceci Christy*
                                          Will Geer, Ga. Bar No. 940493
                                          Ceci Christy, Ga. Bar No. 370092
                                          Century Plaza I
                                          2987 Clairmont Road, Suite 350
                                          Atlanta, Georgia 30329
                                          (404) 584-1238 Telephone
                                          wgeer@rlkglaw.com
                                          cchristy@rlkglaw.com
                                          *Attorneys for Debtor*

## <u>Exhibit A</u>

**Settlement Agreement**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "**Agreement**") is made and entered into this 18th day of January 2024 (the "**Agreement Date**") by and between ARC MANAGEMENT GROUP, LLC, in its capacity as debtor in possession ("**Debtor**"), and FLOCK FINANCIAL, LLC ("**Flock**" and collectively with Debtor, the "**Parties**").

## RECITALS

WHEREAS, on November 28, 2023 (the "**Petition Date**"), Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Georgia (the "**Bankruptcy Court**"), initiating the bankruptcy case captioned *In re ARC Management Group, LLC*, Case No. 23-61742-WLH (the "**Bankruptcy Case**").

WHEREAS, prior to the Petition Date, Debtor and Flock entered into a series of Joint Investment Agreements and related Security Agreements (collectively, the "**JIAs**"), which were executed between July 28, 2022, and February 27, 2023. A list of the JIAs is attached as **Exhibit "A."** Under each of the JIAs, Flock provided funding for a percentage of the purchase price of certain consumer debt portfolios (the "**Portfolios**"). Debtor also provided funding for the purchase of each of the Portfolios. Debtor acquired eleven (11) Portfolios that are detailed on Exhibit B with the amounts funded by Flock and Debtor for Debtor's purchase of each Portfolio. and which were to be collected by Debtor pursuant to the terms of the JIAs.  The collective face value of the Portfolios at the time of purchase was $752,020,571.89.  Flock paid a total of $16,746,739.60 as funding for the purchase of the Portfolios. Debtor paid a total of $3,151,342.40 for the purchase of the Portfolios. Each JIA included a security agreement that granted to Flock a security interest in each Portfolio to secure performance by Debtor under the JIAs. Debtor is the owner of the Portfolios. Except for pricing details which varied across the JIAs, the terms of the JIAs are substantially the same, and an exemplar is attached as **Exhibit "B."**

WHEREAS, as of the Effective Date of this Agreement, the outstanding balance of Flock's total investment in the Portfolios is $12,631,032.60 (the "**Flock Investment Balance**").

WHEREAS, prior to the Petition Date, disputes arose between Debtor and Flock regarding the JIAs. On August 8, 2023, Flock filed a lawsuit in a civil action styled *Flock Financial, LLC v. ARC Management Group, LLC*, Case No. 23-1-6126-69, Superior Court of Cobb County, Georgia (the "**Cobb County Action**"). On October 9, 2023, Debtor filed an answer and counterclaim in the Cobb County Action.

WHEREAS, on October 24, 2023, the Superior Court entered an agreed order (the "**Receiver Order**") appointing Irwin Bernstein (the "**Receiver**") as receiver over the Portfolios.

WHEREAS, Debtor filed the Bankruptcy Case on the Petition Date, and on November 29, 2023, Debtor filed in the Bankruptcy Case an *Emergency Motion for Authority to Use Cash Collateral* [ECF No. 6] (the "**Cash Collateral Motion**"). The Cash Collateral Motion was heard on an expedited basis on December 1. An interim order (the "**Interim Order**") granting the Cash

Collateral Motion was entered on December 5, 2023. The Interim Order also scheduled a further hearing to be held on December 14, 2023. [ECF No. 27].

WHEREAS, on December 14, 2023, a consent order was entered continuing the hearing on the Cash Collateral Motion to January 9, 2024. [ECF No. 44]. At the January 9 hearing, the Court granted Debtor's request to continue the use of cash collateral. The Court entered the Second Interim Order Authorizing Use of Cash Collateral on January 16, 2024 [ECF No. 70].

WHEREAS, on November 30, 2023, the Receiver filed a Motion of State Court Receiver to Excuse Turnover or for Other Protections ("**Receiver Motion**") [ECF No. 16], which was scheduled for hearing on December 1, 2023. The next hearing was scheduled for December 14, 2023, but was continued to January 9, 2024.

WHEREAS, on January 4, 2024, Flock filed *Flock Financial LLC's Objection to Debtor's Emergency Motion for Authority to Use Cash Collateral* [ECF No. 55] (the "**Cash Collateral Objection**").

WHEREAS, the Parties appeared before the Court at the hearing on January 9, 2024, and announced a settlement of the Parties' dispute regarding the JIAs, including, but not limited to, the claims and counterclaims in the Cobb County Action and the matters raised in the Cash Collateral Motion, Cash Collateral Objection, and the Receiver Motion.

NOW THEREFORE, for and in consideration of the promises, the releases contained herein and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereby agree as follows:

## <u>AGREEMENT</u>

In consideration of the forgoing recitals

1. **<u>Recitals.</u>** The foregoing recitals are confirmed by the Parties as true and correct and are incorporated herein by reference. The recitals are a substantive, contractual part of this Agreement.

2. **<u>Definitions</u>** Except as defined in this Agreement, capitalized terms used in this Agreement have the meaning prescribed in the JIAs.

3. **<u>Bankruptcy Court Approval; Effectiveness.</u>** The Parties acknowledge that this Agreement is subject to approval of the Bankruptcy Court in the Bankruptcy Case pursuant to Fed. R. Bankr. P. 9019 ("**<u>Rule 9019</u>**").

(a) On or before January 18, 2024, counsel for Debtor shall file a motion pursuant to Rule 9019 (the "**<u>9019 Motio</u>**n") with the Bankruptcy Court seeking entry of an order (the "**<u>9019 Order</u>**") granting the 9019 Motion, which 9019 Order shall:

(i)      approve the terms of this Agreement and incorporate by reference hereto, the terms of this Agreement;

(ii)     be in form and substance reasonably acceptable to Debtor and Flock;

(iii)    authorize Debtor's execution of this Agreement and Debtor's full performance thereunder and hereunder;

(iv)    authorize Debtor to make the Settlement Payment (defined below) in accordance with this Agreement;

(v)     modify the automatic stay (to the extent it applies) so that the Parties may comply with their respective obligations hereunder; and

(vi)    provide that this Agreement and the 9019 Order are binding upon and inure to the benefit of the Parties, as well as their successors and assigns (as approved, where applicable, by the Bankruptcy Court).

(b)     Notice shall be provided by Debtor to all parties in interest in the Bankruptcy Case of the filing of the 9019 Motion.

(c)     The effectiveness of this Agreement is subject to and contingent upon entry of the 9019 Order by the Bankruptcy Court and the 9019 Order becoming final and non-appealable.

(d)     The "**Effective Date**" of this Agreement is the date that is one (1) business day after the 9019 Order becomes final and non-appealable pursuant to Fed. R. Bankr. P. 8002.

(e)     In the event that the Bankruptcy Court does not enter the 9019 Order, any funds collected by Allgate Financial, LLC ("**Allgate**") pursuant to the terms of this Agreement shall be held by Allgate and not used or disbursed pending further order of the Court.

4.     **Master Servicing Agreement.**  Contemporaneously with the execution of this Agreement, Debtor shall execute a master servicing agreement with Allgate in substantially the same form as the attached Exhibit "B" (the "**MSA**"). Under and subject to the terms of the MSA, Allgate shall have sole responsibility and exclusive authority for collection and servicing of the Accounts.

5.     **Payment of Net Proceeds.**  From the Collections of the Serviced Accounts as defined in the MSA, (the "**Proceeds**"), Allgate shall be entitled to retain fees, costs, and other amounts as provided under the MSA. Allgate shall distribute from the remaining Proceeds (the

"Net Proceeds"), within three (3) business days after the tenth (10th) and last day of each month, ninety percent (90%) of Net Proceeds to Flock and ten percent (10%) to Debtor until the Flock Investment Balance is $0.00. Thereafter, fifty percent (50%) of Net Proceeds shall be distributed to Flock and fifty percent (50%) shall be distributed to Debtor.

6.      **Waiver of Management Fee and Return.** Flock shall waive its right to receive a Management Fee and a Return under the JIAs.

7.      **Flock DIP Account**.  The Second Interim Cash Collateral Order will be modified to permit Debtor to withdraw $43,306.67 from the Debtor's segregated Debtor in Possession Account ending in 9737 to pay Debtor's expenses in accordance with the budget attached to the Order.

8.      **Receiver's Trust Account**.  The Receiver shall be permitted to use the funds being held in the Receiver's trust account to pay his expenses in the amount of $79,987.35.

9.      **Retention of Debtor by Allgate.**  Allgate may, at its sole discretion, engage Debtor for collection of a portion of the Serviced Accounts or to perform some other services.  Allgate and Debtor will agree on reasonable fees for such work.  Funds received by Debtor on Serviced Accounts not placed with it by Allgate will be remitted, along with a record identifying the source of funds and the relevant account number in accordance with the instructions above and with no fees, commissions, or other deductions charged or made by Debtor other than any fees, commissions, or other deductions as may be authorized in writing by Allgate.

10.     **Conditions Precedent.** As used in this Agreement, the term "Condition Precedent" means the occurrence of each of the following:

(i)      the execution of this Agreement by duly authorized representatives of each Party;

(ii)     the occurrence of the Effective Date;

(iii)    Debtor's performance of all its obligations under the MSA, including, but not limited to, (A) full cooperation with Allgate in process required to turn over data files, media, outstanding direct pay requests, media requests and disputes and complaints, and (B) providing full records related to all Accounts placed with credit bureaus within one (1) business day after the Effective Date of this Agreement.

11.    **Definitions Applicable to Releases.**

(a)    "**Flock Released Parties**" means and refers to Flock Financial, LLC, together with its past and present affiliates, subsidiaries, parents, members, managers, officers, directors, shareholders, partners, administrative agents, servicers, agents, employees, attorneys, heirs, assigns, representatives, predecessors, and successors.

(b)    "**Debtor Released Parties**" means and refers to Debtor together with its past and present affiliates, subsidiaries, parents, members, managers, officers, directors, shareholders, partners, administrative agents, servicers, agents, employees, attorneys, heirs, assigns, representatives, predecessors, and successors and Debtor's bankruptcy estate.

12.    **Release by Debtor.**    Subject to and contingent upon the satisfaction of the Conditions Precedent, Debtor shall and shall be deemed to release, acquit and forever discharge the Flock Released Parties from any and all claims, causes of action, suits, damages, judgments, liens, losses, expenses, recoupments, and demands whatsoever in law and/or equity, contract or tort that Debtor and/or Debtor's estate had, now has, or may later have or claim to have against any of the Defendant Released Parties, individually or collectively, whether known or unknown, asserted or unasserted, fixed or contingent, liquidated or unliquidated, now accrued or that may accrue hereafter, that arose or transpired at any time from the beginning of time through the Effective Date, asserted in, arising from or in any way related to the JIAs, the Cobb County Action, Debtor, the Bankruptcy Cases, and/or the business or operations of Debtor, including without limitation, all claims asserted in the Cobb County Action.  Debtor covenants and agrees not to sue or take any action against any of the Flock Released Parties for any claim released by Debtor in this Paragraph.  Nothing herein shall release the Flock Released Parties from their obligations under this Agreement.

13.    **Release by Flock.**    Subject to and contingent upon the satisfaction of the Conditions Precedent, Flock shall and shall be deemed to release, acquit and forever discharge the Debtor Released Parties from any and all claims, causes of action, suits, damages, judgments, liens, losses, expenses, recoupments, and demands whatsoever in law and/or equity, contract or tort that Flock had, now has, or may later have or claim to have against any of the Debtor Released Parties, individually or collectively, whether known or unknown, asserted or unasserted, fixed or contingent, liquidated or unliquidated, now accrued or that may accrue hereafter, that arose or transpired at any time from the beginning of time through the Effective Date, asserted in, arising from or in any way related to the JIAs, the Cobb County Action, Debtor, the Bankruptcy Cases, and/or the business or operations of Debtor, including without limitation, all counterclaims asserted in the Cobb County Action.  Flock covenants and agrees not to sue or take any action against any of the Debtor Released Parties for any claim released by Flock in this Paragraph.  Nothing herein shall release the Debtor Released Parties from their obligations under this Agreement.

14.    **Release of Receiver and Allgate.**    Subject to and contingent upon the satisfaction of the Conditions Precedent, the Parties shall and shall be deemed to release, acquit and forever discharge the Receiver and Allgate (together with all of their respective affiliates, subsidiaries, parents, members, managers, officers, directors, shareholders, partners, administrative agents, servicers, agents, employees, attorneys, heirs, assigns, representatives, predecessors, and successors, the "**Receiver Released Parties**") from any and all claims, causes of action, suits, damages, judgments, liens, losses, expenses, recoupments, and demands whatsoever in law and/or equity, contract or tort that Flock or ARC had, now has, or may later have or claim to have against any of the Receiver Released Parties, individually or collectively, whether known or unknown, asserted or unasserted, fixed or contingent, liquidated or unliquidated, now accrued or that may accrue hereafter, that arose or transpired at any time from the beginning of time through the Effective Date, asserted in, arising from or in any way related to the JIAs, the Cobb County Action, Debtor, the Bankruptcy Cases, and/or the business or operations of Debtor, including without limitation, all claims and counterclaims asserted in the Cobb County Action. The Parties  covenant and agree not to sue any of the Receiver Released Parties for any claim released by the Parties in this Paragraph.

15.    **Dismissal.**  Within five (5) business days after the satisfaction of the Conditions Precedent, the Parties shall file a stipulation of dismissal with prejudice of the Cobb County Action, including all claims and counterclaims.

16.    **Representations and Warranties.** The Parties make the following representations and warranties, and acknowledge that these and all other representations and warranties contained herein are material to this Agreement:

(a)    Each person signing this Agreement on behalf of a Party is fully competent to execute this Agreement and to bind the Party on whose behalf he/she is signing to the promises, covenants, terms, and conditions set forth herein.

(b)    This Agreement is not being made or entered into with the actual intent to hinder, delay or defraud any entity or person.

(c)    No representation regarding the nature and extent of legal liability of the Parties has induced this Agreement.

(d)    There has been no assignment, sale or other transfer or disposition of any interest in any of the claims herein released.

(e)    This Agreement has been reviewed by the Parties' respective counsel.

(f)    Each Party received reasonably equivalent value in exchange for the execution and performance of this Agreement.

17.     **Attorneys' Fees and Expenses.**  The Parties shall bear their own attorneys' fees and expenses in connection with this Agreement, the Bankruptcy Case, and the Cobb County Action.

18.     **Governing Law.**  This Agreement, including its interpretation and enforcement, will be governed by the laws of the State of Georgia, without regard to any state's choice of law rules.

19.     **Jurisdiction of Bankruptcy Court.**  The Parties hereby agree that the Bankruptcy Court shall have exclusive jurisdiction to adjudicate any dispute arising under this Agreement, both before and after the Bankruptcy Case is closed. All Parties agree to submit to the jurisdiction of the Bankruptcy Court therefor.

20.     **Drafting.**  This Agreement was negotiated and drafted with the full participation of the Parties and their respective counsel. In the event that it is determined that any ambiguity exists in this Agreement, any such ambiguity shall not be resolved or otherwise construed against any particular Party by virtue of the fact that it participated in the drafting, but rather, shall be resolved by a fair reading of the intent of the Parties as established herein.

21.     **Successors and Assigns.**  The Parties agree that the terms, covenants, and obligations set forth herein shall inure to the benefit of and be binding upon each of their respective agents, attorneys, officers, directors, members, managers, employees, representatives, administrators, executors, successors and assigns.

22.     **Headings.**  The headings herein have been used to designate the various sections of this Agreement and are solely for convenience and ease of reference and shall not be construed in any event or manner as interpretive of this Agreement.

23.     **Modifications.**  Any future waiver, alteration, amendment or modification of any of the provisions of this Agreement shall not be valid or enforceable unless in writing and signed by all Parties, it being expressly agreed that this Agreement cannot be modified orally, by course of dealing or by implied agreement.

24.     **Severance.**  If any provision of this Agreement is found to be contrary to law or void, the remainder of the Agreement shall be considered valid and enforceable and shall remain in full force and effect and shall in no way be affected, impaired, or invalidated.

25.     **Multiple Counterparts.**  This Agreement may be signed in multiple counterparts, each of which will be deemed an original and all of which taken together will constitute one instrument binding upon the Parties, notwithstanding that each Party is not a signatory to the same counterpart. Any scanned PDF or facsimile counterparts shall be considered originals.

26.    **Strict Compliance.** The failure of any Party at any time or times to demand strict performance by the other Parties of any of the terms, covenants, or conditions set forth herein shall not be construed as a continuing waiver or relinquishment thereof. Any Party may, at any time, demand strict and complete performance by the other Parties of the terms, covenants, and conditions of this Agreement.

27.    **No Admission.** Nothing herein shall be deemed or construed to be an admission or acknowledgement of liability of any Party.

28.    **Notice.** Any notice required to be provided pursuant to this Agreement shall be provided by electronic mail to counsel for the Parties as follows:

**Debtor:**    Ceci Christy
cchristy@rlkglaw.com

**Flock:**    Greg Taube
greg.taube@nelsonmullins.com

29.    **Agreement Binding on Future Trustees.** For the avoidance of doubt, the Parties agree that the Agreement shall be binding on any trustee appointed under the Bankruptcy Code, including without limitation Sections 701 or 1104 of the Bankruptcy Code.

30.    **Survival.** This Agreement shall survive, and its terms shall remain binding on the Parties, in the event the Bankruptcy Case is converted to a case under Chapter 7 of the Bankruptcy Code or is dismissed.

31.    **Entire Agreement.** The Parties agree that this Agreement sets forth the entire agreement of the Parties in relation to its subject matter and that no prior oral or written matters extrinsic to this Agreement shall have any force or effect. The terms of the JIAs and related security agreements are incorporated herein, except as modified by this Agreement. The terms of the MSA are incorporated herein between the Parties regarding the duties of ARC and Allgate. For the avoidance of doubt, to the extent of any inconsistency between the JIAs or the MSA and this Agreement, this Agreement controls.

[REMAINDER OF PAGE LEFT BLANK]

[SIGNATURES ON FOLLOWING PAGES]

IN WITNESS WHEREOF, the Parties have set their hands and seals as of the Agreement Date above.

**ARC MANAGEMENT GROUP, LLC**, in its capacity as debtor in possession in the bankruptcy case of ARC Management Group, LLC

By:_____[seal]
Name:_____
Title:_____

**FLOCK FINANCIAL, LLC,** a Delaware limited liability company

By _Michael R. Flock_ [seal]
Name: _MICHAEL R. FLOCK_
Title _CHAIRMAN & CEO_

IN WITNESS WHEREOF, the Parties have set their hands and seals as of the Agreement Date above.

**ARC MANAGEMENT GROUP, LLC**, in its capacity as debtor in possession in the bankruptcy case of ARC Management Group, LLC

By:_____ [seal]
Name:_____
Title:_____


**FLOCK FINANCIAL, LLC,** a Delaware limited liability company

By:_____ [seal]
Name:_____
Title:_____

JOINT INVESTMENT AGREEMENTS EXHIBIT A

| ACCOUNT PURCHASED | DATE | PURCHASE PRICE | FLOCK INVESTMENT | DEBTOR INVESTMENT |
|---|---|---|---|---|
| **KEYSTONE** | Jul 28, 2022 | $405,427.00 | $324,341.60 | $81,085.40 |
| **TSG RESOURCES, INC.** | Jul 28, 2022 | $2,380,757.00 | $1,904,605.00 | $476,152.00 |
| **TSG RESOURCES, INC.** | Aug 25, 2022 | $1,868,207.81 | $1,494,566.25 | $373,641.56 |
| **TSG RESOURCES, INC.** | Sep 26, 2022 | $2,569,844.57 | $2,055,875.66 | $513,968.91 |
| **TSG RESOURCES, INC.** | Oct 26, 2022 | $1,759,413.15 | $1,407,530.52 | $351,882.63 |
| **TSG RESOURCES, INC.** | Oct 31, 2022 | $363,469.46 | $290,775.57 | $72,693.89 |
| **TSG RESOURCES, INC.** | Nov 22 | $2,268,283.96 | $1,814,627.17 | $453,656.79 |
| **TSG RESOURCES, INC.** | Dec 27, 2022 | $2,361,750.98 | $2,125,575.89 | $236,175.10 |
| **TSG RESOURCES, INC.** | Jan 23 | $1,934,105.70 | $1,740,695.13 | $193,410.57 |
| **TSG RESOURCES, INC.** | Feb 23 | $1,811,862.16 | $1,630,675.95 | $181,186.22 |
| **TSG RESOURCES, INC.** | Mar 23 | $2,174,967.81 | $1,957,471.03 | $217,496.78 |

EXHIBIT B

*FLOCK FINANCIAL, LLC* *JOINT INVESTMENT AGREEMENT*

# JOINT INVESTMENT AGREEMENT

THIS **JOINT INVESTMENT AGREEMENT** (this "*Agreement*") is made as of **SEPTEMBER 26**, **2022**, between **FLOCK FINANCIAL, LLC**, a Delaware limited liability company (collectively the "*Company*"), and **ARC MANAGEMENT GROUP**, **LLC** a Georgia limited liability company ("*Debt Buyer*"). The Company and Debt Buyer are each referred to as a "*Party*" and collectively constitute the "*Parties*" to this Agreement.

## RECITALS

WHEREAS, the Company and Debt Buyer desire to jointly invest in the portfolio of charged-off consumer debt receivables set forth on Exhibit A to this Agreement on the terms and conditions set forth herein (the "*Investment*");

WHEREAS, **ARC MANAGEMENT GROUP**, **LLC** a Georgia limited liability company ("*Debt Buyer Parent*"), is an experienced purchaser of charged-off consumer debt receivables similar to those represented by the Investment and has infrastructure and operational expertise in the collection of charged-off consumer debt receivables, and has formed Debt Buyer as a single purpose entity to purchase portfolios such as the Investment;

WHEREAS, Debt Buyer has provided the Company with a detailed synopsis of the qualitative and topographical features of the Investment, a detailed summary of the terms and conditions of the acquisition documentation associated with the Investment (including the Purchase Price (as defined below)) and the intended strategy with respect to Debt Buyer's recovery program regarding the Investment;

WHEREAS, the Company desires to invest a portion of the Purchase Price associated with the Investment with Debt Buyer pursuant to the terms and conditions outlined in this Agreement; and

WHEREAS, in consideration of such investment of Company Funds, the Parties will enter into the Security Agreement (as defined below), granting the Company a security interest in the Investment to secure the payment of all Company Investment Proceeds, returns and payments to the Company set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## SECTION 1
## DEFINITIONS

1.1     Defined Terms. The following capitalized words and phrases used in this Agreement have the indicated meanings:

"*Affiliate*" means, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any officer, director, or employee of such Person, or (iii) any Person who is an officer, director, or employee of any Person described in clause (i) of this definition.

DocuSign Envelope ID: 592557E7-948B-4914-B310-40F58CAC6CEC

*FLOCK FINANCIAL, LLC*                              *JOINT INVESTMENT AGREEMENT*

"***Agreement***" means this Joint Investment Agreement, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder," refer to this Joint Investment Agreement as a whole, unless the context otherwise requires.

"***BEAM Software***" means Oliphant Financial, LLC's proprietary integrated business processing application for the debt industry.

"***Business Day***" means any day other than a Saturday, Sunday, or a day on which banking institutions in Atlanta, Georgia or New York, New York are authorized or obligated by law or executive order to be closed.

"***Collateral Measurement***" shall mean a monthly measurement made beginning in the fourth (4) full month after the date of this agreement which measures the current portfolio principal balance remaining for all accounts that are ninety (90) days or less delinquent at that time multiplied by **82.5%** multiplied by the percentage ratio of Company Funds divided by the Purchase Price.

"***Company***" has the meaning specified in the introductory paragraph of this Agreement.

"***Company Funds***" has the meaning given it in Section 2.1 hereof.

"***Control Account***" means the bank account at a nationally recognized bank established solely for the purpose of (i) receiving semi-monthly periodic deposits from Debt Buyer related to payments on the Investment, and (ii) distributing amounts per the Company's instructions pursuant to Section 4.1.

"***Debt Buyer***" has the meaning specified in the introductory paragraph of this Agreement.

"***Debt Buyer Funds***" has the meaning given it in Section 2.1 hereof.

"***Debt Buyer Operating Agreement***" has the meaning giving it in Section 5.1 hereof.

"***Debt Buyer Parent***" has the meaning specified in the Recitals to this Agreement, and for purposes of Sections 5.2(e) and 5.2(f) hereof, means the ultimate corporate parent of Debt Buyer Parent.

"***Entity***" means any corporation, partnership, limited liability company, trust or other legal entity.

"***Excluded Expenses***" means out-of-pocket fees and expenses (i) of hiring an attorney customary market rates to litigate collection matters, (ii) of hiring a collection agent at market rates to provide non-customary collection services, (iii) associated with indemnification expenses paid to the "Special Manager" pursuant to Section 2.10 of the Debt Buyer Operating Agreement (as such term is defined therein), (iv) associated with professional fees related to the filing of tax returns with applicable tax authorities, and (v) otherwise mutually agreed to in writing by Debt Buyer and the Company.

"***Flock Financial***" means Flock Financial, LLC, a Delaware limited liability company.

"***Flock Investment Agreements***" refers collectively to this Agreement and all other joint investment agreements entered into with Debt Buyer by the Company and any other company managed or co-managed by Flock Financial for the purpose of investing in portfolios of charged-off consumer debt receivables.

"***Investment***" has the meaning given it in the Recitals to this Agreement.

"***Investment Expenses***" means out-of-pocket fees and expenses incurred by Debt Buyer in

DocuSign Envelope ID: 592557E7-948B-4914-B310-40F58CAC6CEC

*FLOCK FINANCIAL, LLC*        *JOINT INVESTMENT AGREEMENT*

fulfillment of its obligations set forth in Section 3 with respect to the Investment, including the payment of Service Providers and the fees and expenses incurred in connection with the compliance of Debt Buyer with regulatory licensure requirements under applicable law relating to the acquisition and servicing of the Investment. The aggregate Investment Expenses incurred by Debt Buyer and taken into account for purposes of calculating the Management Fee and Investment Proceeds shall be subject to the limitations set forth in Section 3.4. Investment Expenses shall specifically exclude the payment of Company Funds and the Return to the Company as well as any Excluded Expenses.

"***Investment Funds***" means the Company Funds and the Debt Buyer Funds, collectively.

"***Investment Proceeds***" means Investment Revenue, in excess of (i) Investment Expenses, Excluded Expenses, (iii) the Management Fee and (iv) reasonable reserves established by Debt Buyer in consultation with the Company for anticipated Investment Expenses and Excluded Expenses.

"***Investment Proceeds Shortfall***" has the meaning given it in Section 4.3 hereof.

"***Investment Revenue***" means all proceeds received by Debt Buyer in respect of the Investment.

"***Insufficient Collateral Default***" means an event which occurs when Company's Unreturned Investment Account is exceeded by the Collateral Measurement.

"***Joint Investment Agreements***" has the meaning given it in Section 4.3 hereof.

"***Joint Investment Agreement Default***" has the meaning given it in Section 4.2 hereof.

"***Joint Investments***" has the meaning given it in Section 4.3 hereof.

"***JV Documents***" means this Agreement and the Security Agreement together, with a UCC-1 financing statement showing Debt Buyer as debtor and the Company as a secured party, and any other document or agreement evidencing the investment of Company Funds or the collateral securing the investment of Company Funds.

"***Management Fee***" has the meaning given it in Section 3.6 hereof.

"***Management Fee Overage Account***" means with respect to the Company as of a relevant measurement date, the excess, if any, of (i) the aggregate Management Fees paid to the Company for completed monthly periods prior to the relevant measurement date less (ii) an amount equal to (a) 2% multiplied by (b) the aggregate Investment Revenue, measured from the date of this Agreement through the relevant measurement date.

"***Obligor***" means each signer, co-signer, guarantor or other person responsible for payment on an Investment receivable account.

"***Person***" means any individual or Entity,

"***Purchase Agreement***" means the Purchase Agreement pursuant to which Debt Buyer is obligated to acquire the Investment.

"***Purchase Price***" has the meaning given it in Section 2.1 hereof.

"***Remittance Report***" means a report submitted monthly by Debt Buyer to the Company (i) listing deposits into and disbursements out of the Trust Account, and (ii) calculating all Investment Expenses and Excluded Expenses due to Debt Buyer for the period covered by such

DocuSign Envelope ID: 592557E7-948B-4914-B310-40F58CAC6CEC

*FLOCK FINANCIAL, LLC*                                    *JOINT INVESTMENT AGREEMENT*

report. All such amounts shall be identified by Investment.

"***Return***" means an amount computed like interest at a rate of **12.00% PER ANNUM**, compounded annually, calculated on the varying amount of such Party's Unreturned Investment Account during the period to which the computation relates.

"***Return Account***" means with respect to any Party at any time, the excess, if any, of such Party's Return through such time over the total amount of cash distributed to such Party prior to such time pursuant to Sections 4.1(a)(i) and 4.1(b)(i), in the case of the Company, or Sections 4.1(a)(i) and 4.1(b)(iii), in the case of Debt Buyer.

"***Security Agreement***" has the meaning given thereto in Section 7.3.

"***Seller***" means the seller of the Investment under the terms and conditions of the Purchase Agreement.

"***Service Provider***" has the meaning given thereto in Section 3.1.

"***Single Purpose Entity***" means a Person (other than an individual, a government, or any agency or political subdivision thereof) that exists solely for the purpose of owning the investments of Company Funds, conducts business only in its own name, does not engage in any business or have any assets unrelated to the investments of Company Funds, does not have any indebtedness other than as permitted by the Flock Investment Agreements, has its own separate books, records, and accounts (with no commingling of assets), holds itself out as being a Person separate and apart from any other Person, and observes corporate and partnership formalities independent of any other entity, and which otherwise constitutes a single purpose, bankruptcy remote entity.

"***Trust Account***" shall mean the account at a nationally recognized bank established by Debt Buyer solely for the purpose of (i) receiving payments from Obligors of charged-off consumer debt receivables relating to the Investment, and (ii) distributing amounts per the Company's instructions pursuant to Section 4.1.

"***Unreturned Investment Account***" means, with respect to each Party at any time, the excess, if any, of such Party's respective portion of the Investment Funds over the total amount of cash distributed to such Party prior to such time pursuant to Sections 4.1(a)(ii) and 4.1(b)(ii), in the case of the Company, or Sections 4.1(a)(ii) and 4.1(b)(iv), in the case of Debt Buyer.

## <u>SECTION 2</u>
## THE INVESTMENT

2.1    <u>The Investment Purchase Price</u>. The aggregate purchase price with respect to the Investment is **2,569,844.57** (the "***Purchase Price***"). Each Party's respective portion of the Purchase Price is as follows:

| Party | Portion of Purchase Price |
|---|---|
| The Company | 80% |
| Debt Buyer | 20% |

Upon execution of this Agreement, Debt Buyer shall fund **20%** of the Purchase Price to the Seller via wire transfer of immediately available funds in accordance with the wire transfer instructions contemplated by the Purchase Agreement (the "***Debt Buyer Funds***"). Upon execution of this Agreement and the delivery of the Debt Buyer Funds to the Seller as contemplated by the preceding sentence, the Company shall cause an amount equal to **80%** of the Purchase Price to be delivered to the Seller via wire transfer of immediately available funds in accordance with the wire

DocuSign Envelope ID: 592557E7-948B-4914-B310-40F58CAC6CEC

*FLOCK FINANCIAL, LLC*                                                    *JOINT INVESTMENT AGREEMENT*

transfer instructions contemplated by the Purchase Agreement (the "***Company Funds***"). The Company Funds shall be deemed to have been delivered to the Seller on behalf, and at the direction, of Debt Buyer.  The investment of Company Funds shall constitute an investment with Debt Buyer from the Company, which such investment of Company Funds shall be returned in accordance with Section 4.1 of this Agreement and secured pursuant to the Security Agreement to be delivered in accordance with Section 7.3 of this Agreement.

2.2    <u>Acquisition of the Investment</u>.  Upon execution of this Agreement, Debt Buyer shall consummate the acquisition of the Investment for an amount equal to the Purchase Price in accordance with the terms and conditions of the Purchase Agreement. Upon acquisition thereof by Debt Buyer, Debt Buyer shall hold good and valid title to the Investment free and clear of all liens or other encumbrances, subject to the security interest contemplated by the Security Agreement. Immediately following such acquisition of the Investment, Debt Buyer shall deliver written notice to the Company thereof.  Debt Buyer shall deliver an electronic file to the Company containing the relevant Investment information for importing into the BEAM Software.

<u>**SECTION 3**</u>
**SERVICING OF THE INVESTMENT**

3.1.    <u>Servicing of the Investment</u>. Debt Buyer shall collect, administer and service the Investment and shall have full power and authority, to the extent not limited hereunder, to do or cause to be done any and all things permissible under applicable law in connection with such servicing, administration and collection as may be necessary or desirable to optimize the recoverable value of the Investment. In the performance of its duties under this Agreement, Debt Buyer may engage attorneys, collection agents and other service providers to commence collection actions, foreclosure proceedings, collection services and/or other similar actions ("***Service Providers***").

3.2.    <u>Servicing, Administration and Collection Duties</u>. Without limiting the generality of Section 3.1, Debt Buyer's servicing, administration and collection duties under this Agreement shall be subject to the duties set forth below.

(a)    Debt Buyer shall undertake all commercially reasonable efforts to collect or otherwise realize upon the Investment being serviced hereunder. In that connection, Debt Buyer shall be solely responsible for the collection and posting of all payments, responding to inquiries of obligors associated with the Investment, investigating delinquencies, sending statements to obligors associated with the Investment, reporting any required tax information to such obligors, reporting any required credit information on obligors to the credit bureaus, accounting for proceeds collected on account of any portion of the Investment, monitoring the status of any guaranties or insurance policies relating to the Investment, commencing and pursuing collection actions, entering into agreements for the settlement, compromise or satisfaction of any claims relating to the Investment with one or more obligors associated therewith and such other practices and procedures as are generally employed in servicing, administering and collecting similar accounts, loan portfolios and other receivables. To the extent that Debt Buyer, in the performance of its duties and responsibilities under this Agreement, engages Service Providers, Debt Buyer shall also have sole responsibility for compensating, monitoring and managing the activities and actions of such attorneys and ensuring that such activities and actions are in compliance with provisions of this Agreement.

(b)    Debt Buyer will instruct its Service Providers to submit electronic transfer payments directly to the Trust Account. Service Providers will also be instructed that payments

DocuSign Envelope ID: 592557E7-948B-4914-B310-40F58CAC6CEC

*FLOCK FINANCIAL, LLC* *JOINT INVESTMENT AGREEMENT*

received by mail should be deposited into the Trust Account no later than the first Business Day after such amounts are received.

(c)    Debt Buyer shall maintain detailed records with respect to each account forming a portion of the Investment, the amount and application of any funds received with respect thereto, or other realization upon such account and documentation of all servicing, administration and collection efforts and activities with respect to such account.

(d)    On a monthly basis, Debt Buyer shall provide the Company with an electronic file of the collection results for the period then ended for purposes of updating the Investment information on the BEAM Software.

(e)    Debt Buyer shall provide a monthly accounting of the calculation of Investment Proceeds to the Company, together with supporting documentation evidencing the sources and uses of all proceeds from the Investment for such monthly period.

3.3.    <u>Duties of Debt Buyer</u>. Debt Buyer agrees that it shall manage, service, administer, collect and pursue enforcement proceedings with respect to the Investment in accordance with the degree of skill, prudence and attention that is customary and usual for institutions that regularly service and collect comparable accounts and, to the extent more exacting, with the degree of skill, prudence and attention that Debt Buyer exercises from time to time with respect to comparable assets that it services for itself or for others. No appointment of any Service Provider or engagement of any Service Provider for collection litigation or other purposes by Debt Buyer shall relieve Debt Buyer of any of its duties or responsibilities under this Agreement, including without limitation, its servicing responsibilities hereunder.

3.4.    <u>Cap on Investment Expenses; Affiliated Service Providers</u>. Notwithstanding anything herein to the contrary, the aggregate Investment Expenses incurred by Debt Buyer under this Agreement shall not exceed the limitations set forth on <u>Exhibit B</u>. Any Investment Expenses incurred in excess of such limitations shall be borne by Debt Buyer and shall not be taken into account for purposes of calculating the Management Fee or Investment Proceeds, unless otherwise mutually agreed by the Parties in writing. To the extent such engagement is in compliance with Debt Buyer's duties set forth in Section 3.3 above, Debt Buyer may engage one or more of its Affiliates as a Service Provider and such Affiliate may receive compensation from Investment Proceeds, provided that (i) any such compensation shall constitute Investment Expenses for purposes of this Agreement and shall be subject to the limitations set forth in this Section 3.4, (ii) the fees payable to Debt Buyer's Affiliate are at market rates and (iii) the other terms and conditions of such arrangement are no less favorable than those generally available from unaffiliated third parties for a comparable level of service and quality.

3.5.    <u>Investment Expenses</u>. Debt Buyer shall cause all Investment Expenses and Excluded Expenses to be paid from the Investment or proceeds received by Debt Buyer in respect of the Investment.

3.6.    <u>Company Management Fee</u>. Debt Buyer shall pay to Flock Financial as compensation for certain management and other advisory services in connection with the Investment a monthly management fee (the "***Management Fee***") beginning as of the date of this Agreement and continuing until the earlier of (i) the date as of which the Investment has been fully collected and (ii) the date as of which the Parties agree in writing that the remaining portion of the Investment should be abandoned. The Management Fee shall be payable monthly in arrears within ten calendar days following the final day of each calendar month.  Each monthly Management Fee shall be an amount equal to (1) 2% of the Investment Revenue received by Debt Buyer in

DocuSign Envelope ID: 592557E7-948B-4914-B310-40F58CAC6CEC

*FLOCK FINANCIAL, LLC*                                                              *JOINT INVESTMENT AGREEMENT*

connection with the Investment during the applicable calendar month, <u>less</u> (2) the positive balance, if any, of the Management Fee Overage Account.

## SECTION 4
## PAYMENT OF INVESTMENT PROCEEDS

4.1.    <u>Payments of Investment Proceeds</u>. Each month, Debt Buyer will transfer the estimated Investment Proceeds for the month's initial 15 day collection period from the Trust Account to the Control Account by no later than the 20th calendar day of the month. On the 5th day following month end, Debt Buyer will transfer the remaining estimated Investment Proceeds for the month from the Trust Account to the Control Account and provide the Company with a Remittance Report, together with applicable bank reconciliations and other supporting materials, sufficient to allow the Company to confirm that such Remittance Report is correct. In the event Debt Buyer fails to remit the semi-monthly on the aforementioned due dates, Debt Buyer will be charged a daily penalty of $2,500.

Upon receipt of the Remittance Report and confirmation by the Company that the amounts are correct, the Company will instruct Debt Buyer to disburse funds in accordance with the (approved) Remittance Report using amounts then residing in the Control Account. Investment Proceeds from the Investment will be paid by Debt Buyer in accordance with the following provisions of this Section 4.1 within ten days of the final day of each calendar month or, if such tenth day is not a Business Day, the next following Business Day.

(a)    Investment Proceeds will be paid to the Parties in the following priority:

(i)    first, 100% to the Company in proportion to and to the extent of their respective Return Accounts;

(ii)    second, 100% to the Company in proportion to and to the extent of their respective Unreturned Investment Accounts; and

(iii)    thereafter, 15% to the Company and 85% to Debt Buyer

(b)    Notwithstanding anything in Section 4.1(a) to the contrary, upon the occurrence of a Joint Investment Agreement Default in accordance with Section 4.2 below, the payment of Investment Proceeds to the Parties shall be made in the order of priority set forth in this Section 4.1(b), which shall be effective with respect to the next regularly scheduled payment of Investment Proceeds and each payment of Investment Proceeds thereafter. The order of priority shall be as follows:

(i)    first, 100% to the Company to the extent of the Company's Return Account;

(ii)    second, 100% to the Company to the extent of the Company's Unreturned Investment Account;

(iii)    thereafter, 15% to the Company and 85% to Debt Buyer.

DocuSign Envelope ID: 59255757-948B-4914-B310-40F58CAC6CEC

*FLOCK FINANCIAL, LLC*                                        *JOINT INVESTMENT AGREEMENT*

4.2.    <u>Joint Investment Agreement Default</u>. For purposes of this Section 4, a "***Joint Investment Agreement Default***" shall be deemed to occur: (i) if an Insufficient Collateral Default has occurred; (ii) if the Company has not received Investment Proceeds pursuant to Section 4.1 as of the completion of the 28 months from the execution of this Agreement sufficient to reduce the Company's Unreturned Investment Account and Return Account to zero; (iii) upon any breach of any term, condition or covenant set forth in Section 5.2(d), (e) or (i) of this Agreement, including, without limitation, the failure of Debt Buyer to maintain its status as a Single Purpose Entity; (iv) upon  any breach shall remain uncured for fourteen (14) days or more following delivery of written notice thereof by the Company to the Debt Buyer; (iv) upon any failure by Debt Buyer to satisfy the standard of conduct applicable thereto as set forth in Section 3.3, and such failure shall remain uncured for fourteen (14) days or more following delivery of written notice thereof by the Company to Debt Buyer; (v) the filing of any petition in bankruptcy by Debt Buyer; (vi) the filing of a petition in bankruptcy against Debt Buyer that is not dismissed within ninety (90) days; (vii) the application for appointment of a receiver for, making a general assignment for the benefit of creditors by, or insolvency of Debt Buyer; or (viii) upon any "Event of Default" under the Security Agreement (as such term is used therein).

Debt Buyer shall provide prompt written notice to the Company of the occurrence of a Joint Investment Agreement Default within five Business Days of the Managers of Debt Buyer's sole member acquiring actual knowledge of the Joint Investment Agreement Default.  Upon occurrence of any Joint Investment Agreement Default or at any time thereafter, the Company may exercise any or all of the rights and powers and pursue any and all of the remedies available to it hereunder and under the Security Agreement, and shall have and may exercise any and all rights and remedies available under any other provision of law or in equity including without limitation the remedies of a secured party under the Uniform Commercial Code of New York, as applicable to the Collateral (as defined in the Security Agreement)

Notwithstanding the foregoing: (A) upon a Joint Investment Agreement Default described in subsections 4.2(v), (vi) or (vii) above, the Company Funds and any and all other amounts due and payable under this Agreement and the other JV Documents shall become immediately due and payable without notice or demand; (B) in the event any Joint Investment Agreement Default described in subsection 4.2(i) occurs due to an Insufficient Collateral Default, Investment Proceeds will be paid according to the provisions of Section 4.1(b) and if the minimum Collateral Measurement threshold is then achieved at   a future period and such threshold is maintained for two periods (i.e., 2 consecutive months), the provisions of Section 4.1(a) will be restored for determining allocation of the Investment Proceeds; and (C) in the event of any Joint Investment Agreement Default described in subsections 4.2(iii) and (iv), the Company shall have a period of 60 calendar days from the occurrence of a Joint Investment Agreement Default to deliver a written notice to Debt Buyer electing for the payment of Investment Proceeds to be made in accordance with the waterfall set forth in Section 4.1(b) above. Debt Buyer shall be obligated to deliver a notice to the Company in accordance with this Section 4.2 in connection with each Joint Investment Agreement Default.

4.3.    <u>Cross Collateralization</u>. The Parties may enter into other Joint Investment Agreements (this Agreement and such other joint investment agreements being referred to collectively as the "***Joint Investment Agreements***" and individually as a "***Joint Investment Agreement***") with respect to other joint investments (the Investment and such other joint investments being referred to collectively as the "***Joint Investments***" and individually as a "***Joint Investment***"). If at the completion of the 28th month following the execution of a Joint Investment

DocuSign Envelope ID: 592557E7-948B-4914-B310-40F59CAC6CEC

*FLOCK FINANCIAL, LLC*                                                    *JOINT INVESTMENT AGREEMENT*

Agreement, the Investment Proceeds from the Joint Investment are insufficient to repay the Company's Unreturned Investment Account in respect of that Joint Investment and accrued interest thereon (the "***Investment Proceeds Shortfall***"), then the Investment Proceeds collected, with respect to all other Joint Investments in which the Company's Unreturned Investment Account in respect of that Joint Investment and accrued interest thereon have been paid in full, shall be paid and applied to the Investment to which the Investment Proceeds Shortfall has occurred until the Unreturned Contribution Account on that Investment has been paid in full (such amounts shall be deemed distributed to Debt Buyer for such performing Joint Investments). The determination of which performing Joint Investments will be used to make up any Investment Proceeds Shortfall shall be made by the Company in its sole and absolute discretion.

4.4.    Tax Classification. The Company and Debt Buyer acknowledge their intention to treat for federal income tax purposes the arrangement between themselves as a joint venture (or joint ventures, as applicable) taxable as a partnership (partnerships), and for Debt Buyer to file all necessary federal income tax returns for such partnership(s) on an annual basis. The Company and Debt Buyer further acknowledge their intention to allocate all items of income, gain, loss, deduction and credits of such partnership(s) between themselves in a manner consistent with their economic arrangements (as reflected in Section 4.1), as mutually agreed upon by the Company and Debt Buyer. Debt Buyer is hereby designated as the "tax matters partner" for the partnership referenced by this Section 4.4.

4.5.    Right of Inspection. Upon request and after reasonable prior written notice from the Company, Debt Buyer and Debt Buyer Parent will permit any Person designated by the Company, at the Company's expense, to visit and inspect any of the properties, books and financial reports of Debt Buyer and Debt Buyer Parent and to discuss its affairs, finances and accounts all at such reasonable times during ordinary business hours of Debt Buyer and Debt Buyer Parent and as often as the Company may reasonably request for the purpose of determining compliance with this Agreement, or the status of the Investment; provided, however that the Company will use reasonable efforts to conduct (or have conducted) any such examination or inspection so as to minimize disruptions to the operations of Debt Buyer and Debt Buyer Parent.

## SECTION 5
## REPRESENTATIONS AND WARRANTIES; COVENANTS

5.1.    Representations and Warranties of Debt Buyer. Debt Buyer hereby represents and warrants to the Company as follows:

(a)    Debt Buyer is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and is duly qualified, fully licensed and authorized as a passive debt buyer, and as otherwise required to hold title to the Investment and to carry out all of its other obligations hereunder, in the states and jurisdictions that require it. Debt Buyer will ensure that its Service Providers are duly qualified and licensed to conduct collection activities with respect to the Investment and are in good standing in each jurisdiction in which such qualification or licensing is necessary as a condition to conducting collection activities with respect

to the Investment and where failure to obtain such licensing or qualification would have a material adverse effect on Debt Buyer. Debt Buyer has all requisite power and authority to own and operate its properties, carry out its business as presently conducted and as proposed to be conducted and to enter into and discharge its obligations under this Agreement, the Purchase Agreement, and the JV Documents to which it is a party;

DocuSign Envelope ID: 592557E7-948B-4914-B310-40F58CAC6CEC

*FLOCK FINANCIAL, LLC*                                             *JOINT INVESTMENT AGREEMENT*

(b)        the execution and delivery by Debt Buyer of this Agreement, the Purchase Agreement, and the JV Documents to which it is a party and performance and compliance by Debt Buyer with such agreements have been duly authorized by all necessary action on the part of Debt Buyer and will not violate Debt Buyer's organizational documents or constitute a default under any indenture or loan or credit agreement or any other material agreement, lease or instrument to which Debt Buyer is a party or by which it or its properties may be bound or affected;

(c)        this Agreement, the Purchase Agreement, and the JV Documents to which it is a party constitute the valid, legal and binding obligations of Debt Buyer, enforceable against it in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (whether considered in a proceeding or action in equity or at law);

(d)        as of the date hereof, no litigation is pending or, to Debt Buyer's knowledge, threatened against Debt Buyer, the consequences of which would prohibit its entering into this Agreement, the JV Documents or the Purchase Agreement or that would materially and adversely affect the condition (financial or otherwise) or operations of Debt Buyer or its properties or the consequences of which would materially and adversely affect its performance hereunder or under the Purchase Agreement or the JV Documents to which it is a party;

(e)        all actions, approvals, consents, waivers, exemptions, variances, franchises, orders, permits, authorizations, rights and licenses required to be taken, given or obtained, as the case may be, by or from any federal, state or other governmental authority or agency, that are necessary or advisable in connection with the execution and delivery by Debt Buyer of this Agreement, the Purchase Agreement, and the JV Documents to which it is a party have been duly taken, given or obtained, as the case may be, are in full force and effect on the date hereof, are not subject to any pending proceedings or appeals (administrative, judicial or otherwise) and either the time within which any appeal therefrom may be taken or review thereof may be obtained has expired or no review thereof may be obtained or appeal therefrom taken, and are adequate to authorize this Agreement, the Purchase Agreement, and the JV Documents and the performance by Debt Buyer in all material respects of its obligations under this Agreement, the Purchase Agreement, and the JV Documents to which it is a party;

(f)        Debt Buyer has paid or caused to be paid to the proper authorities when due all federal, state and local taxes required to be withheld by it, other than any taxes the payment of which is being contested in good faith and by proper proceedings and for which adequate reserves have been set aside on Debt Buyer's books. Debt Buyer has filed all federal, and all state and local tax returns that would require payment of any material tax that, to the knowledge of the officers of Debt Buyer, are required to be filed, and Debt Buyer has paid or caused to be paid to the respective taxing authorities all taxes as shown on said returns or on any assessment received by it to the extent such taxes have become due except to the extent the Debt Buyer is contesting the same in good faith and through appropriate and timely proceedings and has set aside adequate reserves for the payment thereof;

(g)        other than as contemplated by this Agreement, the Purchase Agreement or the JV Documents, Debt Buyer has no ownership interest in the Investment and Debt Buyer has not granted, or attempted to grant, to any other Person any security interest in the Investment, and no financing statement naming Debt Buyer or Debt Buyer Parent as debtor and covering the Investment is on file in any office;

DocuSign Envelope ID: 592557E7-948B-4914-B310-40F58CAC6CEC

FLOCK FINANCIAL, LLC                                                    JOINT INVESTMENT AGREEMENT

(h)     Debt Buyer has delivered to the Company a copy of the executed Purchase Agreement together with all applicable amendments or modifications thereto;

(i)     Debt Buyer has delivered to the Company a certificate of its secretary certifying (a) Debt Buyer's valid corporate existence, (b) the status of Debt Buyer as a Single Purpose Entity, including specific affirmations that it will remain as such, (c) the current Debt Buyer Operating Agreement, (d) its current Certificate of Formation or Articles of Organization, as the case may be, (e) the resolutions of the board of managers or other governing authority and of the members or other equity holders of Debt Buyer approving the transactions contemplated hereby, (f) the solvency of Debt Buyer, (g) the absence of pending litigation against the company, and (h) the incumbency of officers executing documents on behalf of Debt Buyer;

(j)     Debt Buyer and Debt Buyer Parent have entered into that certain Limited Liability Company Operating Agreement of Debt Buyer dated as of **TBD** attached hereto as <u>Exhibit E</u> (the "***Debt Buyer Operating Agreement***") and such Debt Buyer Operating Agreement has not been amended or modified since its enactment; and

(k)     Debt Buyer is and has at all times since its formation been a Single Purpose Entity.

5.2.    <u>Covenants of Debt Buyer</u>. Debt Buyer will comply with the following covenants and will cause the following covenants to be complied with, unless the Company shall otherwise consent in writing:

(a)     Debt Buyer will preserve and maintain its legal existence and all of its rights, privileges and franchises necessary or desirable in the normal conduct of its business and shall conduct its business in an orderly, efficient and regular manner;

(b)     Debt Buyer shall obtain prior to the date required, and preserve and maintain, all licenses and authorizations necessary to purchase, manage and administer consumer debt and other obligations from time to time constituting the Investment and all of its other obligations hereunder in each state in which such licensing is required;

(c)     Debt Buyer will conduct all collection activities and all sales, transfers and dispositions relating to the Investment on an arms-length basis;

(d)     Debt Buyer will not create, or attempt to create, any pledge, lien, security interest, assignment or transfer upon or in any portion of the Investment, or assign or otherwise convey, or attempt to assign or otherwise convey, any right to receive collections or other income with respect thereto;

(e)     neither Debt Buyer nor Debt Buyer Parent will (i) sell, lease, assign, transfer or otherwise dispose of all or a substantial part of its assets (whether in one transaction or in a series of transactions) to any other Person, or (ii) liquidate, dissolve or suspend its business operations;

(f)     neither Debt Buyer nor Debt Buyer Parent will consolidate with or merge into

any Person, or permit any other Person to merge into it, or acquire (in a transaction analogous in purpose or effect to a consolidation or merger) all or substantially all the assets of any other Person, unless, with respect to Debt Buyer, such transaction is permitted or otherwise approved by the Special Manager of Debt Buyer under the Debt Buyer Operating Agreement and, with respect to

*FLOCK FINANCIAL, LLC*                                        *JOINT INVESTMENT AGREEMENT*

Debt Buyer Parent, (i) Debt Buyer Parent is the resulting and surviving entity and (ii) following such transaction, the equity holders of Debt Buyer Parent immediately prior to such transaction own more than fifty percent (50%) of the voting power of the equity holders of the surviving entity;

(g)    Debt Buyer will not accept or receive or agree to accept or receive any rebate, refund, commission, fee (other than as a Service Provider), kickback or rake-off, including any payments under a so-called "Balance Transfer" program, whether cash or otherwise and whether paid by or originating with an obligor associated with the Investment or any other party (including but not limited to brokers and agents), as a result of or in any way in connection with collection activities related to the Investment or in connection with the sale, disposition, transfer or servicing of the Investment;

(h)    Debt Buyer shall, and shall cause its Service Providers to, undertake all reasonable efforts to collect or otherwise realize upon the Investment in accordance with the collections plan attached hereto as Exhibit C, which has been previously provided to the Company;

(i)    Debt Buyer shall preserve and keep in full force and effect its existence as, and at all times operate as, a Single Purpose Entity, and shall not amend, alter or modify its Debt Buyer Operating Agreement or change, transfer or assign any of its ownership or management interests during the term of this Agreement. A violation of this provision shall be deemed a material default; provided, however, that if the Special Manager of Debt Buyer fails to approve a change to the Debt Buyer Operating Agreement that is proposed by Debt Buyer in response to a notice delivered by the Company pursuant to Section 4.2, and such change to the Debt Buyer Operating Agreement would otherwise cure the Joint Investment Agreement Default set forth in such notice, then, provided that the Company's consent to such amendment is required in its capacity as Special Manager, the facts, circumstances and events set forth in such notice shall not constitute a Joint Investment Agreement Default;

(j)    Debt Buyer will not terminate, amend or modify the Purchase Agreement without the prior written consent of the Company; and

(k)    Debt Buyer will not, and will ensure that the Service Providers will not, refer to or use the name "Flock Financial," "Flock Middle Market Fund," or any derivative thereof or other name confusingly similar thereto in connection with any collection or enforcement activities with respect to the Investment, in any advertising, printed material, electronic medium or other medium or in any other manner whatsoever.

5.3.    Representations and Warranties of the Company. The Company hereby represents and warrants to Debt Buyer as follows:

(a)    the Company is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. The Company has all requisite power and authority to enter into and discharge its obligations under this Agreement; the execution and delivery by the Company of this Agreement and performance and compliance by the Company with the terms of this Agreement have been duly authorized by all necessary action on the part of the Company and will not violate the Company's organizational documents or constitute a default under any

indenture or loan or credit agreement or any other material agreement, lease or instrument to which the Company is a party or by which it or its properties may be bound or affected;

DocuSign Envelope ID: 592557E7-948B-4914-B310-40F58CAC6CEC

FLOCK FINANCIAL, LLC                                                JOINT INVESTMENT AGREEMENT

(b)    this Agreement constitutes the valid, legal and binding obligations of the Company, enforceable against the Company in accordance with the Agreement's terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (whether considered in a proceeding or action in equity or at law); and

(c)    as of the date hereof, no litigation is pending or, to the Company's knowledge, threatened against the Company, the consequences of which would prohibit its entering into this Agreement or that would materially and adversely affect the condition (financial or otherwise) or operations of the Company or the consequences of which would materially and adversely affect its performance hereunder.

(d)    <u>Accredited Investors; Investment for Own Account</u>.  The Company represents and warrants that it is an "accredited investor" as defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933. The Company represents that it is making the Investment with Company Funds solely for its own account and beneficial interest for investment and not with a view to or for sale in connection with any distribution of securities, has no present intention of selling, granting any participation in the same, and does not presently have reason to anticipate a change in such intention.

(e)    <u>Information and Sophistication</u>. The Company acknowledges that it has received all the information it has requested from Debt Buyer that it considers necessary or appropriate for deciding whether to invest the Company Funds. The Company represents that it has had an opportunity to ask questions and receive answers from Debt Buyer and its officers regarding the terms and conditions of the Investment and to obtain any additional information necessary to verify the accuracy of the information given the Company. The Company further represents that it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risk of the Investment.

(f)    <u>Ability to Bear Economic Risk and Knowledge of Certain Risk Factors</u>. The Company acknowledges that investment in the Investment involves a high degree of risk, and represents that it is able, without materially impairing its financial condition, await payment of Investment Proceeds for an indefinite period of time and to suffer a complete loss of its investment. The Company has evaluated the risks involved in investing in the Investment, and has determined that the Investment is a suitable investment for the Company.

## SECTION 6
## GOVERNING LAW; JURISDICTION

6.1.    <u>Governing Law</u>. The laws of the State of New York shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Parties without regard to conflicts of law principals.

6.2.    <u>Jurisdiction; Waiver of Jury Trial</u>.

(a)    Each party hereby irrevocably (i) submits to the exclusive jurisdiction of any state or federal court in the State of Georgia, in any action or proceeding arising out of or relating to this Agreement, the relations between the parties and any matter, action or transaction described in this Agreement, whether in contract, tort or otherwise, (ii) agrees that such courts

shall have exclusive jurisdiction over such actions or proceedings, (iii) waives the defense that Georgia is an inconvenient forum to the maintenance and continuation of such action or proceeding, (iv) consents to the service of any and all process in any such action or proceeding by

FLOCK FINANCIAL, LLC                                    JOINT INVESTMENT AGREEMENT

the mailing of copies (certified mail, return receipt requested and postage prepaid) of such process to them at their addresses specified in Section 7.1 and (v) agrees that a final and non-appealable judgment rendered by a court of competent jurisdiction in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. In the event that an action or proceeding is initiated in one of the courts referenced above and is pending, the parties agree, for the convenience of the parties and subject to any limitations on subject matter jurisdiction of the court, to initiate any counterclaims or related actions in the same proceeding (as opposed to a separate proceeding in any of the other courts specified above).

(b)    EACH PARTY HERETO, FOR ITSELF AND ON BEHALF OF ITS AFFILIATES, HEREBY WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY ACTION, LAWSUIT OR PROCEEDING RELATING TO ANY DISPUTE ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DESCRIBED IN THIS AGREEMENT, WHETHER IN CONTRACT OR IN TORT, OR DISPUTE BETWEEN THE PARTIES (INCLUDING DISPUTES WHICH ALSO INVOLVE OTHER PERSONS).

## SECTION 7
## MISCELLANEOUS

7.1.    <u>Notices</u>. Any notice, payment, demand, or communication required or permitted to be given pursuant to any provision of this Agreement shall be in writing and shall be (i) delivered personally, (ii) sent by postage prepaid, registered mail (airmail internationally) or (iii) delivered by nationally recognized overnight courier, addressed as follows, or to such other address as such Person may from time to time specify by notice to the other

Party: (a)    If to the Company, to the Company at:

400 Galleria Parkway, Suite 1720
Atlanta, Georgia 30339
Attn:  Michael Flock

(b)    If to Debt Buyer, to Debt Buyer at:

1825 Barrett Lakes Blvd,
Kennesaw, GA 30144
Attn: Bill Wilson

(c)    Any such notice, payment, demand, or communication shall be deemed to be delivered, given, and received for all purposes hereof (i) on the date of receipt if delivered personally or by courier or (ii) five (5) days after posting if transmitted by mail.

7.2.    <u>Indemnity by Debt Buyer and by the Company</u>.  Debt Buyer agrees to indemnify, defend and hold harmless the Company and its Affiliates from and against any and all claims, losses, liabilities, damages, penalties, fines, forfeitures, and judgments, and all reasonable legal and accounting fees and other fees, expenses and costs of any kind resulting from or arising out of

(i) any failure of Debt Buyer to comply with and perform all of its duties and agreements hereunder, (ii) any breach by Debt Buyer of any term, condition, representation or covenant of Debt Buyer set forth in this Agreement, (iii) and any and all claims, actions or proceedings brought

*FLOCK FINANCIAL, LLC*                                    *JOINT INVESTMENT AGREEMENT*

against the Company or any Affiliate thereof by any third party as a result of or based upon actions or inactions by Debt Buyer in the performance of its obligations under this Agreement, including any failure by Debt Buyer, any Service Provider or any of their agents, representatives or employees to comply with all applicable debt collection laws, rules and regulations and any other action taken in collection of the Investment, and (iv) fraud and willful misconduct. By its execution below, Debt Buyer Parent hereby agrees to guaranty to the Company the payment and performance of Debt Buyer's obligations under Section 7.2(iv); <u>provided</u>, <u>however</u>, that in no event shall the indemnification obligations of Debt Buyer Parent hereunder extend to a default upon Debt Buyer's obligation to repay any investment of Company Funds to the extent such default arises from insufficient Investment Proceeds.

The Company agrees to indemnify, defend and hold harmless Debt Buyer and its Affiliates, its officers, directors, employees, agents, attorneys, representatives and successors and assigns from and against any and all claims made or threatened by any third party and any related losses, expenses, damages, costs or liabilities, including any reasonable attorneys' fees and expenses incurred in investigation and defense resulting from or arising out of (i) any failure of the Company to comply with and perform all of its duties and agreements hereunder, (ii) any breach by Company of any term, condition, representation or covenant of Company set forth in this Agreement, (iii) and any and all claims, actions or proceedings brought against Debt Buyer or any Affiliate thereof by any third party as a result of or based upon actions or inactions by the Company in the performance of its obligations under this Agreement or any other Agreement with any other party they may have in relation to the Investment, including any failure by the Company, or any of its agents, representatives or employees to comply with all applicable laws, rules and regulations and any other action taken with regard to the Investment, and (iv) fraud and willful misconduct.

7.3. <u>Deliveries of the Parties</u>. Upon the execution and delivery of this Agreement, Debt Buyer shall deliver to the Company a duly executed copy of the Security Agreement in substantially the formed attached hereto as <u>Exhibit D</u> (the "***Security Agreement***") granting the Company a security interest in the Investment to secure the payment of Investment Proceeds under this Agreement as well as the other payments to be made to the Company pursuant to this Agreement. This Agreement, together with the Security Agreement, and all other documents required to be delivered hereunder, shall be delivered to the offices of the Company at the address set forth in Section 7.1(a).

7.4. <u>Binding Effect</u>. Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

7.5. <u>Construction</u>. Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Party. The word "including" shall mean "including, without limitation."

7.6. <u>Confidentiality</u>. The Parties and their Affiliates will keep confidential all financial terms regarding the transactions contemplated hereby, as well as all financial or business information, or other confidential or proprietary information of or relating to the one another, which has been or is disclosed to the other Party in connection with the negotiation and execution of this Agreement or the transactions contemplated hereby (the "***Confidential Financial Information***"). Neither Party will not disclose any Confidential Financial Information to any Person without the prior written consent of the other Party, other than to the directors, employees, auditors, counsel, or Affiliates of such Party, each of whom shall be informed of the confidential nature of the Confidential Financial Information; <u>provided</u>, <u>however</u>, that each Party may disclose

*FLOCK FINANCIAL, LLC*                                            *JOINT INVESTMENT AGREEMENT*

any such Confidential Financial Information (a) as may be required by any municipal, state, federal or other regulatory body having or claiming to have jurisdiction over such Party, (b) in order to comply with any law, order, regulation, regulatory request or ruling applicable to such Party, or (c) in the event either Party is legally compelled (by interrogatories, requests for information or copies, subpoena, civil investigative demand or similar process) to disclose any such Confidential Financial Information. This Section 7.6 shall be inoperative as to those portions of the Confidential Financial Information which are or become generally available to the public or to Debt Buyer on a non-confidential basis from a source other than the Company or any Person that has a confidentiality obligation with respect thereto to the Company. The obligations of the both Parties under this Section 7.6 shall survive the execution of this Agreement and the acquisition of the Investment.

      7.7.   <u>Time</u>. Time is of the essence with respect to this Agreement.

      7.8.   <u>Heading</u>. Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

      7.9.   <u>Severability</u>. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

      7.10.   <u>Further Action</u>. Each Party agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

      7.11.   <u>Counterpart Execution</u>. This Agreement may be executed in any number of counterparts with the same effect as if all of the Parties had signed the same document. All counterparts shall be construed together and shall constitute one agreement. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

      7.12.   <u>Amendments</u>. This Agreement may be amended, modified or supplemented only in a written amendment executed by each of the Parties hereto.

      7.13.   <u>Survival</u>. The respective obligations of the Parties and set forth in this Agreement shall survive the execution and delivery of this Agreement and the consummation of the acquisition of the Investment pursuant to the Purchase Agreement.

***[SIGNATURES BEGIN ON FOLLOWING PAGE]***

DocuSign Envelope ID: 592557E7-948B-4914-B310-40F59CAC6CEC

*FLOCK FINANCIAL, LLC*                                        *JOINT INVESTMENT AGREEMENT*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed as of the date first written above.

**THE COMPANY**:

**FLOCK FINANCIAL, LLC**

By: _____
     Name: Michael R. Flock
     Title: CEO / Managing Member

**DEBT BUYER**:

**TBD**

By: *Bill Wilson*
     Name: Bill Wilson
     Title:   CEO

**DEBT BUYER PARENT**:

ACKNOWLEDGED AND AGREED SOLELY TO EVIDENCE ITS RIGHTS AND OBLIGATIONS SET FORTH IN SECTIONS 4.5, 5.2 AND 7.3:

**ARC MANAGEMENT GROUP, LLC**

By: *Bill Wilson*
     Name:  Bill Wilson
     Title:   CEO

DocuSign Envelope ID: 592557E7-948B-4914-B31D-40F59CAC6CEC

*FLOCK FINANCIAL, LLC*                                        *JOINT INVESTMENT AGREEMENT*

## <u>EXHIBIT A</u>

### Description of the Investment

ARC Management Group is purchasing "Balance After Insurance" and "Self-pay Patient Accounts". The accounts are 120 days past due and are being purchased from Schumacher Clinical Partners (SCP). These are unpaid Emergency Room bills for hospitals and physicians that SCP provides billing services.

DocuSign Envelope ID: 592557E7-948B-4914-B310-40F59CAC6CEC

*FLOCK FINANCIAL, LLC*                                              *JOINT INVESTMENT AGREEMENT*

## <u>EXHIBIT B</u>

### Limitations on Investment Expenses

Investment Expenses in the aggregate shall be limited on a periodic basis (measured in months from the date of this Agreement) to a specified percentage of the Investment Revenue attributable to the Investment collected during the applicable period.  The percentages attributable to each such period are as follows:

| **MONTHLY PERIOD** | **PERCENTAGE OF INVESTMENT REVENUE** |
|---|---|
| Months 0 - 6 | 27.5% |
| Months 7 - 12 | 30.0% |
| Months 13 – 18 | 35.0% |
| Months 19 – 24 | 35.0% |
| Months 25 – 36 | 40.0% |
| Months 37 – 48 | 40.0% |
| Months 49+ | 45.0% |

*FLOCK FINANCIAL, LLC*                                          *JOINT INVESTMENT AGREEMENT*

## <u>EXHIBIT C</u>

### Collection Plan

ARC will collect 75% of the accounts internally using commercial collection techniques-letters, text, emails and calls. Higher balance accounts will be forwarded to ARC's legal network for suit. 25% of the accounts will be outsourced to other agencies for benchmarking and capacity purposes.

DocuSign Envelope ID: 592557E7-948B-4914-B310-40F58CAC9CEC

*FLOCK FINANCIAL, LLC*                                          *JOINT INVESTMENT AGREEMENT*

## EXHIBIT D

### Form of Security Agreement
### SECURITY AGREEMENT

      **THIS SECURITY AGREEMENT** is executed as of this **DAY** of **MONTH**, **2021** by and between **ARC MANAGEMENT GROUP, LLC**, a Georgia limited liability company (hereinafter "***Debtor***") on the one hand, and **FLOCK FINANCIAL, LLC,** a Delaware limited liability company, on the other hand (together hereinafter "***Secured Party***").

      **WHEREAS**, Debtor and Secured Party have entered into a Joint Investment Agreement, dated as of the date hereof (the "***Joint Investment Agreement***"; capitalized terms used herein and not defined shall have the meanings assigned to them in the Joint Investment Agreement);

      **WHEREAS**, pursuant to the terms of the Joint Investment Agreement, Secured Party has agreed to invest Company Funds with Debtor for the purpose of jointly investing in the Investment;

      **WHEREAS**, Debtor is a single purpose entity whose sole member is Debt Buyer Parent, and has agreed to certain obligations under the Joint Investment Agreement; and

      **WHEREAS**, Secured Party has required, as a condition precedent to the obligations of Secured Party under the Joint Investment Agreement, that Debtor (among other things) execute this Agreement to secure the payment and performance of all obligations of Debtor under the Joint Investment Agreement.

      **NOW THEREFORE**, in consideration of the foregoing recitals, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Debtor and Secured Party hereby agree as follows:

      1.    <u>Secured Obligations.</u>  This Agreement is entered into as security for (a) all obligations of Debtor under the Joint Investment Agreement (whether monetary or otherwise and whether for Investment Proceeds, expenses, indemnity or reimbursement payments or otherwise), (b) any and all other liabilities and obligations owed by Debtor to Secured Party from time to time, howsoever created, arising or evidenced, whether direct or indirect, joint or several, absolute or contingent, now or hereafter existing, or due or to become due, (c) all renewals, extensions, refinancing and modifications of any of the foregoing, and (d) all reasonable costs and expenses incurred by Secured Party in connection with the exercise of its rights and remedies hereunder and under the Joint Investment Agreement (including reasonable attorneys' fees) (collectively, "***Secured Obligations***").

      2.    <u>Granting Clause.</u>  In order to secure the full and punctual payment and performance of the Secured Obligations in accordance with the terms thereof, Debtor does hereby grant, pledge, transfer, sell, assign, convey and deliver to Secured Party a security interest in and to all of Debtor's right, title and interest in and to all of Debtor's personal property and assets, including: (a) all of its receivable portfolios and underlying consumer accounts and receivables attributable to and associated with the Investment that have been or will be acquired by Debtor pursuant to the Joint Investment Agreement and the Purchase Agreement (as the case may be), as well as any

*FLOCK FINANCIAL, LLC*                                    *JOINT INVESTMENT AGREEMENT*

Investment Proceeds from the Investment, including, without limitation, all existing, future, and after-acquired accounts, general intangibles, instruments, investment property, chattel paper, letters of credit, letter of credit rights, contract rights, the Control Account, the Trust Account, and the rights to service, manage and cause the collection upon such Investment, together with all ancillary rights, remedies, powers and privileges in connection therewith, and all documents evidencing the foregoing and all cash and non-cash proceeds of the foregoing, including any insurance proceeds, and (b) to the extent not included in the foregoing subsection (a), all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money, and all proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Debtor from time to time with respect to any of the foregoing ((a) and (b), collectively, the "***Collateral***")). The security interests are granted as security only and shall not subject Secured Party to, or transfer to Secured Party, or in any way affect or modify, any obligation or liability of Debtor with respect to any Collateral or any transaction in connection therewith.

        3.     <u>Perfection of Security Interests.</u>  Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to file in any relevant jurisdiction relating to the Collateral any financing statements and amendments thereto that contain the information required by Article 9 of the UCC, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by Debtor hereunder, without the signature of Debtor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by Debtor, or words of similar effect. Debtor agrees to provide all information required by Secured Party pursuant to this Section promptly to Secured Party upon request. Further, promptly upon the request of Secured Party, Debtor agrees to cause the depositary bank or banks holding the Control Account and/or Trust Account to execute and deliver a Deposit Account Control Agreement, in form and substance satisfactory to Secured Party, to perfect Secured Party's security interest in such deposit accounts under the UCC.

        4.     <u>Warranties of Title, etc.</u>  Debtor hereby: (a) covenants with Secured Party, its successors and assigns that Debtor is the lawful owner of the Collateral and has the right to sell, assign, convey and grant a security interest in same and that the Collateral is free and clear of all encumbrances and security interests; (b) warrants and covenants to forever defend the title of the Collateral unto Secured Party, its successors and assigns against the claims of all persons whosoever, whether lawful or unlawful; (c) warrants that no financing statement covering any of the Collateral or any of the proceeds therefrom is on file at any public office and that when the UCC financing statements in appropriate form are filed in the appropriate filing office, the security interests of Secured Party shall constitute valid and perfected security interests in the Collateral, prior to all other liens and rights of others therein, to the extent that a security interest therein may be perfected by filing pursuant to the UCC, assuming the proper filing and indexing thereof; and (d) agrees, promptly upon request from Secured Party, at the expense of Debtor, to execute and

DocuSign Envelope ID: 592557E7-948B-4914-B310-40F58CAC6CEC

*FLOCK FINANCIAL, LLC*                                              *JOINT INVESTMENT AGREEMENT*

deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable in order to perfect and protect any security interest granted hereby or to Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.

  5. <u>Taxes and Charges.</u> Debtor agrees to pay all taxes, and charges levied against the Collateral and all other claims that are or may become liens against the Collateral, or any part thereof, and should default be made in the payment of the same.

  6. <u>Non-Waiver.</u> It is agreed that no delay in exercising any right or option given or granted hereby to Secured Party shall be construed as a waiver thereof, nor shall a single or partial exercise of any other right, power or privilege.  Secured Party may permit Debtor to remedy any default, and Secured Party may waive any default without waiving any other subsequent or prior default to Debtor.

  7. <u>Events of Default.</u> As used in this Agreement, the terms "***default***" or "***Security Agreement Default***" shall mean (a) the occurrence of a Joint Investment Agreement Default under the Joint Investment Agreement, (b) any representation or warranty made by or on behalf of Debtor under or pursuant to this Agreement shall have been false or misleading in any material respect when made, or (c) Debtor shall fail to observe or perform any covenant or agreement set forth in this Agreement and such default shall remain uncured for fourteen (14) days or more following notice thereof.

  8. <u>Acceleration of Liabilities.</u> Secured Party shall have the rights set forth in the Joint Investment Agreement with respect to the acceleration of amounts payable to Secured Party thereunder.

  9. <u>Secured Party's Right After Default.</u> Upon the occurrence of a Security Agreement Default, Secured Party shall have, in addition to any other rights available to it under this Agreement, the Joint Investment Agreement and applicable law, the right without further notice to Debtor to take any or all of the following actions at the same or at different times:  (a) to collect all Collateral in Debtor's name and take control of any cash or non-cash proceeds of the Collateral; (b) to enforce payment of any Collateral to prosecute any action or proceeding with respect to the Collateral, to extend the time of payment of any and all Collateral, to make allowance and adjustments with respect thereto and to issue credits in the name of Debtor; and (c) to exercise other rights and remedies under this Agreement and the Joint Investment Agreement or that are available to a secured creditor under the New York Uniform Commercial Code or that are otherwise available at law or in equity, at any time, in any order and in any combination.  The net cash proceeds resulting from the exercise of any of the foregoing rights, after deducting all charges, expenses, cost and attorneys' fees relating thereto, including any and all costs and expenses incurred in securing the possession of the Collateral and preparing the same for sale, shall be applied by Secured Party to the payment of the Investment, whether due or to become due, and Debtor shall remain liable to Secured Party for any deficiency.

  10. <u>General Authority.</u> Debtor hereby irrevocably appoints Secured Party its true and lawful attorney, with full power of substitution, in the name of Debtor, Secured Party or otherwise,

---

DocuSign Envelope ID: 592557E7-048B-4914-B310-40F58CA96CEC

*FLOCK FINANCIAL, LLC*                                            *JOINT INVESTMENT AGREEMENT*

for the sole use and benefit of Secured Party, but at Debtor's expense, to exercise, at any time (subject to the provision below) all or any of the following powers:

a.    to file financing statements, financing statement amendments and continuation statements in connection with this Agreement,

b.    to demand, sue for, collect, receive and give acquittance for any and all monies due or to become due with respect to any Collateral or by virtue thereof,

c.    to settle, compromise, compound, prosecute or defend any action or proceeding with respect to any Collateral,

d.    to sell, transfer, assign or otherwise deal in or with the Collateral or the proceeds or avails thereof, as fully and effectually as if Secured Party were the absolute owner thereof, and

e.    to extend the time of payment of any or all thereof and to make any allowance and other adjustments with reference to the Collateral;

provided, however, that the powers described in clauses (b) through (e) above may be exercised by Secured Party only if a Security Agreement Default then exists.

11.    <u>Successor and Assigns.</u> All covenants and agreements herein made by Debtor shall bind it and its permitted successors and assigns, and every option, right and privilege herein reserved or granted to Secured Party shall inure to the benefit of and may be exercised by Secured Party's successors or assigns.

12.    <u>Modification, etc.</u> No modification, amendment or waiver of any provision of this Agreement, any note secured hereby, nor consent to any departure by Debtor there from shall in any event be effective unless the same shall be in writing and signed by Secured Party and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on Debtor shall entitle it to any other or further notice or demand in the name, similar or other circumstances.

13.    <u>Notices.</u> Any notice, payment, demand, or communication required or permitted to be given pursuant to any provision of this Agreement shall be in writing and shall be (a) delivered personally, (b) sent by postage prepaid, registered mail (airmail internationally) or (c) delivered by nationally recognized overnight courier, addressed as follows, or to such other address as such person may from time to time specify by notice to the other party:

i.    If to Secured Party, to Secured Party at:

       100 Galleria Parkway, Suite 990
       Atlanta, Georgia 30339
       Attn: Michael Flock

ii.    If to Debtor, to Debtor at:

       1825 Barrett Lakes Blvd
       Kennesaw, GA 30144
       Attn: Bill Wilson

*FLOCK FINANCIAL, LLC*                                                    *JOINT INVESTMENT AGREEMENT*

    iii.      Any such notice, payment, demand, or communication shall be deemed to be delivered, given, and received for all purposes hereof (A) on the date of receipt if delivered personally or by courier or (B) five (5) days after posting if transmitted by mail.

14.    <u>Governing Law</u>.  This Agreement shall be construed in accordance with and governed by the laws of the State of New York.

15.    <u>Counterpart Execution</u>.  This Agreement may be executed in any number of counterparts with the same effect as if all of the parties had signed the same document.  All counterparts shall be construed together and shall constitute one agreement. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and shall be valid and effective for all purposes.

**[SIGNATURES BEGIN ON FOLLOWING PAGE]**

*FLOCK FINANCIAL, LLC*                                          *JOINT INVESTMENT AGREEMENT*

IN WITNESS WHEREOF, each of the undersigned has executed this Security Agreement on the day and year first above written.

**<u>SECURED PARTY</u>:**

**FLOCK FINANCIAL, LLC**

By:

    Name:  Michael R. Flock _____

    Title:    Managing Member

**<u>DEBTOR</u>:**

**ARC MANAGEMENT GROUP, LLC**

By:

    Name: _____

    Title:

*FLOCK FINANCIAL, LLC*                                    *JOINT INVESTMENT AGREEMENT*

## <u>EXHIBIT E</u>

### Debt Buyer Operating Agreement

DocuSign Envelope ID: 592557E7-948B-4914-B31D-40F59CAC6CEC

*FLOCK FINANCIAL, LLC*                                      *ORIGINATION FEE AGREEMENT*

## ORIGINATION FEE AGREEMENT

This Origination Fee Agreement ("Agreement") between Flock Financial, LLC, a limited liability company organized and existing under the laws of the State of Delaware ("Flock"); and the person or entity ("Debt Buyer Parent") signing the Counterpart Signature Page attached to this Agreement (the "Counterpart Signature Page") takes effect on the effective date set forth on the Counterpart Signature Page (the "Effective Date").

### BACKGROUND:

A.       Debt Buyer Parent is engaged in the business of purchasing portfolios of charged-off consumer debt.

B.       Flock has raised capital for investment in portfolios of charged-off consumer debt receivables through joint investment arrangements with single purpose subsidiaries of reputable buyers of charged-off consumer debt.

C.       Debt Buyer Parent has established a limited liability company ("SPV") that will purchase portfolios of charged-off consumer debt receivables through partial funding by Flock.

D.       Simultaneously with the execution of this Agreement, SPV and Flock have entered into a Joint Investment Agreement (the "Joint Investment Agreement") whereby Flock has agreed to invest an amount specified in the Joint Investment Agreement (the "Investment") in SPV to enable it to purchase the portfolios of charged-off consumer debt receivables identified in the Joint Investment Agreement (the "Portfolios"), which Investment return, terms and conditions are in accordance with the terms of the Joint Investment Agreement and is secured pursuant to a Security Agreement between SPV and Flock whereby SPV grants Flock a security interest in the Portfolios.

E.       Flock and Debt Buyer Parent (the "Parties") wish to set forth the terms and conditions upon which Debt Buyer Parent will pay Flock an origination fee for the procurement of the Investment (the "Origination Fee").

### AGREEMENT:

The Parties therefore agree as follows:

**1.**      *Origination Fee.*

**1.1**      *Amount.* The Origination Fee is **$20,558.76** representing **1%** of the Investment.

**1.2**      *Due Date.* The Origination Fee is payable by Debt Buyer Parent two months after the Effective Date.

**1.3**      *Mandatory Prepayments.* Whenever SPV receives "Investment Proceeds" (as such term is defined in the Joint Investment Agreement), Debt Buyer Parent must prepay an amount equal to the Investment Proceeds SPV receives towards the balance of any unpaid Origination Fee. Any such mandatory prepayment is due within 10 days after SPV received the Investment Proceeds.

**1.4**      *Late Payment.* Any payment due under this Agreement that is not paid when due must bear interest from the due date at a monthly rate equal to the lower of 1.5% or the maximum rate allowed under the law.

**2.**      *Governing Law.* Regardless of the place of contract, place of performance, or otherwise, this Agreement and all amendments, modifications and supplements to it, and the rights of the Parties under it, must be construed under, and be governed by, the laws of the State of Georgia without giving effect to the principles of law (such as conflicts of law or choice of law rules) that might make the law of some other jurisdiction applicable.

**3.**      *Miscellaneous.*

**3.1**      *Notice Procedure.* No notice or other communication under this Agreement is sufficient to affect any rights, remedies or obligations of a Party unless the notice or communication is in writing and (as elected by the Party giving the notice) is (i) personally delivered, (ii) transmitted by facsimile or e-mail (with receipt acknowledgment), (iii) transmitted by a recognized courier service agreed to by the Parties from time to time or (iv) transmitted by postage prepaid certified or registered mail (with a return receipt requested - airmail if

DocuSign Envelope ID: 592557E7-948B-4914-B310-40F59CAC6CEC

*FLOCK FINANCIAL, LLC*                                      *ORIGINATION FEE AGREEMENT*

international), to the Party to which notice or communication is being given at the appropriate address as follows:

(a)   If to Flock:
As set forth below its signature at the last page of this Agreement

(b)   If to Debt Buyer Parent:
As set forth on the Counterpart Signature Page

Except as otherwise specified in this Agreement, all notices or communications are deemed to have been duly given (i) on the date of receipt if delivered personally, (ii) on the date of transmission if transmitted by facsimile or e-mail, (iii) the day after pick-up by courier if delivered by courier or (iv) 3 days after mailing if delivered by the postal service.  A Party may change its address by notice to the other Party.

**3.2**   ***Exhibit.***  The following exhibit is incorporated into this Agreement by this reference:

Exhibit 1:        Counterpart Signature Page

**3.3**   ***Nonwaiver of Default.***  If a Party fails to strictly enforce the performance of a provision of this Agreement, the failure does not constitute a waiver of that provision at any future time and it does not prevent that Party from insisting on the strict keeping and performance of that provision at a later time.

**3.4**   ***Amendment or Rescission.***  The Parties may not modify or rescind this Agreement except by a written instrument signed by both Parties.

**3.5**   ***Entirety of Agreement.***  This Agreement constitutes the final agreement between the Parties.  It is the complete and exclusive expression of the Parties' agreement on the matters contained in this Agreement.  All prior and contemporaneous negotiations and agreements between the Parties on the matters contained in this Agreement are expressly merged into and superseded by this Agreement.  The provisions of this Agreement may not be explained, supplemented, or qualified through evidence of trade usage or a prior course of dealings.  In entering into this Agreement, neither Party has relied upon any statement, representation, warranty, or agreement of the other Party except for those expressly contained in this Agreement.  There are no conditions precedent to the effectiveness of this Agreement other than those expressly stated in this Agreement.

**3.6**   ***Execution.***  The Parties may execute this Agreement in multiple counterparts, each of which constitutes an original, and all of which, collectively, constitute only one agreement.  The signatures of both Parties need not appear on the same counterpart, and delivery of an executed counterpart signature page by facsimile or electronic means (including .pdf) is as effective as executing and delivering this Agreement in the presence of the other Party.  This Agreement is effective upon delivery of one executed counterpart from each Party to the other Party.  In proving this Agreement, a Party must produce or account only for the executed counterpart of the other Party.

*FLOCK FINANCIAL, LLC*                                    *ORIGINATION FEE AGREEMENT*

Signed:

**FLOCK:**

**FLOCK FINANCIAL, LLC**

By: _____
Name: Michael R. Flock
Title: CEO

Flock Financial, LLC
400 Galleria Parkway, Suite 1720
Atlanta, Georgia 30339

Attn: Michael Flock

Tel:      (770) 644-0850
Fax:      (770) 644-0854
Email:    mflock@flockfinance.com

**THE SIGNATURE OF DEBT BUYER PARENT:**

Is on the Counterpart Signature Page

*FLOCK FINANCIAL, LLC*                                          *ORIGINATION FEE AGREEMENT*

*Exhibit 1*

**FLOCK FINANCIAL, LLC**
**ORIGINATION FEE AGREEMENT**

**COUNTERPART SIGNATURE PAGE**

By signing this Counterpart Signature Page, the undersigned identified below as Debt Buyer Parent agrees to be bound by the terms of the Origination Fee Agreement (the "Agreement") between Flock Financial, LLC and Debt Buyer Parent and authorizes the attachment of this signature page to a duplicate original of the Agreement.

Debt Buyer Parent acknowledges receipt of a copy of the Agreement.  Debt Buyer Parent acknowledges that Debt Buyer Parent has read the Agreement and understands that by signing this document, Debt Buyer Parent assumes all of the duties and obligations imposed upon Debt Buyer Parent under the Agreement.

Debt Buyer Parent has executed the Agreement as of the date written below.

**DEBT BUYER PARENT:**

**ARC MANAGEMENT GROUP, LLC**
*Please print or type legal name of Debt Buyer Parent*

X _____ *Bill Wilson* _____
   *Sign here*

Its: _____ CEO _____
*If the signatory is executing on behalf of an entity, please*
*Indicate the signatory's title or office with such entity*

Effective Date: ___ September 26, 2022 _____

*Print or type address and e-mail address preferred*
*for communications under the Agreement:*

1825 Barrett Lakes Blvd
Kennesaw, GA 30144

Attn:  Bill Wilson
Phone:
Fax:
Email:

*Page 4 of 4*                                                          *ARC-TSG03 LOF*

DocuSign Envelope ID: 59255E7E7-948B-4914-B310-40F58CAC9CEC

*FLOCK FINANCIAL, LLC*                                                                 *SECURITY AGREEMENT*

# SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** is executed as of this **26th** of **SEPTEMBER 2022** by and between **ARC MANAGEMENT GROUP, LLC**, a Georgia limited liability company (hereinafter "***Debtor***") on the one hand, and **FLOCK FINANCIAL, LLC**, a Delaware limited liability company, on the other hand (together hereinafter "***Secured Party***").

**WHEREAS**, Debtor and Secured Party have entered into a Joint Investment Agreement, dated as of the date hereof (the "***Joint Investment Agreement***"; capitalized terms used herein and not defined shall have the meanings assigned to them in the Joint Investment Agreement);

**WHEREAS**, pursuant to the terms of the Joint Investment Agreement, Secured Party has agreed to invest Company Funds with Debtor for the purpose of jointly investing in the Investment;

**WHEREAS**, Debtor is a single purpose entity whose sole member is Debt Buyer Parent, and has agreed to certain obligations under the Joint Investment Agreement; and

**WHEREAS**, Secured Party has required, as a condition precedent to the obligations of Secured Party under the Joint Investment Agreement, that Debtor (among other things) execute this Agreement to secure the payment and performance of all obligations of Debtor under the Joint Investment Agreement.

**NOW THEREFORE**, in consideration of the foregoing recitals, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Debtor and Secured Party hereby agree as follows:

1.      <u>Secured Obligations.</u>  This Agreement is entered into as security for (a) all obligations of Debtor under the Joint Investment Agreement (whether monetary or otherwise and whether for Investment Proceeds, expenses, indemnity or reimbursement payments or otherwise), (b) any and all other liabilities and obligations owed by Debtor to Secured Party from time to time, howsoever created, arising or evidenced, whether direct or indirect, joint or several, absolute or contingent, now or hereafter existing, or due or to become due, (c) all renewals, extensions, refinancing and modifications of any of the foregoing, and (d) all reasonable costs and expenses incurred by Secured Party in connection with the exercise of its rights and remedies hereunder and under the Joint Investment Agreement (including reasonable attorneys' fees) (collectively, "***Secured Obligations***").

2.      <u>Granting Clause.</u>  In order to secure the full and punctual payment and performance of the Secured Obligations in accordance with the terms thereof,  Debtor does hereby grant, pledge, transfer, sell, assign, convey and deliver to Secured Party a security interest in and to all of Debtor's right, title and interest in and to all of Debtor's personal property and assets, including: (a) all of its receivable portfolios and underlying consumer accounts and receivables attributable to and associated with the Investment that have been or will be acquired by Debtor pursuant to the Joint Investment Agreement and the Purchase Agreement (as the case may be), as well as any Investment Proceeds from the Investment, including, without limitation, all existing, future, and after-acquired accounts, general intangibles, instruments, investment property, chattel paper, letters of credit, letter of credit rights, contract rights, the Control Account, the Trust Account, and the rights to service, manage and cause the collection upon such Investment, together with all ancillary rights, remedies, powers and privileges in connection therewith, and all documents

DocuSign Envelope ID: E9255FE7-948B-4914-B310-40F58CAC6CEC

*FLOCK FINANCIAL, LLC*                                                    *SECURITY AGREEMENT*

evidencing the foregoing and all cash and non-cash proceeds of the foregoing, including any insurance proceeds, and (b) to the extent not included in the foregoing subsection (a), all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money, and all proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Debtor from time to time with respect to any of the foregoing ((a) and (b), collectively, the "***Collateral***")).  The security interests are granted as security only and shall not subject Secured Party to, or transfer to Secured Party, or in any way affect or modify, any obligation or liability of Debtor with respect to any Collateral or any transaction in connection therewith.

      3.   <u>Perfection of Security Interests</u>.  Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to file in any relevant jurisdiction relating to the Collateral any financing statements and amendments thereto that contain the information required by Article 9 of the UCC, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by Debtor hereunder, without the signature of Debtor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by Debtor, or words of similar effect. Debtor agrees to provide all information required by Secured Party pursuant to this Section promptly to Secured Party upon request.  Further, promptly upon the request of Secured Party, Debtor agrees to cause the depositary bank or banks holding the Control Account and/or Trust Account to execute and deliver a Deposit Account Control Agreement, in form and substance satisfactory to Secured Party, to perfect Secured Party's security interest in such deposit accounts under the UCC.

      4.   <u>Warranties of Title, etc.</u>  Debtor hereby: (a) covenants with Secured Party, its successors and assigns that Debtor is the lawful owner of the Collateral and has the right to sell, assign, convey and grant a security interest in same and that the Collateral is free and clear of all encumbrances and security interests; (b) warrants and covenants to forever defend the title of the Collateral unto Secured Party, its successors and assigns against the claims of all persons whosoever, whether lawful or unlawful; (c) warrants that no financing statement covering any of the Collateral or any of the proceeds therefrom is on file at any public office and that when the UCC financing statements in appropriate form are filed in the appropriate filing office, the security interests of Secured Party shall constitute valid and perfected security interests in the Collateral, prior to all other liens and rights of others therein, to the extent that a security interest therein may be perfected by filing pursuant to the UCC, assuming the proper filing and indexing thereof; and (d) agrees, promptly upon request from Secured Party, at the expense of Debtor, to execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable in order to perfect and protect any security interest granted hereby or to Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.

*FLOCK FINANCIAL, LLC*                                          *SECURITY AGREEMENT*

5.    <u>Taxes and Charges.</u>  Debtor agrees to pay all taxes, and charges levied against the Collateral and all other claims that are or may become liens against the Collateral, or any part thereof, and should default be made in the payment of the same.

6.    <u>Non-Waiver.</u>  It is agreed that no delay in exercising any right or option given or granted hereby to Secured Party shall be construed as a waiver thereof; nor shall a single or partial exercise of any other right, power or privilege.  Secured Party may permit Debtor to remedy any default, and Secured Party may waive any default without waiving any other subsequent or prior default to Debtor.

7.    <u>Events of Default.</u>  As used in this Agreement, the terms "***default***" or "***Security Agreement Default***" shall mean (a) the occurrence of a Joint Investment Agreement Default under the Joint Investment Agreement, (b) any representation or warranty made by or on behalf of Debtor under or pursuant to this Agreement shall have been false or misleading in any material respect when made, or (c) Debtor shall fail to observe or perform any covenant or agreement set forth in this Agreement and such default shall remain uncured for fourteen (14) days or more following notice thereof.

8.    <u>Acceleration of Liabilities.</u>  Secured Party shall have the rights set forth in the Joint Investment Agreement with respect to the acceleration of amounts payable to Secured Party thereunder.

9.    <u>Secured Party's Right After Default.</u>  Upon the occurrence of a Security Agreement Default, Secured Party shall have, in addition to any other rights available to it under this Agreement, the Joint Investment Agreement and applicable law, the right without further notice to Debtor to take any or all of the following actions at the same or at different times:  (a) to collect all Collateral in Debtor's name and take control of any cash or non-cash proceeds of the Collateral; (b) to enforce payment of any Collateral to prosecute any action or proceeding with respect to the Collateral, to extend the time of payment of any and all Collateral, to make allowance and adjustments with respect thereto and to issue credits in the name of Debtor; and (c) to exercise other rights and remedies under this Agreement and the Joint Investment Agreement or that are available to a secured creditor under the New York Uniform Commercial Code or that are otherwise available at law or in equity, at any time, in any order and in any combination.  The net cash proceeds resulting from the exercise of any of the foregoing rights, after deducting all charges, expenses, cost and attorneys' fees relating thereto, including any and all costs and expenses incurred in securing the possession of the Collateral and preparing the same for sale, shall be applied by Secured Party to the payment of the Investment, whether due or to become due, and Debtor shall remain liable to Secured Party for any deficiency.

10.    <u>General Authority.</u>  Debtor hereby irrevocably appoints Secured Party its true and lawful attorney, with full power of substitution, in the name of Debtor, Secured Party or otherwise, for the sole use and benefit of Secured Party, but at Debtor's expense, to exercise, at any time (subject to the provision below) all or any of the following powers:

  (a)    to file financing statements, financing statement amendments and continuation statements in connection with this Agreement,

DocuSign Envelope ID: 592557E7-948B-4914-B310-40F58CAC6CEC

*FLOCK FINANCIAL, LLC*                                                    *SECURITY AGREEMENT*

   (b)   to demand, sue for, collect, receive and give acquittance for any and all monies due or to become due with respect to any Collateral or by virtue thereof,

   (c)   to settle, compromise, compound, prosecute or defend any action or proceeding with respect to any Collateral,

   (d)   to sell, transfer, assign or otherwise deal in or with the Collateral or the proceeds or avails thereof, as fully and effectually as if Secured Party were the absolute owner thereof, and

   (e)   to extend the time of payment of any or all thereof and to make any allowance and other adjustments with reference to the Collateral;

provided, however, that the powers described in clauses (b) through (e) above may be exercised by Secured Party only if a Security Agreement Default then exists.

   11.   <u>Successor and Assigns.</u>  All covenants and agreements herein made by Debtor shall bind it and its permitted successors and assigns, and every option, right and privilege herein reserved or granted to Secured Party shall inure to the benefit of and may be exercised by Secured Party's successors or assigns.

   12.   <u>Modification, etc.</u>  No modification, amendment or waiver of any provision of this Agreement, any note secured hereby, nor consent to any departure by Debtor there from shall in any event be effective unless the same shall be in writing and signed by Secured Party and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice to or demand on Debtor shall entitle it to any other or further notice or demand in the name, similar or other circumstances.

   13.   <u>Notices.</u>  Any notice, payment, demand, or communication required or permitted to be given pursuant to any provision of this Agreement shall be in writing and shall be (a) delivered personally, (b) sent by postage prepaid, registered mail (airmail internationally) or (c) delivered by nationally recognized overnight courier, addressed as follows, or to such other address as such person may from time to time specify by notice to the other party:

   (i)   If to Secured Party, to Secured Party at:

      400 Galleria Parkway, Suite 1720
      Atlanta, Georgia 30339
      Attn:  Michael Flock

   (ii)   If to Debtor, to Debtor at:

      1825 Barrett Lakes Blvd
      Kennesaw, GA30144
      Attn: Bill Wilson

   (iii)   Any such notice, payment, demand, or communication shall be deemed to be delivered, given, and received for all purposes hereof (A) on the date of receipt if delivered personally or by courier or (B) five (5) days after posting if transmitted by mail.

*FLOCK FINANCIAL, LLC*                                                              *SECURITY AGREEMENT*

      14.   <u>Governing Law</u>.  This Agreement shall be construed in accordance with and governed by the laws of the State of New York.

      15.   <u>Counterpart Execution</u>.  This Agreement may be executed in any number of counterparts with the same effect as if all of the parties had signed the same document.  All counterparts shall be construed together and shall constitute one agreement. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and shall be valid and effective for all purposes.

***[SIGNATURES BEGIN ON FOLLOWING PAGE]***

*FLOCK FINANCIAL, LLC*                                                    *SECURITY AGREEMENT*

IN WITNESS WHEREOF, each of the undersigned has executed this Security Agreement on the day and year first above written.

**SECURED PARTY:**

**FLOCK FINANCIAL, LLC**

By: _____

     Name:  Michael R. Flock
     Title:  Managing Member

**DEBTOR:**

**ARC MANAGEMENT GROUP, LLC**

By: *Bill Wilson* _____

     Name: Bill Wilson

     Title: CEO

EXHIBIT C

## MASTER SERVICING AGREEMENT

This Master Servicing Agreement (this "**Agreement**") is made and entered into as of January 18, 2024 by and between ARC Management Group, LLC ("**ARC**"), a Georgia limited liability company, Allgate Financial LLC, an Illinois limited liability company ("**Servicer**").

### RECITALS:

WHEREAS, ARC owns eleven portfolios (the "**Portfolios**") of charged off consumer medical accounts receivables that are detailed on Exhibit A attached to this Agreement (the "**Serviced Accounts**");

WHEREAS, Flock Financial, LLC ("**Flock**") is an investor in the Portfolios;

WHEREAS, Irwin Bernstein ("**Bernstein**") is the managing member of Servicer;

WHEREAS, prior to the Petition Date, disputes arose between ARC and Flock regarding the Portfolios. On August 8, 2023, Flock filed a lawsuit in a civil action styled *Flock Financial, LLC v. ARC Management Group, LLC*, Case No. 23-1-6126-69, Superior Court of Cobb County, Georgia (the "**Cobb County Action**"). On October 9, 2023, ARC filed an answer and counterclaim in the Cobb County Action;

WHEREAS, on October 24, 2023, the Superior Court entered an agreed upon order appointing Bernstein as receiver over the Portfolios;

WHEREAS, on November 28, 2023, ARC filed for bankruptcy protection under chapter 11 title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court, Northern District of Georgia, Atlanta Division, Chapter 11 Case No. 23-61742-WLH (the "**Bankruptcy Case**");

WHEREAS, in the Bankruptcy Case, ARC, Flock, and Bernstein entered into a Settlement Agreement regarding the collection of the Serviced Accounts in the Portfolios;

WHEREAS, pursuant to the Settlement Agreement approval by the Bankruptcy Court, ARC is engaging Servicer to act as the custodian of record for the Serviced Accounts and to manage the collection of the Serviced Accounts;

WHEREAS, pursuant to the Settlement Agreement approved by the Bankruptcy Court, ARC grants Servicer the necessary powers for the Serviced Accounts to act on its behalf, make strategy decisions, and execute agreements without further approval from ARC;

WHEREAS, ARC shall remain fully licensed as required under the JIAs;

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement and for other valuable consideration, the parties agree as follows:

**Section 1.    SERVICES**

(a) Pursuant to the terms of the Settlement Agreement, ARC will refer the Serviced Accounts to Servicer for collection under this Agreement.  The Serviced Accounts will be sent to Servicer in an electronic format mutually agreeable to both parties.

(b) During the term of this Agreement, the Servicer agrees to provide the services set forth in **EXHIBIT B** attached hereto (the "**Services**").

(c) Servicer agrees to use its best efforts to diligently service and collect the Serviced Accounts.  Servicer shall follow the criteria/collection protocol (the "**Servicing Policy**"), which shall require the placement of Serviced Accounts with collection agencies and law firms based on Servicer's evaluation of the JIAs applicable to the Serviced Accounts and the optimal collection strategy for such Serviced Accounts following the Servicer's due diligence investigation of such Serviced Accounts, and as detailed in Exhibit B.

(d) Servicer shall provide adequate personnel and resources to service the Serviced Accounts. All collection activities shall be undertaken by properly licensed and trained personnel and shall be lawful and ethical.  Professionally acceptable procedures and methods shall be used at all times by Servicer and its agents in collecting the Serviced Accounts.  In addition, Servicer and its agents shall comply with all applicable federal, state and municipal laws, rules, or regulations regarding collection agencies, including without limitation the federal Fair Debt Collection Practices Act, as amended, and any regulations there under, all applicable privacy statutes, all applicable state and local debt collection laws and regulations and any collection agency licensing laws and regulations, any applicable administrative rulings, the Gramm-Leach-Bliley Act and any regulations there under and all applicable court decisions.

(e) In the event Servicer requires the assistance of ARC to perform its Services, ARC and Servicer shall agree upon a reasonable fee to be paid to ARC for that assistance on an individual basis for the Serviced Accounts, including ARC's credit bureau reporting for any Serviced Accounts. Notwithstanding the foregoing, ARC shall not be entitled to receive payment for peforming tasks required by this Agreement or the Settlement Agreement.

**Section 2.    REPORTS**

(a) Servicer shall provide ARC on the 7th day of each month with such collection reports, statistical reports, a monthly accounts receivable report for each of the Portfolios, and other reasonable data and information on the Serviced Accounts that is acceptable to ARC and as required by the United States Trustee's Office (including, but not limited to, any telephone number or address of any debtor related to any Serviced Account and status codes of the Serviced Accounts), and in electronic format acceptable to ARC and the United States Trustee's Office: (a) at such time as it remits monies; (b) upon the termination of this Agreement; or (c) at any time requested by ARC.

(b)  On or before the 7th day of each month, the Servicer shall prepare and deliver a data report detailing all transactions relating to the Serviced Accounts in the preceding month (the "**Data Report**") to ARC.  The Data Report shall include fields for each Serviced Accounts, including information regarding the related account debtor, repayments, current status, payments to Flock, payments due to Flock, payments to ARC, payments due to ARC, payments to Servicer, payments due to Servicer, payments to any subservicer,  payments due to subservicer, gross collections, and such other information as the parties shall mutually agree.

## Section 3.      SERVICER FEES

Pursuant to the terms of the Settlement Agreement, Servicer shall be paid from monthly gross collections (the "**Collections**") on a monthly basis as outlined  in **EXHIBIT C** attached hereto. Except as explicitly set forth in **EXHIBIT C** attached hereto, the Servicer shall be responsible for all business expenses incurred by the Servicer and its employees in connection with, or related to, the performance of the Services, including, but not limited to overhead costs and expenses of performing its services hereunder, payroll costs, data processing fees, rents and utilities, fees of outside counsel and independent accountants.  The Servicer and its employees shall not be entitled to any benefits, coverages or privileges, including, without limitation, health insurance, social security, unemployment, medical or pension payments, made available to employees of ARC.  The Servicer and its employees shall not be employees of ARC.

## Section 4.      PAYMENTS TO ARC AND FLOCK.

Pursuant to the terms of the Settlement Agreement, Servicer shall distribute from the remaining Collections (the "**Net Proceeds**"), within three (3) business days after the tenth (15th) and last day of each month, ninety percent (90%) of Net Proceeds to Flock and ten percent (10%) to ARC until Flock's Investment Balance Investment as defined in the Settlement Agreement is $0.00, which cumulative balance as of the date of this Agreement is $12,631,032.60. Thereafter, fifty percent (50%) of Net Proceeds shall be distributed to Flock and fifty percent (50%) shall be distributed to Debtor.

Section 5.      INDEMNIFICATION

(a)  Servicer agrees to indemnify and hold ARC harmless against any and all liability, damages, loss and expense, including attorneys' fees and court costs, occasioned by claims or suits, or any loss or damages, arising out of any breach of this Agreement by Servicer, its agents or employees, or any acts or omissions of Servicer, its agents or employees, however caused.  Servicer further agrees to indemnify and hold ARC harmless from all loss, damage, injury, and claims arising from or directly or indirectly related to the improper disclosure, use or handling of customer account information by Servicer, its employees or agents or its failure to maintain the confidentiality of such information in accordance with the terms of this Agreement.

(b)  ARC agrees to indemnify and hold Servicer harmless against any and all liability, damages, loss and expenses, including attorneys' fees and court costs, occasioned by claims or suits for loss or damages arising out of the acts or omissions of ARC, its agents or employees, however caused only for those accounts serviced and worked exclusively by ARC prior to the turnover of the accounts to the Servicer.  ARC agrees to defend Servicer at ARC's sole cost and expense and shall pay any and all damages and/or settlements resulting from said

3

act or omission of ARC only for those accounts serviced and worked exclusively by ARC prior to the turnover of the accounts to the Servicer. Any accounts serviced and worked by a subservicer prior to the turnover of the accounts to the Servicer shall be indemnified by that subservicer.

## Section 6.   REPRESENTATIONS & WARRANTIES

(a) **Servicer:**

(i)   is a duly organized, valid limited liability company, existing and in good standing under the laws of its State of Illinois.

(ii)  is qualified to do business and has obtained all necessary licenses, permits and approvals in each jurisdiction where it operates.

(iii) has the power and authority to execute, deliver and perform its obligations under the terms of this Agreement and has taken all necessary actions to authorize the execution, delivery, and performance of its obligations under the terms of this Agreement.

(iv)  warrants that the consummation of this Agreement will not conflict with or result in any breach or default of any of its obligations.

(v)   has the professional ability to place for collection the Serviced Accounts in accordance with the terms of this Agreement.

(vi)  has the professional ability to supervise Subservicers in the collection of accounts similar to the Serviced Accounts.

(vi)  represents there are no actions, suits or pending proceedings against Servicer which have or will have a material effect on the ability of Servicer to perform its obligations under the terms of this Agreement.

(vii) has a positive net worth and cash liquidity to meet all its obligations, including but not limited to those obligations set forth in this Agreement.  Servicer agrees to immediately notify ARC of any adverse change in the financial condition of Servicer.

(viii) represents all information furnished by Servicer to ARC is true and correct in all material respects.

(b) **ARC:**

(i)   is a duly organized, valid limited liability company, existing and in good standing under the laws of its State of Georgia.

(ii) is qualified to do business and has obtained all necessary licenses, permits and approvals to hold and to place the Serviced Accounts with Servicer.

(iii) has the power and authority to execute, deliver and perform its obligations under the terms of this Agreement and has taken all necessary actions to authorize the execution, delivery, and performance of its obligations under the terms of this Agreement.

(iv) warrants that the consummation of this Agreement will not conflict with or result in any breach or default of any of its obligations.

(v) represents all information furnished by Servicer to ARC is complete, true and correct in all material respects and will, in a timely manner, be supplemented if any new information is received.

**Section 7.    TERM/TERMINATION**

This Agreement shall continue for period of one (1) year from the date hereof, and, at the end of the first one (1) year period, shall continue for successive one (1) year periods upon the same terms and conditions as set forth herein until termination of this Agreement, unless otherwise terminated by an order of the Bankruptcy Court.  In the event this Agreement is terminated by either party, Servicer shall return to ARC (in electronic format acceptable to ARC) each Serviced Account assigned hereunder including, but not limited to those Serviced Accounts placed for litigation and those Serviced Accounts on which payments have been collected, remittance of all funds held, received but un-deposited checks, and related data and reports as requested, within ten (10) days of the notice of termination or expiration.  If, after the termination of this Agreement, Servicer receives any debtor payments or comes into possession of any papers, materials, checks or property belonging to ARC or to a successor in interest, Servicer shall deliver the same to ARC (or at the direction of ARC) within five (5) business days and, if deemed necessary or appropriate by ARC, with an endorsement in the form substantially as follows: "Pay to the order of "Allgate Financial ARC Debtor in Possession Trust Account."  Notwithstanding the foregoing, after termination, ARC shall have the authority to deposit any payments payable to Servicer for the benefit of ARC. Servicer shall not be entitled to any fees on payments received on any Serviced Accounts following termination of this Agreement.

**Section 8.    CONFIDENTIALITY**

Servicer shall keep confidential and cause its respective officers, directors, employees, and agents to keep confidential, any and all Confidential Information, as defined below, and shall not use such Confidential Information for any purpose other than as expressly contemplated by this Agreement. Servicer shall neither provide access to, nor disclose, such Confidential Information to a third party except as necessary to perform its obligations under this Agreement, without the prior written consent of ARC.  For purposes of this Agreement, "**Confidential Information**" means the name, address and credit card and bank account numbers of persons whose Serviced Accounts are or have been referred by ARC to Servicer for collection, or any other information about such persons provided to or obtained by Servicer in connection with the performance of its duties under this Agreement.

**Section 9.     MISCELLANEOUS**

(a) **Limited Power of Attorney**.  Servicer is authorized and empowered on behalf of ARC, and in its name, to prepare, execute, deliver and or file any instructions, documents or amendments or supplements thereto (collectively, the "Documents"), or to do or to cause to be done any and all other acts and things that it, in its sole discretion, may deem necessary or appropriate for a Custodian of Records and or Master Servicer to do to carry out the purposes of the foregoing appointment, the necessity or appropriateness of which shall be conclusively evidenced by the preparation, execution, delivery, and/or filing of such Documents or the carrying out of such acts.

(b) <u>Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, legal representatives, and assigns.  This Agreement shall not be assignable by either party without prior written consent of the other party and upon approval by the  Bankruptcy Court.

(c) <u>Notice</u>.  Any notice permitted or required will be deemed given, on the date sent by Federal Express or a similar national overnight courier service, to the applicable address set forth below:

|  |  |
|---|---|
| To ARC: | ARC Management Group, LLC |
|  | Mr. Bill Wilson |
|  | 12655 Old Surrey Place |
|  | Roswell, Georgia 3007 |
|  | bwilson@arcmgmt.com |
|  |  |
| With a copy to: | Ceci Christy |
|  | Rountree Leitman Klien & Geer, LLC |
|  | Century Plaza I |
|  | 2987 Clairmont Road, Suite 350 |
|  | Atlanta, Georgia 30329 |
|  | cchristy@rlkglaw.com |
|  |  |
| To Servicer: | c/o Allgate Financial LLC |
|  | 820 Davis Street, Suite 453 |
|  | Evanston, IL 60201 |
|  | Attn: Irwin Bernstein |
|  | ibernstein@allgatellc.com |

(d) **Non-Waiver**.  No term or provision of this Agreement shall be deemed waived and no breach shall be deemed excused unless its waiver or consent shall be in writing and signed by the party claimed to have waived or consented.  No consent by any party to waiver of a breach of the other, whether express or implied, shall constitute a consent to, waiver of, or excuse for any different or subsequent breach.

(e) **Exclusivity**.  This Agreement is an exclusive arrangement between Servicer and ARC that is subject to the Settlement Agreement between ARC and Flock and is under the jurisdiction of the Bankruptcy Court.

(f) **Governing Law/Venue**.  This Agreement shall be subject to and governed by the laws of the State of Georgia and the United States Bankruptcy Code.  The United States Bankruptcy Court for the Northern District of Georgia shall be the excusive venue for any issues relating to this Agreement.

(g) **Whole Agreement**.  It is expressly understood and agreed that the terms of this Agreement between the parties hereto supersedes and replaces any prior agreements, understanding, or arrangements, whether written or oral, including but not limited to those taken by assignment by ARC.  This Agreement may be modified or amended only in writing duly signed by both parties and upon approval of the Bankruptcy Court.

(h) **Customer Information**.  Servicer shall maintain appropriate safeguards for the customer information with respect to the Serviced Accounts.  For the purposes of this Section, "customer information" shall mean "customer information" as such term is defined in the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 et seq., and the regulations thereunder.

[REMAINDER OF PAGE LEFT BLANK]

[SIGNATURES ON FOLLOWING PAGES]

IN WITNESS WHEREOF, the parties agree to the terms of this Agreement effective as of the day and year first written above.

**ARC:**

**ARC Management Group, LLC**

By:_____

Name: Bill Wilson

**SERVICER:**

**Allgate Financial LLC**

By:_____

Name:   Irwin Bernstein

Title:     CEO

8

IN WITNESS WHEREOF, the parties agree to the terms of this Agreement effective as of the day and year first written above.

**ARC:**                                        **ARC Management Group, LLC**

By:_____
Name: Bill Wilson

**SERVICER:**                                  **Allgate Financial LLC**

By: _____
Name:   Irwin Bernstein
Title:     CEO

## EXHIBIT A

**List of Purchased Portfolios**

JOINT INVESTMENT AGREEMENTS EXHIBIT A

| ACCOUNT PURCHASED | DATE | PURCHASE PRICE | FLOCK INVESTMENT | DEBTOR INVESTMENT |
|---|---|---|---|---|
| **KEYSTONE** | Jul 28, 2022 | $405,427.00 | $324,341.60 | $81,085.40 |
| **TSG RESOURCES, INC.** | Jul 28, 2022 | $2,380,757.00 | $1,904,605.00 | $476,152.00 |
| **TSG RESOURCES, INC.** | Aug 25, 2022 | $1,868,207.81 | $1,494,566.25 | $373,641.56 |
| **TSG RESOURCES, INC.** | Sep 26, 2022 | $2,569,844.57 | $2,055,875.66 | $513,968.91 |
| **TSG RESOURCES, INC.** | Oct 26, 2022 | $1,759,413.15 | $1,407,530.52 | $351,882.63 |
| **TSG RESOURCES, INC.** | Oct 31, 2022 | $363,469.46 | $290,775.57 | $72,693.89 |
| **TSG RESOURCES, INC.** | Nov 22 | $2,268,283.96 | $1,814,627.17 | $453,656.79 |
| **TSG RESOURCES, INC.** | Dec 27, 2022 | $2,361,750.98 | $2,125,575.89 | $236,175.10 |
| **TSG RESOURCES, INC.** | Jan 23 | $1,934,105.70 | $1,740,695.13 | $193,410.57 |
| **TSG RESOURCES, INC.** | Feb 23 | $1,811,862.16 | $1,630,675.95 | $181,186.22 |
| **TSG RESOURCES, INC.** | Mar 23 | $2,174,967.81 | $1,957,471.03 | $217,496.78 |

# EXHIBIT B

## SERVICES

**1.      COLLECTION OF SERVICED ACCOUNTS.**

(a)      Servicer shall maintain a segregated bank account for the collection of the Serviced Accounts which shall be named "**Allgate Financial ARC Debtor in Possession Trust Account**."

(b)      The Servicer will supervise the performance of each sub-servicer, collection agency, law firm, attorney or other person (not including employees of the Servicer) engaged by the Servicer to assist in the servicing or collection of any of the Serviced Accounts (each, a "Subservicer") to which the Serviced Accounts may be assigned, from time to time.  In conducting this supervision, the Servicer shall cause such Subservicers to:

1.      Use commercially reasonable efforts to collect all payments due under the Serviced Accounts, including, where authorized, instituting judicial proceedings on behalf of ARC or its subsidiaries to collect when due all amounts owing under the terms and conditions of any Serviced Account.

2.      Proceed diligently to collect all payments due under each Serviced Account consistent with the Servicing Policy.

3.      Cause all Collections received pursuant to each Serviced Account to be paid directly into such Subservicer's bank account net of the approved fees and  approved costs of Subservicer.

4.      Instruct each Subservicer to make all payments with respect to Serviced Accounts directly to the Allgate Financial ARC Debtor in Possession  Trust Account; provided, however, that with respect to any payment received that does not contain sufficient identification of the account number to which such payment relates or cannot be processed due to an act beyond the control of the Servicer, such deposit shall be made no later than the fourth (4th) Business Day following the date on which such account number is identified or such payment can be processed, as applicable.

5.      (A) hold any funds which are Collections which are not paid directly into the Allgate Financial ARC Debtor in Possession Trust Account and which are in Servicer's possession for the benefit of ARC, and (B) promptly, but in any event within four (4) Business Days after receipt of such funds and the information necessary to identify the ownership of such funds, transfer all such funds to the Allgate Financial ARC Debtor in Possession Trust Account.

6.      Upon payment in full of any Serviced Account, or otherwise in accordance with the Servicer's customary policies, take all necessary action to execute and deliver, on behalf of ARC, any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, and all other comparable instruments, with respect to the Serviced Account.

(c)    The Servicer will supervise the performance of each sub-servicer, collection agency, law firm, attorney, or other person (not including employees of the Servicer) engaged by the Servicer to assist in the servicing or collection of any of the Serviced Accounts (each, a "Subservicer") to which the Serviced Accounts may be assigned, from time to time.  In conducting this supervision, the Servicer shall cause such Subservicers to:

1.    Amend, modify or waive any term or condition of any Serviced Account which in Servicer's reasonable discretion, would maximize recoveries on such Serviced Account; provided, that the Servicer shall not have the authority to, and shall not, reduce, modify or waive any payment due on, or any right thereunder of ARC, except in accordance with this Agreement and the Servicing Policy.

2.    Perform specific duties as the Servicer with respect to a Serviced Account through the Subservicers and/or collection agents identified to ARC from time to time, consistent with the Servicer's customary practice and the Servicing Policy; provided, that, (x) the Servicer shall not be released from any of its obligations, duties or responsibilities under this Agreement.

(d)    Servicer shall not:

1.    Change the instructions given to Subservicers to make payments on account of Serviced Accounts to the Allgate Financial ARC Debtor in Possession Trust Account.

2.    Change any instructions given to any bank or financial institution which in any manner redirects the proceeds of any Collections in the Allgate Financial ARC Debtor in Possession Trust Account to any account which is not the Allgate Financial ARC Debtor in Possession Trust Account.

3.    Take any action, or omit to take any action, that would impair the rights of ARC in any Serviced Account.

4.    Take any action not approved by the Bankruptcy Court relating to the Portfolios.

(e)    Notwithstanding the foregoing, the Servicer acknowledges and agrees that the Servicer shall have no ownership rights in and to the Serviced Accounts.  The Servicer shall not have any rights or interest in the Allgate Financial ARC Debtor in Possession Trust Account and shall not have the authority to withdraw funds from, or otherwise exercise control over, the Allgate Financial ARC Debtor in Possession Trust Account except as otherwise set forth herein or in the Settlement Agreement.

**EXHIBIT C - FEES**

The fee payable to Servicer shall be the greater of three percent (3.0%) of Collections for any applicable period or twenty thousand dollars ($20,000) and court approved payments to 3rd parties for work or reporting on behalf the Serviced Accounts, payable monthly (the "**Servicer Fees**").  Fees shall be deducted by Servicer from funds collected on the Serviced Accounts.

For the purposes of this agreement, "**Collections**" means all gross amounts collected on or with respect to the Serviced Accounts or amounts realized as proceeds thereof, including, but not limited to, as a result of  a direct payment to any original creditor that is forwarded to Servicer or its affiliates.  Collections will be reduced in any period to reflect any amounts of payments from any obligor for, or guarantor or surety of, or any party liable for, the performance of the obligations under a Specified Account that are returned for insufficient funds in such period or not otherwise reflected in the calculation of Collections in prior periods.

"**Net Proceeds**" means the remaining Collections after deduction of Servicer Fees, legal fees to defend Serviced Accounts debtors' lawsuits up to $15,000 per year, and payments to debtors to resolve disputes over Serviced Accounts.

**Exhibit B**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **In Re:** | **CASE NO. 23-61742-WLH** |
| **ARC MANAGEMENT GROUP, LLC,** | **CHAPTER 11** |
| **Debtor.** | |

**ORDER GRANTING**
**MOTION FOR APPROVAL OF SETTLEMENT AGREEMENT**

Upon consideration of the motion (the "**Motion**")[1] of Debtor for Approval of its Settlement

Agreement between Debtor and Flock Financial LLC ("**Flock**"); and this Court having jurisdiction

to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and

1334; and consideration of the Motion and the relief requested therein being a core proceeding

under 28 U.S.C. § 157(b); and venue being proper before this Court under 28 U.S.C. §§ 1408 and

1409; the Court having considered the Motion and all other matters of record, including the lack

of a response to the Motion; and sufficient notice being given and no further notice or hearing

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

being required; the Court finds that good cause exists to grant the relief requested in the Motion.

Accordingly,

It is hereby **ORDERED** as follows:

1.      The Motion is GRANTED.

2.      Debtor is authorized to enter into the Settlement Agreement attached to the Motion

as **Exhibit A**, which is hereby APPROVED.

3.      This Order shall be effective and enforceable immediately upon entry hereof.

4.      Debtor is authorized and empowered to take all actions necessary to implement the

relief granted in this Order.

5.      This Court shall retain jurisdiction with respect to all matters arising from or related

to the implementation or interpretation of this Order.

### ### END OF ORDER ###

**Prepared and presented by:**

**ROUNTREE LEITMAN KLEIN & GEER, LLC**

*/s/ Ceci Christy*
Ceci Christy, Ga. Bar No. 370092
Century Plaza I
2987 Clairmont Road, Suite 350
Atlanta, Georgia 30329
(404) 584-1238 Telephone
cchristy@rlkglaw.com
*Attorneys for Debtor*

**Distribution List**

Ceci Christy
ROUNTREE LEITMAN KLEIN &GEER, LLC
Century Plaza I
2987 Clairmont Road, Suite 350
Atlanta, Georgia 30329

Office of the U.S. Trustee
362 Richard B. Russell Bldg.
75 Ted Turner Drive, SW
Atlanta, GA 30303

James W. Hays
Hays & Potter, LLP
3945 Holcomb Bridge Road, Suite 300
Peachtree Corners, Georgia 30092

Gregory M. Taube
Nelson Mullins Riley & Scarborough LLP
201 17th Street, NW, Suite 1700
Atlanta, Georgia 30363