**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | : | |
| | : | **CHAPTER 7** |
| **ARC MANAGEMENT GROUP, LLC,** | : | |
| | : | **Case No. 23-61742 - BEM** |
| _____Debtor._____ | : | |

**MOTION (A) FOR AUTHORITY TO SELL ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, AND ENCUMBRANCES; (B) TO ESTABLISH PROCEDURES WITH
RESPECT TO SUCH SALE; (C) FOR APPROVAL OF BREAKUP FEE AND EXPENSE
REIMBURSEMENT; AND (D) TO SHORTEN AND LIMIT NOTICE**

**COME NOW** S. Gregory Hays, as Chapter 7 Trustee ("**Trustee**" or "**Seller**") for the

bankruptcy estate (the "**Estate**") of ARC Management Group, LLC, Debtor (the "**Debtor**") in the

above captioned case (the "**Case**"), by and through counsel, and herewith files this *Motion (A) for*

*Authority to Sell Assets Free and Clear of Liens, Claims, and Encumbrances; (B) to Establish*

*Procedures With Respect to Such Sale; (C) for Approval of Breakup Fee and Expense*

*Reimbursement; and (D) to Shorten and Limit Notice* (the "**Motion**"), respectfully showing the

Court as follows:

**Summary of Requested Relief**

1.      By this Motion, the Trustee seeks the entry of one or more orders authorizing the

Trustee to sell the Identified Assets (as defined below) and consummate such other related and

necessary transactions in connection therewith as are summarized in this Motion and/or described

in more detail in a Sale Agreement (as defined below) with Undue (as defined below) as the Initial

Bidder (as defined below), or with any other Purchaser (as defined below) approved by the Court,

with such assets to be transferred and conveyed free and clear of all liens, claims and encumbrances

with such liens to attach to the proceeds of the sale of the Identified Assets.

2.      To accomplish the proposed sale, the Trustee seeks the entry of an order shortening notice and scheduling an expedited hearing (the "**Procedures Hearing**") to consider (a) approval of certain bidder protections for approving Medical Debt Resolution, Inc. dba Undue Medical Debt (collectively with its nominee and/or affiliated entit(ies), "**Undue**" or the "**Initial Bidder**") as the proposed "stalking horse" purchaser, with whom the Trustee has, subject to Court approval, negotiated the essential terms of an agreement—evidenced by the Accounts Payable Master Sale Agreement (the "**Sale Agreement**") attached hereto as **Exhibit "A"** and incorporated herein by reference—to sell the Identified Assets, which bidder protections include the payment of a proposed Expense Reimbursement (as defined below) and Breakup Fee (as defined below); and (b) scheduling an auction sale (the "**Auction**") for the sale of the Identified Assets and establishing terms and conditions for other interested bidders to submit higher and better offers.

3.      The Trustee further seeks the entry of an order (the "**Procedures Order**"), substantially in the form of **Exhibit "B"** attached hereto, that: (a) approves the proposed bid protections and procedures (collectively, the "**Bid Procedures**") and scheduling the proposed Auction; and (b) schedules a further hearing (the "**Sale Hearing**") to consider approval of the Sale Agreement by and among the Seller, on the one hand, and Undue, on the other hand, or between the Seller and any other bidder who shall have submitted the highest and best offer for the purchase of the Identified Assets (any such successful bidder being referred to herein as a "**Purchaser**"), as determined following the conclusion of the Auction.

4.      Furthermore, the Trustee also seeks the entry of an order that: (a) approves a Sale Agreement with any Purchaser; (b) authorizes and approves the sale to any such Purchaser the portion of the Portfolios (as defined below) as identified in the Sale Agreement ("**Identified Assets**") that the Trustee proposes to sell a free and clear of all liens, claims, interests and

encumbrances; and (c) waives the automatic 14-day stay following entry of such order under Bankruptcy Rule 6004(h) in order to permit the Seller to consummate immediately the sale of the Identified Assets.

5.      The Trustee further seeks authorization to take any and all reasonable and necessary steps to complete and implement any approved sale, including, but not limited to, executing and delivering any approved asset purchase agreement and such other documents, agreements and instruments as may be necessary or advisable to effectuate the terms of any sale approved by the Court.

### Jurisdiction, Venue, and Procedural Background

6.      This Court has jurisdiction of this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. Sections 157(b).  Venue before this Court is proper pursuant to 28 U.S.C. Sections 1408 and 1409.  The statutory predicates for the relief sought herein are Sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**") and Bankruptcy Rules 2002, 6004, 9006, and 9007 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

7.      On November 28, 2023 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the Bankruptcy Code.

8.      On November 12, 2024, the United States Trustee filed a *Notice of Appointment of Chapter 11 Trustee and Setting Bond* [Doc. No. 227] pursuant to which S. Gregory Hays was appointed as the Chapter 11 Trustee for the Bankruptcy Estate of the Debtor.

9.      On November 14, 2024, the Court entered an order [Doc. No. 231] approving the appointment of the Trustee as Chapter 11 Trustee in this Case.

10.     On March 20, 2025, the Court entered an Order Converting Chapter 11 Case of the Debtor to Chapter 7 [Doc. No. 253] incident to which this Case was converted to Chapter 7.

11.     On March 20, 2025, the United States Trustee filed a *Notice of Appointment of Interim Trustee and Section 341(a) Meeting of Creditors* [Doc. No. 254] pursuant to which S. Gregory Hays was appointed as the interim Chapter 7 Trustee for the Bankruptcy Estate of the Debtor.

### Sale Background

12.     Prior to the Petition Date, the business of the Debtor involved the collection of past due consumer medical accounts receivable incident to which the Debtor received revenue from: a) commissions for collecting accounts of clients (the "**Commission Accounts**"); and b) past due consumer accounts that were purchased by the Debtor (the "**Portfolios**") from F. Schumacher & Co. ("**Schumacher**"). The Commission Accounts are not included in the sale.[1] The sale is limited the portion of the Portfolios consisting the Identified Assets.

13.     Flock Financial, LLC ("**Flock**") asserts a security interest in the Portfolios owned by the Debtor, particularly in the revenue generated from collections. Between July 28, 2022, and February 27, 2023, Debtor and Flock entered into a series of Joint Investment Agreements and related Security Agreements (collectively, the "**JIAs**") incident to which Flock provided funding for a percentage of the purchase price of the Portfolios. Flock was purportedly granted a security interest in the Portfolios arising from the JIAs.

14.     WebBank ("**WebBank**"), Libertas Funding, LLC ("**Libertas**"), SuperB Capital, LLC ("**SuperB**" or "**Libertas**"), and Lendspark Corporation (collectively with WebBank,

---

[1] The Trustee does not believe that the Debtor has any remaining Commission Accounts which could be sold by the Trustee and the Trustee therefore anticipates that this will be the only sale of assets to be pursued by the Trustee herein.

Libertas, and SuperB, the "**Libertas Parties**") also assert a security interest in the Portfolios among other assets of the Debtor. Prior to the Petition Date, the Libertas Parties entered into various financing agreements with the Debtor, including seven (7) Agreements of Sale of Future Receipts and/or Agreements for the Purchase and Sale of Future Receipts that the Libertas Parties contend were outstanding as of the Petition Date (the "**Libertas Agreements**") and three (3) Business Loan and Security Agreements (the "**WebBank Agreements**"). The security interest asserted by the Libertas Parties purportedly arises from the Libertas Agreements and WebBank Agreements.

15.    After the Debtor failed to issue timely monthly payments and disputes arose regarding the JIAs, Flock initiated litigation on August 8, 2023, in Cobb County (the "**Cobb County Action**") incident to which Irwin Bernstein (the "**Receiver**") was appointed as receiver over the Portfolios.

16.    Prior to the appointment of the Trustee, the Court approved the use of cash collateral pursuant to certain interim orders [Doc. Nos. 27, 33, 70 and 75] and a final order [Doc. Nos. 117 and 121] (the "**Cash Collateral Order**").

17.    Prior to the appointment of the Trustee, Debtor, Flock, and the Receiver negotiated a settlement memorialized in the Settlement and Release Agreement (as amended, the "**Settlement**"). On August 23, 2024, Debtor filed a motion [Doc. No. 181] to approve the Settlement. The Settlement entered prior to the appointment of the Trustee required the Debtor to execute a Master Servicing Agreement with Allgate Financial LLC ("**Allgate**") under the terms of which Allgate would collect and service the charged off consumer medical accounts receivable of the eleven Portfolios. The Settlement further provided that the proceeds of the Portfolios would be divided as follows: (a) 45% to Flock; (b) 45% to Libertas and (c) 10% to the Chapter 11 Debtor.

18.     On March 27, 2025, the Court entered an Order [Doc. No. 245] approving a motion [Doc. No. 245] to amend the Settlement incident to which a Chapter 7 Trustee would be authorized to retain the Estate's 10% interest in the Portfolios in the event of a conversion of the case to Chapter 7. This Case was converted to Chapter 7 shortly after the entry of the Order amending the Settlement and the Chapter 7 Trustee has held and concluded the Section 341 Meeting.

19.     Since the appointment of the Trustee, the Trustee and professionals engaged by the Trustee have cooperated with Flock and the Libertas Parties (collectively, the "**Secured Parties**") and conducted an investigation of the business affairs of the Debtor to determine viable strategic options, including identifying potential strategic partners and exploring options to reorganize and/or sell assets of the Estate. After evaluating alternatives and consulting with advisors and the Secured Parties, the Trustee concluded that it was in the best interests of the Debtor, its creditors, the Estate and other parties in interest to effectuate a sale of the Portfolios.

20.     Through a process initially directed by Flock, Flock solicited interest in the Portfolios and identified Undue as a potential purchaser for the Identified Assets. The Trustee entered into a form of non-disclosure agreement with Undue and Undue conducted extensive due diligence. The Trustee received the highest purchase price in a proposal from Undue for a portion of the Portfolios in the form of the Identified Assets. Flock has requested, and the Trustee has agreed that Flock be paid 5% finder's fee (the "**Finder's Fee**") for its efforts in locating Undue and its efforts to conclude a sale of the Portfolios to Undue to be paid from the proceeds of the sale at closing.

## Proposed Sale

21.     The terms proposed by Undue are summarized in the Sale Agreement and contemplate a sale effectuated under Sections 105, and 363 of the Bankruptcy Code of a portion

of the Portfolios in the form of the Identified Assets in two tranches for a total purchase price of at least $3,012,422.80 with the first portion in the amount of $406,116.30 and the second in the amount of $2,606,306.50. The proposed Sale Agreement provides for the sale of the Identified Assets for a purchase price on terms and conditions set forth more fully in the Sale Agreement as approved by the Court.[2] The sale of the Identified Assets shall constitute funds collected by the Trustee for the benefit of the Estate.

22.     In light of the nature of the Identified Assets, the Sale Agreement requires that approval from the Court be obtained expeditiously so that Undue, if it is approved as the Purchaser, can close on the proposed sale as soon as possible.  The Trustee believes that any Purchaser will wish to close within that same time frame. Accordingly, because of the importance of being able to obtain Court approval for a sale to allow a closing by the end of July, 2025, the Trustee is filing this Motion on an expedited basis.

23.     The sale of Identified Assets is to be free and clear of any and all liens, claims, interests and encumbrances, with these to attach to the net proceeds generated from the sale of the Identified Assets, to the extent valid, perfected and enforceable.

**Expense Reimbursement and Breakup Fee To Initial Bidder**

24.     The Trustee anticipates that Undue, as the Initial Bidder, shall have invested substantial time and effort in negotiating the material terms of an Agreement with the Seller. Undue shall also have invested time and effort in connection with its investigation and due diligence review of the Identified Assets. It shall have incurred various legal and other professional costs and expenses, and will incur still further substantial additional fees and costs in its continuing due

---

[2] If there is any discrepancy between the terms contained in this Motion and the terms of the Sale Agreement itself, the terms of the Sale Agreement as approved by the Court shall govern.

diligence investigations. Subject to the terms of the Agreement reached with Undue, if a closing occurs with respect to a sale of Identified Assets to a party other than Undue with respect to such assets (the "**Alternative Transaction**") and Undue is ready, willing and able to close the transaction and is not in default under the Agreement, the Trustee proposes that Undue: (a) be paid an agreed-upon "Breakup Fee" in an amount equal to $60,000 (the "**Breakup Fee**"); and (b) be reimbursed for its reasonable and documented actual out-of-pocket fees and expenses (including legal, accounting, escrow and other fees and expenses) incurred in connection with, or related to (directly or indirectly), the transactions contemplated by the Agreement, in an amount not to exceed $100,000 (the "**Expense Reimbursement**"); provided, however, that such Breakup Fee and Expense Reimbursement shall be due and payable only if the Trustee has consummated an Alternative Transaction for the Identified Assets to a third party other than or related to the Undue. For the avoidance of doubt, Seller shall not be obligated to pay and Undue shall not be entitled to receive the Expense Reimbursement or the Breakup Fee if no Alternative Transaction occurs or if the Seller terminates this Agreement as a result of breach of the Agreement by Undue. The obligation to pay a Breakup Fee and Expense Reimbursement to Undue shall be allowed as an administrative expense claim in the Case pursuant to 11 U.S.C. §§ 503(b) and 507(a)(1) as an actual, necessary expense to preserve the value of the bankruptcy estate and paid from the proceeds of the sale at closing of the Alternative Transaction.

25.     Sellers of assets often employ buyer protections in order to encourage the making of other purchase offers. These protections are "important tools to encourage bidding and to maximize the value." *In re Integrated Resources, Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992). The Trustee submits that the proposed Expense Reimbursement and Breakup Fee will not hamper or deter competitive bidding for the Identified Assets. Rather, it will encourage bidding by inducing

Undue, as Initial Bidder, to serve as a stalking horse and provide prospective purchasers with an incentive to bid for the Identified Assets and will likely serve as a magnet for other bids.

## **Bid Procedures**

26.    The Trustee seeks to identify the highest and best offer for the Portfolios in the form of the Identified Assets or otherwise by subjecting the proposal of the Initial Bidder in the Sale Agreement to overbid at the Auction.

27.    In order to ensure that asset values are truly maximized, the Trustee requests that the Court approve the following bid procedures at the Procedures Hearing, so that competing offers for the Portfolios shall be accepted only if they meet the following requirements:

   a.  Initial Overbid. Any third party (other than Undue) that is interested in acquiring the Identified Assets must submit an "Initial Overbid" in conformance with the Bid Procedures by not later than 5:00 p.m. local time in Atlanta, Georgia on July 15, 2025 (the "**Overbid Deadline**"). Any such Initial Overbid must:

   i.  Contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from the Sale Agreement with Undue) with, at a minimum, the following requirements: (1) having substantially identical terms and conditions as the Sale Agreement with Undue, except with higher and better consideration; (2) containing terms and conditions otherwise no less favorable to the Estate than the terms and conditions in the Sale Agreement (provided that no Initial Overbid shall provide for the payment to the overbidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement); (3) provide for consideration to the Trustee in an amount equal to or greater than the sum of (a) the consideration payable by Undue under the Sale Agreement, plus (b) an additional amount of $185,000 in cash; (4) not be subject to any (a) financing contingency, (b) contingency relating to the completion of unperformed due diligence, (c) contingency relating to the approval of the overbidder's board of directors or other internal approvals or consents, or (d) any conditions precedent to the overbidder's obligation to purchase the Identified Assets other than those included in the Sale Agreement with Undue; and (5) provide that the overbidder shall purchase all of the Identified Assets;

   ii. Include a cashiers' or certified check as a deposit in the aggregate amount of $100,000, payable to an independent escrow agent to be designated by the Seller (it being understood that deposits may also be sent by wire transfer of immediately available funds);

     iii. To the extent not previously provided to the Trustee, be accompanied by evidence satisfactory to the Trustee that the Purchaser can complete the transaction;

     iv. Remain open and irrevocable until one hundred (100) days after the entry of an order by the Court approving a definitive agreement providing for the sale of the Identified Assets; and

     v. Be submitted to (1) counsel to the Trustee, Law Offices of Henry F. Sewell Jr., LLC, Buckhead Centre, 2964 Peachtree Road NW, Suite 555, Atlanta, GA 30305 (Attn: Henry F. Sewell, Jr., Esq.) (hsewell@sewellfirm.com), (2) counsel to Undue, Sheehan Phinney Bass & Green PA, 1000 Elm Street, 17th Floor, Manchester, NH 03101, Attn: Christopher M. Candon (ccandon@sheehan.com), and (3) Office of the U.S. Trustee, 362 Richard Russell Bldg., 75 Spring Street, SW, Atlanta, Georgia 30303, in each case so as to be received not later than the Overbid Deadline.

b. <u>Auction</u>. In the event the Trustee timely receives a conforming Initial Overbid from a prospective purchaser as described above (a "**Qualified Bidder**"), then the Trustee will conduct an Auction with respect to the sale of the Identified Assets on July 16, 2025, beginning at 10:00 a.m. local time, at the offices of counsel for the Trustee, Law Offices of Henry F. Sewell Jr., LLC, Buckhead Centre, 2964 Peachtree Road NW, Suite 555, Atlanta, GA 30305 (Attn: Henry F. Sewell, Jr., Esq.), or at such other location as may be designated by the Trustee. In order to participate in the Auction, each prospective purchaser shall be required to comply with the requirements of the Bid Procedures and to submit an Initial Overbid that is timely and that complies in all respects with the Bid Procedures Order. At the Auction, Qualified Bidders and Undue (it being understood that Undue shall be deemed to be a Qualified Bidder) may submit successive bids in cash increments of at least One Hundred Thousand Dollars ($100,000) greater than the prior bid for the purchase of the Identified Assets until there is only one offer that the Trustee determine (in the exercise of their sole discretion), subject to Court approval, is the highest or best offer for the Identified Assets (the "**Prevailing Bid"**). When bidding at the Auction, Undue shall receive a cash "credit" in an amount equal to the <u>sum</u> of the maximum Expense Reimbursement <u>plus</u> the Breakup Fee. All bidding for the Identified Assets will be concluded at the Auction and there will be no further bidding at the Sale Hearing. If no conforming Initial Overbid from a Qualified Bidder shall have been received at or prior to the Overbid Deadline, the Auction will not be held, Undue shall be designated as the highest and best bid, and the Sale Hearing will proceed with respect to the Sale Agreement with Undue on an expedited basis. In determining the Prevailing Bid, consideration will be given to, among other things: (i) the number, type and nature of any changes to the Sale Agreement with Undue requested by each bidder; (ii) the extent to which such modifications are likely to delay closing of the sale of the Identified Assets and the cost to the Trustee of such modifications or delay; (iii) the total consideration to be received by the Seller; (iv) the likelihood of the bidder's ability to close a transaction and the timing thereof; (v) the net benefit to the Estate; and (vi) the amount of the bidder's experience acquiring, owning, rehabilitating and managing projects that are substantially similar to the Portfolios. At the Auction, Undue shall have the right

to (i) submit further bids along with a markup of the Sale Agreement with Undue; and (ii) at any time, request that the Trustee announce, subject to any potential new bids, the then current Prevailing Bid and, to the extent Undue requests, use reasonable efforts to clarify any and all questions Undue may have regarding the Trustee' announcement of the then current Prevailing Bid. Only the persons who submitted Initial Overbids and Undue may participate in the Auction. After the Auction has concluded, the Trustee shall present the Prevailing Bid to the Court for consideration and approval at the Sale Hearing.

c.  <u>Sale Hearing</u>. The Sale Hearing will be conducted at ____:___ a.m. local time, on _____ , at the United States Bankruptcy Court, 75 Spring Street, S.W., Atlanta, Georgia 30303, at which time the Trustee intend to present the Prevailing Bid for approval by the Court pursuant to the provisions of Sections 105, 363(b), 363(f), 363(m), and 363(n) of the Bankruptcy Code. The Trustee shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing.

d.  <u>Highest and/or Best Bid</u>. At all times during the proposed sale process, the Trustee shall retain the right to determine, in their reasonable discretion, which bid constitutes the highest or otherwise best offer for the purchase of the Identified Assets, and which bid should be selected as the Prevailing Bid, if any, all subject to final approval by the Court pursuant to the provisions of Section 363(b) of the Bankruptcy Code. Without limiting the generality of the foregoing, the Trustee may, at any time before entry of an order of the Court approving a Prevailing Bid, reject any bid (other than the Undue bid, as reflected in the Sale Agreement) that, in the reasonable discretion of the Trustee, is (i) inadequate or insufficient, (ii) contrary to the requirements of the Bankruptcy Code or the Bid Procedures, (iii) from a bidder that does not have substantial experience acquiring, owning, rehabilitating and managing projects that are substantially similar to the Portfolios, or (iv) otherwise contrary to the best interests of the Estate or its creditors.

e.  <u>Sale Implementation</u>. Following the approval of the Prevailing Bid at the Sale Hearing, the Trustee will be authorized and directed to take all commercially reasonable and necessary steps to complete and implement the transaction(s) contemplated by the Prevailing Bid, including (but not limited to) seeking entry of one or more Sale Orders.

28.  Any entity who wishes to make an offer to acquire the Identified Assets is invited to conduct due diligence, at their own expense, prior to the Sale Hearing; provided, however, that any party conducting due diligence must execute and deliver a HIPPA-compliant non-disclosure agreement prior to conducing due diligence. All bidders will be given an equal and fair opportunity to gather information that they feel is necessary to formulate a bid for the acquisition of Identified

Assets, subject to the execution of a confidentiality agreement in form reasonably satisfactory to the Trustee.

29.     The Trustee further requests that the Court require that any examination by a prospective bidder of the Identified Assets and other financial information relevant to the transaction be conducted prior to the Sale Hearing at mutually convenient dates and times by contacting the undersigned counsel for the Trustee.  Such inspections should be conducted in a manner that is not disruptive to the Trustee. In addition, any bidder should be required, within twenty-four (24) hours after the Trustee' request, to submit financial statements and other documents relating to its business activities and its ability to perform in the event that its bid is accepted.

30.     The Trustee also asks the Court to direct that offers made prior to or at the Sale Hearing may not be withdrawn after they are made and any entity's refusal or failure to comply with its offer after acceptance of same by the Trustee and approval by the Court shall entitle the Trustee to retain any deposit submitted by such party.

31.     Finally, the Trustee reserves the right to reject any proposed higher and better offer which, in their discretion, is deemed inadequate or insufficient or which is contrary to the best interests of the Estate. The Trustee intends to submit any disputes which may arise in connection with the bidding process to the Court for determination on an expedited basis.

**The Sale of the Identified Assets is in the Best Interests of Stakeholders**

32.     After a thorough review of the current financial condition of the Debtor and the reasonable financial outlook of and prospects for the Debtor, the Trustee, in an exercise of the sound business judgment of the Trustee, has determined that a sale of the Identified Assets as proposed herein is reasonable and proper under the Bankruptcy Code, would result in the best

recovery for their stakeholders, and is in the best interests of each of the Estate and its creditors. Under the circumstances, ample cause exists for the proposed sale of the Identified Assets.

33.    Section 363(b) of the Bankruptcy Code provides that, after notice and a hearing, a debtor in possession "may use, sell, or lease, other than in the ordinary course of business, property of the estate." A court approving a sale under Section 363(b) should find from the evidence presented a good business reason to approve the sale. *See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

34.    The decision to sell the Portfolios is supported by a sound business justification. The Trustee believes that the present circumstances of the Case warrants approval of the sale of Identified Assets. Thus, a sale of Identified Assets is appropriate as such transaction shall represent the exercise of sound business judgment on the part of the Trustee.

35.    Pursuant to Section 363(f) of the Bankruptcy Code, property may be sold under section 363 free and clear of any interest in such property of an entity other than the estate if, among other instances, such entity consents or "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." *See* 11 U.S.C. §§ 363(f)(2) & (5).

36.    The Trustee believes that approval of the proposed sale of Identified Assets to Undue as the Initial Bidder, or any other successful Purchaser, comports with Section 363(f)(2) of the Bankruptcy Code in that all creditors asserting valid interests in and against Identified Assets will consent to the transaction. To the extent that any creditor asserting a valid interest in and against Identified Assets does not consent to the sale, such creditor could be compelled to accept a money satisfaction of such interest in accordance with Section 363(f)(5) of the Bankruptcy Code.

37.    In addition, Section 105(a) of the Bankruptcy Code authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title." 11 U.S.C. § 105(a). "Section 105(a) provides a bankruptcy court with the power to take whatever action is appropriate or necessary in aid of the exercise of its jurisdiction over the administration of a title 11 case." *In re Gonzalez*, No. BAP NV-06-1154-SBN, 2007 WL 7532280, at *4 (B.A.P. 9th Cir. Mar. 30, 2007). Thus, this Court may exercise its equitable powers to grant the relief requested in this Motion.

### The Purchaser Should be Afforded Protection as Good Faith Purchaser

38.      Section 363(m) of the Bankruptcy Code provides that "the reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith." 11 U.S.C. § 363(m).

39.      As part of the relief requested herein, the Trustee requests that any successful Purchaser receive the protections afforded to a good faith purchaser under § 363(m) of the Bankruptcy Code. A party may be designated a good faith purchaser in the context of a sale when the purchaser is an unrelated third party who is not affiliated with or does not have any insider relationship with the Debtor and where the transaction is for fair value and the result of arms-length negotiations between the parties. *See  In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986).

40.      The Trustee anticipates that any Purchaser will meet the qualifications for designation as a good faith purchaser in that: (a) the Purchaser will not be affiliated in any way with the Debtor; and (b) the Purchaser will have negotiated in good faith and at arm's length with the management of the Debtor.

41.      The Trustee reserves the right to provide further evidence supporting a finding by the Court that the proposed method of conducting the sale of Identified Assets is reasonable and

appropriate and that the Purchaser is entitled to the protections of Section 363(m) of the Bankruptcy Code. To the extent necessary, the Trustee may present further evidence at the Sale Hearing that: a) the Sale Agreement was negotiated at arms-length; b) neither the Trustee nor the Purchaser has engaged in any conduct that would allow the sale of the Identified Assets to be set aside pursuant to 363(n) of the Bankruptcy Code; and c) the Purchaser is bona fide purchaser and is not an insider of the Trustee.

### Notice

42.     Simultaneously herewith, the Trustee has served a copy of this Motion, along with exhibits, on: (a) the Office of the United States Trustee; (b) counsel for Schumacher; (c) counsel for Undue; (d) counsel for Flock and Libertas; (e) all parties identified on the Master Service List maintained in the Case; (e) all parties believed by the Trustee to assert a security interest in any of their assets; (f) the Internal Revenue Service and all taxing authorities in each jurisdiction applicable to the Debtor; (g) all governmental entities exercising jurisdiction with respect to the Portfolios; and (h) the Attorney General of the State of Georgia.

43.     The Trustee proposes to serve notice of the preliminary Procedures Hearing on the same parties to consider proposed sale procedures. The Trustees contend that the proposed notice and the period for scheduling the hearing on the sale as set forth herein satisfy Rules 6004[3] and 9007[4] of the Bankruptcy Rules and constitute good and sufficient notice under the circumstances.

### Waiver of 14-Day Stay on Closing

---

[3] Rule 6004 of the Bankruptcy Rules provides, in pertinent part, that "[n]otice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(1), (i), and (k) and, if applicable, in accordance with § 363(b)(2) of the Code." Fed. R. Bankr. P. 6004.

[4] Rule 9007 of the Bankruptcy Rules provides, in pertinent part, that "[w]hen notice is to be given under these rules, the court shall designate, if not otherwise specified herein, the time within which, the entities to whom, and the form and manner in which the notice shall be given." Fed. R. Bankr. P. 9007.

44.     Bankruptcy Rule 6004(h) respectively provide that an order authorizing the use, sale, or lease of property will be stayed for fourteen days after entry of such approval orders unless the court orders otherwise.  Because of the need to close the transaction contemplated herein as promptly as possible, the Trustee requests that the Court order and direct that the order approving this Motion shall not be automatically stayed for fourteen days.

### Proceeds from Sale

45.     The Trustee seeks authority to pay the Finder's Fee from a sale to Undue from the paid proceeds of such sale at closing. After the payment of the Finder's Fee and any other closing costs, the remaining balance (the "**Net Proceeds**") shall, pending further order of the Court, be distributed as follows: a) the Estate is entitled to 10% of the Net Proceeds pursuant to the Settlement to be used to be retained by the Chapter 7 Bankruptcy Estate; b) the Libertas Parties shall be entitled to 45% of the Net Proceeds; and c) Flock shall be entitled to 45% of the Net Proceeds. Incident thereto, the Trustee seeks authority to: a) retain 10% of the Net Proceeds; and b) distribute 45% of the Net Proceeds to the Libertas Parties and 45% of the Net Proceeds to Flock pursuant to the Settlement and, if necessary, the payment of a Breakup Fee and Expense Reimbursement to Undue.

46.     No previous request for the relief sought herein has been made to this or any other Court.

WHEREFORE, the Trustee respectfully requests that the Court grant this Motion and enter one or more orders providing relief as requested herein and  granting such other and further relief as may be just and proper.

Dated: July 1, 2025.

Respectfully submitted,

LAW OFFICES OF HENRY F. SEWELL JR., LLC

*/s/ Henry F. Sewell, Jr.*
Henry F. Sewell, Jr.
Georgia Bar No. 636265
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
(404) 926-0053
hsewell@sewellfirm.com
COUNSEL FOR THE CHAPTER 7 TRUSTEE

**EXHIBIT A**
**(Sale Agreement)**



**Medical Debt Resolution, Inc.**
**dba Undue Medical Debt**
**28-07 Jackson Ave 5th Fl**
**Long Island City, NY 11101**
**www.unduemedicaldebt.org**

## ACCOUNTS PURCHASE MASTER SALE AGREEMENT
Debt Relief and Extinguishment

This **ACCOUNTS PURCHASE MASTER SALE AGREEMENT** ("Agreement") is made by and between **Medical Debt Resolution, Inc. dba Undue Medical Debt aka RIP Medical Debt** (hereinafter referred to as "Purchaser") and **S. Gregory Hays**, not individually, but as Chapter 7 Trustee ("Trustee") for the bankruptcy estate (the "Estate") of ARC Management Group, LLC, Debtor (the "Debtor") in the Bankruptcy Case No. 23-61742 – BEM (the "Bankruptcy Case") in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court") (hereinafter collectively referred to as "Seller") and, for purposes of Sections 3(D) and 5 below, Flock Financial, LLC, a Delaware Limited Liability Company ("Flock") and Libertas Funding, LLC, a Delaware Limited Liability Company ("Libertas")  and **is effective as of the last signature date of this Agreement**.

**WHEREAS,** the Debtor filed on November 28, 2023, a voluntary petition for relief under chapter 11 of title 11 of the United States Bankruptcy Code to initiate the Bankruptcy Case;

**WHEREAS,** on March 20, 2025, the Bankruptcy Court entered an Order to convert the Chapter 11 Bankruptcy Case of the Debtor to Chapter 7 [Doc. No. 253].

**WHEREAS,** S. Gregory Hays has been appointed as and continues to serve as Chapter 7 Trustee for the bankruptcy estate of the Debtor.

**WHEREAS,** Seller desires to sell, subject to approval of the Bankruptcy Court, certain accounts of the Debtor, each as defined in the applicable Schedule to this Agreement ("Account", or "Accounts"); and

**WHEREAS,** Purchaser desires to purchase such Accounts from Seller, as more particularly defined herein on the terms and conditions set forth in this Agreement and its respective Schedule(s);

WHEREAS, Flock and Libertas each hold liens and interests in the Accounts and will each receive significant portions of the consideration to be paid to the Seller herein;

**NOW THEREFORE**, in consideration of the foregoing recitals and the mutual covenants and conditions contained in this Agreement, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, it is agreed as follows:

1.  **SALE AND PURCHASE OF ACCOUNTS.**  Subject to the terms of this Agreement and its Schedule(s) (a copy of a Schedule is attached for reference hereto as Exhibit B) and approval by the Bankruptcy Court, Seller agrees to sell, convey, transfer and assign to Purchaser and Purchaser agrees to purchase from Seller, for the consideration herein provided, the right, title, interest, and obligations of the Debtor in and to those Accounts as described on Appendix A to each Schedule to this Agreement.  To the best knowledge of Seller, the Accounts shall not include accounts which, as of each Closing Date (the actual date of each closing being herein called the "Closing Date"), are classified as follows (hereinafter referred to as "Unqualified Accounts"):

    A.  Satisfied, settled, or released (the account was paid or otherwise released or settlement check was received by Seller prior to the Closing Date).

    B.  Bankruptcy (an Account where all of the debtors obligated on such Account filed for bankruptcy, and such bankruptcies have not been dismissed).

    C.  Deceased (an Account where all of the debtors obligated on such Account have died).

    D.  Fraud (an Account where debtor obligated on such Account has asserted in writing that the Account was

fraudulently originated or used and such assertion was evidenced to the reasonable satisfaction of Seller).

E.  Pending litigation or disputes.

ALL ACCOUNTS SOLD TO PURCHASER UNDER THIS AGREEMENT ARE SOLD AND TRANSFERRED WITHOUT RECOURSE AS TO THEIR ENFORCEABILITY, COLLECTABILITY OR DOCUMENTATION EXCEPT AS STATED ABOVE.

2.  **PURCHASE PRICE.**  Subject to the terms and conditions of this Agreement, and in reliance upon the representations, warranties and covenants of the Seller made herein, Purchaser shall pay and deliver to Seller the sum set forth in the Closing Statement, located in Appendix A to each Schedule to this Agreement, for the Accounts purchased under that Schedule and this Agreement.

3.  **REPRESENTATIONS AND WARRANTIES OF SELLER.**  Seller represents and warrants to Purchaser that to the best of its knowledge and belief as of the date of this Agreement, and shall ensure that the following are accurate representations and warranties on each Closing Date:

A.  The entry and performance of this Agreement by the Seller is subject to approval by the Bankruptcy Court and on an "as is, where is" basis without any representations or warranties.

B.  After receiving approval from the Bankruptcy Court, the Debtor will, at the time of execution of the Assignment and Bill of Sale ("Transfer Date"), have all right, title, and interest in and to all of the Accounts. Subject to approval by the Bankruptcy Court, Seller shall transfer on behalf of the Debtor the assets to be sold free and clear of all assignments, liens, charged, encumbrances and other security interests.

C.  Subject to approval from the Bankruptcy Court, on the Transfer Date, the Debtor will have good and marketable title to the Accounts free and clear of all liens, charges, encumbrances or rights of others (other than Purchaser). The Seller will sell and transfer the Accounts to Purchaser without recourse, and without any express or implied representation or warranty on an "as is, where is" basis except as made in this Agreement. Except as expressly set forth in this Agreement, Seller has made no representation, and now makes no representation, with respect to any of the Accounts or with respect to the completeness or accuracy of any documents relating to any Account.

D.  To the extent that Seller contracts with collection agencies (the "Collection Agencies") that report delinquent debt to the three major credit bureaus (the "Credit Bureaus"), immediately following the Closing Date, Flock and Libertas shall instruct the Collection Agencies to remove any delinquent debt references related to the Accounts purchased under this Agreement and notify the Credit Bureaus of the same. Flock and Libertas shall provide written verification to Purchaser within ninety (90) days from the Closing Date that all delinquent debt references related to the Accounts have been removed from the applicable individuals' credit reports and that the Collection Agencies will not report any further information related to the Accounts to the Credit Bureaus.

E.  Seller agrees not to publicize the sale of the Accounts to Purchaser in a manner that the Seller knows or should know is likely to influence a patient's selection of a health service provider; provided, however, that Purchaser acknowledges that: 1) this Agreement will be filed with the Bankruptcy Court and available in the Bankruptcy Case; and 2) Seller is permitted to fully disclose any relevant information to obtain any approval from the Bankruptcy Court related to this Agreement. Subject to the foregoing, Seller is permitted to fully disclose any relevant information regarding the arrangement described in this Agreement on Schedule H of its Internal Revenue Service Form 990, as applicable.

4.  **LIMITATIONS OF LIABILITY.**  Notwithstanding any provision in this Agreement to the contrary, the liabilities, responsibilities, and obligations of the parties under this Agreement shall be subject to the following limitations:

A.  In no event will either party be liable or responsible to the other party for any indirect, incidental, consequential, special, punitive or exemplary damages (including, without limitation, lost profits) arising from, or relating to, any provision, breach, default, or performance of this Agreement.

B.  In no event will Purchaser be liable to Seller or to any patient regarding amounts previously paid by the

patient to their health care service providers and ultimately forgiven by Purchaser. The parties shall direct patients seeking refunds to the applicable health care service provider.

C.      No claim by either party under this Agreement will be effective if it is not received by the other party in writing on or before the first anniversary of the Closing Date.

D.      The maximum aggregate liability of Seller under this Agreement, a Schedule, the Bill of Sale, or otherwise in connection with the Accounts shall be equal to (i) the Purchase Price paid by Purchaser; minus (ii) all payments made or scheduled to be made to Purchaser.

E.      The maximum aggregate liability of the Purchaser under this Agreement, a Schedule, the Bill of Sale, or otherwise in connection with the Accounts shall be equal to the lesser of (i) the Purchase Price paid by Purchaser; or (ii) Purchaser's available insurance coverage applicable to the claim at issue.

5.      **REMITTANCE OF DIRECT PAYMENTS.**   Flock and Libertas shall remit to the patient/debtor/guarantor of record, as applicable, all payments on Accounts purchased hereunder that are received after the applicable Closing Date.

6.      **CONDITIONS OF SALE.**

A.      The obligations of Purchaser to perform hereunder and purchase the Accounts on each Closing Date shall be subject to the satisfaction on or before each Closing Date of the following further conditions:  (i) the representations and warranties contained in Section 3 hereof shall to the best of Seller's knowledge and belief be true and correct in all respects on the Closing Date as if made on such date; and (ii) Seller shall have performed and observed all covenants, agreements and conditions hereof to be performed or observed by it on or before the Closing Date.

B.      The obligations of Seller to perform hereunder and sell the Accounts at Closing shall be subject to the satisfaction, on or before each Closing Date, of the Purchaser's delivery to Seller of the Purchase Price specified in Section 2 hereof.

C.      The Trustee will file a motion (the "Approval Motion") seeking an order of the Court in the Bankruptcy Case (the "Approval Order") that approves this Agreement and the sale to the Purchaser. This Agreement is contingent upon and shall not be enforceable against the Trustee or the Estate until the entry of a final and non-appealable order approving the Agreement and the sale to the Purchaser. Other than as provided herein, this Agreement shall have no force and effect against the Trustee or the Estate unless and until the Court enters a final order granting the Approval Motion to approve this Agreement and sale to the Purchaser.

D.      The Seller shall have obtained all required approvals from the Bankruptcy Court incident to the Approval Order to sell the Accounts to the Purchaser.

E.      The Bankruptcy Court shall have entered the Approval Order to approve the sale to the Purchaser under the Agreement and that such Approval Order shall have become a final order.

7.      **CLOSING.**  The closing of the sale and applicable purchase of the Accounts shall take place on the Closing Date described in Appendix A to each Schedule. At each Closing, the following shall be done:

A.      Seller shall deliver or cause to be delivered to Purchaser such bills for sale, assignments, conveyances and other good and sufficient instruments of transfer (all of which shall be consistent with the terms set forth in this Agreement), which shall be effective to vest in Purchaser good and valid title to the Accounts on an "as is, where is" basis without any representations or warranties.

B.      Purchaser shall pay to Seller the Purchase Price as set forth on Section 2 of this Agreement and in Appendix A of each Schedule.

8.      **REPRESENTATIONS AND WARRANTIES OF PURCHASER.**   Purchaser hereby represents and warrants to Seller as of the date of this Agreement and shall ensure that the following are accurate representations and warranties on each Closing Date:

Purchaser is a New York Company duly organized, validly existing and in good standing under the laws of the state of its formation with full power and authority to enter into this Agreement, to purchase the Accounts, and to carry out the terms and provisions hereof.

Purchaser has the power and authorizations, if any, required by governmental authority to carry on its business as now being conducted which relate to the Accounts, which authorization is in full force and effect.

The execution and delivery of this Agreement and the performance hereunder have been duly authorized on or prior to the Closing Date, by all necessary action on the part of Purchaser and no provision of applicable law or regulation or the charter or by-laws of Purchaser or any agreement, judgment, injunction, order, decree or other instrument binding upon Purchaser is or will be contravened by Purchaser's execution and delivery of this Agreement or Purchaser's performance hereunder.

No authorization, consent, approval, license, qualification or formal exemption from, nor any filing, declaration or registration with, any governmental agency or regulatory authority or any other body is required in connection with the execution, delivery or performance by Purchaser of this Agreement, which authorization, consent, approval, license, qualification or formal exemption from, or filing declaration or registration has not been obtained on or prior to each Closing Date hereunder.

No authorization, consent, approval, license, qualification or formal exemption from, nor any filing, declaration or registration with, any governmental agency or regulatory authority or other body is required in connection with the purchase by the Purchaser of the Accounts to be purchased on each Closing Date, which authorization, consent, approval, license, qualification or formal exemption, or filing, declaration or registration has not been obtained on or prior to such date.

Purchaser agrees to immediately notify Seller in writing of any unauthorized misappropriation, disclosure or use by any person of any of Seller's confidential information which may come to its attention and to take immediate steps to limit, stop, or otherwise remedy such misappropriation, disclosure or use.

This Agreement constitutes a legal, valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general and the rights of creditors of national banking associations and except as such enforceability may be limited by general principles of equity (whether considered in a suit at law or in equity).

Purchaser represents and warrants that its sole and absolute business purpose is to provide a charitable relief to consumers across the United States of America by lawfully acquiring the unpaid legal obligations of consumers ("Debt" or "Debts") and subsequently extinguishing those Debts owed by the consumer by eliminating any further obligation with respect to the specific Account purchased by the Purchaser.

Purchaser covenants and agrees that it will not, nor will any of its representatives, agents, independent contractors, persons or entities acting on its behalf, or any assignee engage in any type of collection efforts in connection with any Account sold to it by Seller (those of which also may be listed in Appendix A to each Schedule), and that (to the extent applicable) Purchaser and its agents, employees, representatives or assignees shall comply with all applicable state and federal debt collection laws, or any other law.

Purchaser warrants and represents that it will not resell any Accounts being purchased pursuant to this Agreement to any third parties, affiliates, or any other entity that is not a party to this Agreement.

Purchaser or its assignee or successor shall, at its own expense, give the debtor of each Account written notice of the transfer by ordinary mail or debtor's last known address in its first written communication with the debtor. Purchaser shall not use information provided by Seller to contact the debtor of any Account without the consent of Seller or the debtor except to inform such debtors of the transfer and related debt relief; *provided* that, when sending a notice of transfer, Purchaser may include additional resources on medical debt and financial empowerment.

Purchaser warrants and represents that it is a sophisticated informed investor, has knowledge and experience in financial and business matters that enables it to evaluate the merits and risks of the transaction contemplated by this

Agreement.

Purchaser acknowledges that Seller does not represent, warrant or ensure the accuracy or completeness of any information or its sources of information contained in the information provided or in any of the Account files.

Purchaser agrees and represents that the Accounts and any other information provided to Purchaser prior to the decision to purchase the Accounts were an adequate and sufficient basis on which to determine whether and at what price to purchase the Accounts.

Purchaser has made such independent investigations as it deems to be warranted into the nature, validity, enforceability, collectability and value of the Accounts, and all other facts it deems material to its purchase and is entering into this transaction solely on the basis of that investigation and Purchaser's own judgment, and is not acting in reliance on any representatives or independent contractors (other than the representations and warranties of Seller contained herein).

Purchaser is in full compliance with its obligations under the terms of any confidentiality agreement, including but not limited to any business associate agreement executed by the Purchaser to review the information made available by Seller or its agents, and the terms thereof are hereby incorporated herein subject to Purchaser's ownership rights and interests acquired by Purchaser hereunder.

Purchaser is compliant with all data and information security standards, patient account privacy standards, and any other account information security standards that are generally accepted industry standards for the financial services and healthcare industries, including but not limited to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as amended from time to time including Sections 13400 through 13424 of the Health Information Technology for Economic Clinical Health Act ("HITECH").

At time of each Closing, the Purchaser represents and warrants that it has and will continue to maintain during its ownership of any Account sold to Purchaser under this Agreement, General Liability Insurance and Errors & Omissions Insurance, each individually in an amount of not less than $1,000,000 per occurrence, and $2,000,000 in aggregate.

9.    **NOTICES.**  Any notice or other communication provided for herein or given hereunder to a party hereto shall be in writing and shall be delivered in person to such party or mailed by first class registered or certified mail, or by courier service such as Federal Express, postage prepaid, addressed as follows:

| If to Seller: | If to Purchaser: |
|---|---|
| **S. Gregory Hays, Trustee for the Bankruptcy Estate of ARC Management Group, LLC**<br>Suite 555<br>2964 Peachtree Road NW<br>Atlanta, Georgia 30305<br>Attn: S. Gregory Hays | **Medical Debt Resolution, Inc. dba Undue Medical Debt aka RIP Medical Debt**<br><br>28-07 Jackson Ave 5th Fl<br>Long Island City, NY 11101<br>Attn: President/CEO |
| If to Flock: | If to Libertas: |
| **FLOCK FINANCIAL, LLC, a Delaware limited liability company**<br><br>Gregory Taube, Esq.<br>Nelson Mullins<br>201 17th Street NW<br>Atlanta, GA 30363 | **LIBERTAS FUNDING, LLC, a Delaware limited liability company**<br><br>Jeffrey Cianciulli, Esq<br>Weir LLP<br>1339 Chestnut Street<br>Suite 500<br>Philadelphia PA 19107 |

10. **SEVERABILITY.** If any provision, or application thereof, of this Agreement is held unlawful or unenforceable in any respect, the parties hereto agree that such illegality or unenforceability shall not affect other provisions or allocations that can be given effect, and this Agreement shall be construed as if the unlawful or unenforceable provisions are amended so as to make it valid, reasonable and enforceable and agree to be bound by the terms of such provision, as modified by the court.

11. **AMENDMENTS.** This Agreement may be amended or modified only by a written instrument executed by all the parties hereto.

12. **COUNTERPARTS.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute but one instrument.

13. **HEADINGS.** The headings contained in this Agreement, the Exhibits and the Schedules are for convenience only and shall be deemed to affect the interpretation of the provisions of this Agreement.

14. **SURVIVAL OF REPRESENTATIONS AND WARRANTIES.** The representations, warranties, covenants and agreements of the parties set forth herein shall survive the closing.

15. **GOVERNING LAW.** This Agreement is made pursuant to and shall be construed under the laws of New York without regard to its conflicts of laws provisions other than New York General Obligations Law Section 5-1401. Any disputes between the Seller and Purchaser concerning or arising out of this Agreement shall be heard by the Bankruptcy Court and the Seller and the Purchaser agree that the Bankruptcy Court is the exclusive venue for the resolution of any such disputes.

16. **ENTIRE AGREEMENT.** This Agreement (including each and every Exhibit and Schedule) is intended to define the full extent of the legally enforceable undertakings of the parties hereto, and no related promise or representation, written or oral, which is not set forth explicitly in this Agreement is intended by either party to be legally binding. Both parties acknowledge that in deciding to enter into this transaction they have relied on no representations, written or oral, other than those explicitly set forth in this Agreement.

17. **CONFIDENTIALITY.** The parties understand and agree that:

    A.    Except as required by law, by government regulation, by a court ordered process, to enforce or defend this Agreement and the transactions it contemplates (whether with Seller or concerning any Account purchased or considered for purchase from Seller), or as otherwise expressly provided below, the terms of this Agreement are confidential and will not be disclosed to anyone outside of the parties' respective organizations unless the recipients of such information are agents or representatives of such organizations (including attorneys and accountants thereof), each of which if receiving such information shall be bound by the same terms and conditions of any confidentiality agreements or other agreements signed by Purchaser; provided, however, that Purchaser acknowledges that: 1) this Agreement will be filed with the Bankruptcy Court and available in the Bankruptcy Case; and 2) Seller is permitted to fully disclose any relevant information to obtain any approval from the Bankruptcy Court related to this Agreement.

    B.    Purchaser may generally describe (without disclosing the identity of Seller, the name of any individual representative of Seller, the price paid for any individual Account, the aggregate amount paid by Seller for the Accounts being purchased, or any debtor with respect to any Account) the process of identifying, negotiating and purchasing the Accounts.

    C.    Purchaser shall be permitted to disclose the existence of this Agreement and share redacted copies of this Agreement with the Internal Revenue Service to the extent required in order for Purchaser to obtain and/or maintain its tax-exempt status.  Seller and Purchaser mutually agree that prior to sharing any redacted agreement, Purchaser must request permission to do so, and must provide the redacted agreement before presenting it to the IRS.

    D.    At no time and for no reason will Purchaser refer to the Seller's name, the name of any individual representative of Seller, or the price paid by Purchaser for any Account or any portfolio of Accounts in any document, publication, online forum, or anything that would be viewable by any third party, except as

provided in subsection A above. Further, Purchaser may disclose the price paid by Purchaser for a portfolio of Accounts for reporting to government entities and private donors who fund Purchaser's debt relief efforts.

E.      Purchaser further agrees that, other than as provided in subsection A above, it will not disclose to any third party without written consent from Seller any information describing Seller's business practices, contacts, sources for assets, other customers or pricing information, or any other non-public information received from Seller, except to the extent reasonably required to be revealed to Purchaser's accountants to prepare financial statements or tax returns, or to a lender in order to obtain financing.  For the avoidance of doubt, the preceding sentence shall not prevent Purchaser from discussing, in general terms, for educational purposes and in any medium, the workings of the debt-collection industry, so long as such information does not contain any non-public information about Seller received from Seller or its employees, representatives, and agents, and does not contain any information about the specific transaction or transactions contemplated by this Agreement.

F.      These confidentiality provisions of this Agreement will replace and extend the terms and conditions of any prior confidentiality agreement that Purchaser has executed with Seller.

**18.**    **INTERPRETATION & CONSTRUCTION SUBJECT TO HIPAA**.  The Purchaser and Seller recognize that under HIPAA, Purchaser is a Business Associate as that term is defined under the HIPAA Privacy Standards, codified at 45 C.F.R. §§ 160 and 164 et seq. Consequently, concurrently herewith, Purchaser and Seller are entering into a Business Associate Agreement, a copy of which is attached as Exhibit A. This Agreement will be construed and interpreted, at all times, to assure that HIPAA, and any state-law equivalents that are more restrictive than HIPAA, are fully observed and effectuated.  Nothing contained in this Agreement permits any use or disclosure of PHI that is contrary to HIPAA, or any state-law equivalents that are more restrictive than HIPAA.

**19.**    **PURCHASER'S RIGHT OF RESALE.**  Purchaser is strictly prohibited from reselling any Account purchased under this Agreement.

**20.**    **DEFAULT BY PURCHASER.**  If after the execution of this Agreement the Purchaser fails or refuses, for any reason, to purchase Accounts pursuant to this Agreement prior to the applicable Closing Date, or fails to perform any of Purchaser's other obligations hereunder prior to the Closing Date, Seller shall have the right to (i) enforce specific performance of Purchaser's obligations under this Agreement and/or (ii) exercise any other right or remedy Seller may have at law or in equity by reason of the default.

**21.**    **FACSIMILE SIGNATURES.**  All signatures to this Agreement may be delivered by facsimile and such facsimile signatures shall be binding and have full force and effect of original signatures.

**22.**    **DENIAL OF APPROVAL ORDER; BREAK-UP FEE AND EXPENSE REIMBURSEMENT.** In the event that the Court denies approval of this Agreement and sale to the Purchaser, then, unless otherwise agreed to by the Seller and the Purchaser, this Agreement shall terminate and be null and void and of no further force or effect and the Seller and the Purchaser shall be restored to their respective factual and legal positions that existed immediately prior to the execution of this Agreement. Purchaser acknowledges that this Agreement is subject to higher and better offers until the entry of the Approval Order. If this Agreement is terminated by the Seller and the Seller closes on and consummates a sale of the Accounts to a party other than the Purchaser on or prior to the date that is twelve (12) months after the date of such termination (the "Alternative Transaction"), the Purchaser shall be entitled to (A) the reasonably documented actual out-of-pocket fees and expenses (including legal, accounting, escrow and other fees and expenses) not to exceed $100,000 (the "Expense Reimbursement") and (B) a break-up fee in the amount equal to $60,000 (the "Break-Up Fee") with such amount being payable upon the closing or consummation of such Alternative Transaction; provided, however, that, for the avoidance of doubt, notwithstanding any provisions of this Agreement to the contrary, Seller shall not be obligated to pay, and Purchaser shall not be entitled to receive, the Expense Reimbursement or the Break-Up Fee if no Alternative Transaction occurs.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, each party has executed this Accounts Purchase Master Sale Agreement as of the party's signature date, below.

| | |
|---|---|
| **SELLER:** | **PURCHASER:** |
| **S. Gregory Hays, Trustee for the Bankruptcy Estate of ARC Management Group, LLC**<br>Suite 555<br>2964 Peachtree Road NW<br>Atlanta, Georgia 30305 | **Undue Medical Debt**<br>28-07 Jackson Avenue, 5th Floor<br>Long Island City, NY 11101 |

By: _____

**S. Gregory Hays, not individually, but as Trustee for the Bankruptcy Estate of ARC Management Group, LLC**

By: _____

**Allison Sesso**
**President & CEO**

Date: _____          Date: _____

**<u>For purposes of Sections 3(D) and 5 only</u>:**

FLOCK FINANCIAL, LLC, a Delaware limited liability company

By: _____

Name: _____

Title: _____

And

LIBERTAS FUNDING, LLC, a Delaware limited liability company

By: _____

Name: _____

Title: _____

4933-6898-3558.2

**EXHIBIT A**
**BUSINESS ASSOCIATE AGREEMENT**

**(Executed Separately)**



**Medical Debt Resolution, Inc.**
**dba Undue Medical Debt**
**28-07 Jackson Ave 5th Floor**
**Long Island City, NY 11101**
**www.unduemedicaldebt.org**

# BUSINESS ASSOCIATE AGREEMENT

**THIS BUSINESS ASSOCIATE AGREEMENT** ("Agreement") is made by and between **Medical Debt Resolution, Inc. dba Undue Medical Debt aka RIP Medical Debt** ("Business Associate") and **ARC Management Group, LLC** ("Covered Entity"), (Covered Entity and Business Associate are each referred to herein as a "Party," and collectively the "Parties"), and is effective as of the last signature date of the Agreement.

## <u>W H E R E A S</u>

A.     The Covered Entity is subject to, and must comply with, certain provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") as amended from time to time including Sections 13400 through 13424 of the Health Information Technology for Economic Clinical Health Act (the "HITECH Act") and the corresponding Standards for Privacy of Individually Identifiable Health Information (the "Privacy Rule"), Security Standards for the Protection of Electronic Protected Health Information (the "Security Rule"), and the Notification in the Case of Breach of Unsecured Protected Health Information (the "Breach Notification Rule"), each of which are incorporated herein by reference.

B.     The Covered Entity filed a Voluntary Petition seeking relief under Chapter 11 of the United States Bankruptcy Code on December 23, 2023, commencing Chapter 11 Case No. 23-61742  in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court").  On November 14, 2024, the Bankruptcy Court appointed S. Gregory Hays as Chapter 11 Bankruptcy Trustee for the Covered Entity.

C.     Business Associate is a contractor that provides services to the Covered Entity and that the Covered Entity deems to be a "business associate" under the Privacy Rule and/or Security Rule.

D.     Business Associate is subject to, and must comply with, certain provisions of the Privacy Rule, the Security Rule and the Breach Notification Rule, as required by the HITECH Act.

E.     Business Associate acknowledges that the Covered Entity must comply with certain provisions of HIPAA and its corresponding regulations, and that in order to achieve such compliance, the agreement between the Parties must contain certain satisfactory assurances that Business Associate will appropriately safeguard Protected Health Information and Electronic Protected Health Information (collectively referred to herein as "PHI") that it receives from, or creates or receives on behalf of, the Covered Entity.

F.     The Covered Entity seeks certain assurances from Business Associate, and Business Associate wishes to provide such assurances to the Covered Entity, to help it achieve and maintain compliance with the Privacy Rule, Security Rule and Breach Notification Rule.

G.     By this Agreement, the Covered Entity and Business Associate wish to supplement the terms and conditions of the underlying agreement between the Parties to include provisions required by the HITECH Act, the Privacy Rule, the Security Rule and the Breach Notification Rule in order to bring the relationship between the Parties into compliance therewith.

Now therefore, for and in consideration of the mutual covenants and agreements contained herein, the Covered Entity and Business Associate agree as follows:

## ARTICLE I
## DEFINITIONS

Unless otherwise defined herein, terms used in this Agreement have the same meanings as those terms defined in the Privacy Rule (45 C.F.R. § 160.103 and § 164.501), the Security Rule (45 C.F.R. Parts 160, 162 and 45 C.F.R. § 164.304), and the Breach Notification Rule (45 C.F.R. § 164.402).

## ARTICLE II
## PERMITTED USES AND DISCLOSURES OF PHI

Pursuant to the underlying agreement between the Parties, Business Associate provides debt relief and related research services ("Services") for the Covered Entity that may involve the use and/or disclosure of PHI that may be obtained from the Covered Entity.  Except as otherwise specified herein, Business Associate may use or disclose such PHI only in accordance with the Privacy Rule and Security Rule (as applicable) and only to perform those functions, activities or services for, or on behalf of, the Covered Entity as specified in the underlying agreement, provided that such use or disclosure would not violate (i) the Privacy Rule or Security Rule if done by the Covered Entity or (ii) the minimum necessary policies and procedures of the Covered Entity.

Business Associate may use and disclose PHI created or received by Business Associate on behalf of Covered Entity if necessary for the proper management and administration of Business Associate or to carry out Business Associate's legal responsibilities, if (i) the disclosure is required by law, or (ii) Business Associate obtains reasonable assurances from the person to whom the PHI is disclosed that (1) the PHI will be held confidentially and used or further disclosed only as required by law or for the purpose for which it was disclosed to the person; and (2) the Business Associate will be notified of any instances of which the person is aware in which the confidentiality of the information is breached.

## ARTICLE III
## RESPONSIBILITIES OF BUSINESS ASSOCIATE

With regard to its use and/or disclosure of PHI, Business Associate agrees to do the following:

3.1     *Use.*   Business Associate agrees to use and/or disclose PHI only as permitted or required by this Agreement or as otherwise required by law.

3.2     *Safeguards.*  Business Associate will implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of the PHI it creates, receives, maintains or transmits on behalf of Covered Entity, and that reasonably prevent the use or disclosure of the PHI except as described in this Agreement.  Business Associate shall comply, as applicable, with the requirements of the Security Rule.

3.3     *Reporting to Covered Entity.*  Business Associate will report to the Covered Entity any security incident or use or disclosure of PHI of which it becomes aware that is not permitted or required by this Agreement.

3.4     *Mitigation.*  Business Associate agrees to mitigate, to the extent practicable, any harmful effect known to it resulting from a use or disclosure of PHI in violation of the terms of this Agreement.

3.5     *Agents.*  Business Associate agrees to require all of its subcontractors and agents that create, receive, maintain or transmit PHI under the underlying agreement between the Parties to agree, in writing, to adhere to the same restrictions and conditions on the use and/or disclosure of PHI and to implement the same safeguards to protect PHI that apply to Business Associate.  Business Associate agrees to make available to Covered Entity at its reasonable request documentation evidencing its subcontractors' and agents' agreements described in the preceding sentence.

3.6     *Access to Records.*  Except as protected by state or federal privilege, Business Associate agrees to make available all records, books, policies and procedures relating to the safeguards implemented and the use or disclosure of PHI to the Secretary of the Department of Health and Human Services (the "Secretary"), in a time and manner designated by the Secretary, for the purpose of determining the Parties' compliance with the Privacy Rule, Security Rule, Breach Notification Rule and/or the Enforcement Rule.

3.7     *Documentation of Disclosures.*  Business Associate agrees to document the disclosures of PHI and information related to those disclosures that would be required for Covered Entity to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 C.F.R. § 164.528.  Business Associate agrees to provide the Covered Entity with documentation of all of Business Associate's disclosures of PHI as and to the extent

reasonably requested by Covered Entity to permit Covered Entity to respond to an Individual's request for an accounting of disclosures of PHI in accordance with 45 C.F.R. § 164.528.

**3.8**    ***Access to Designated Record Set.***  Business Associate agrees to provide access to the Covered Entity, or to an Individual or an Individual's designee as directed by the Covered Entity, to PHI contained in a Designated Record Set in the time and manner designated by the Covered Entity.

If an Individual requests an electronic copy of PHI maintained electronically in a Designated Record Set, Business Associate agrees to provide access to the Covered Entity, or to an Individual or an Individual's designee as directed by the Covered Entity, to PHI in a readable electronic form and format as agreed to by Covered Entity and the Individual, with respect to the PHI maintained electronically in a Designated Record Set.

**3.9**    ***Amendments to Designated Record Set.***  Business Associate agrees to make any amendment(s) to PHI contained in a Designated Record Set that the Covered Entity directs or agrees to pursuant to 45 C.F.R. § 164.526.

**3.10**    ***Minimum Necessary.***  Business Associate agrees to request from the Covered Entity, and disclose to its subcontractors, agents or applicable third parties, only the minimum PHI necessary to fulfill a specific function required or permitted hereunder.

**3.11**    ***Covered Entity's Obligations under the Privacy Rule.***  To the extent that Business Associate is to carry out one or more of Covered Entity's obligation(s) under the Privacy Rule, Business Associate agrees to comply with the requirements of the Privacy Rule that apply to Covered Entity in the performance of such obligation(s).

**3.12**    ***Breach Notification.***  Business Associate shall, following the Discovery of a Breach of Unsecured PHI, notify Covered Entity of such Breach without unreasonable delay and in no event later than three (3) business days after Discovery of the Breach.  When notifying Covered Entity, Business Associate shall include, to the extent possible, the identification of each individual whose Unsecured PHI has been, or is reasonably believed by Business Associate to have been, accessed, acquired, used, or disclosed during the breach, as well as the information outlined in 45 C.F.R. § 164.404(c).  If it is not possible to provide such information at the time of initial notification, Business Associate shall provide the information to Covered Entity promptly thereafter as information becomes available.

**3.13**    ***De-identification.***  Business Associate may use PHI to de-identify the information: (i) if required for purposes of providing Services, (ii) as agreed in the underlying service agreement, (iii) for Business Associate's quality assessment and quality improvement purposes, (iv) for research purposes, limited to academic not-for-profit research regarding the impact of medical debt and medical debt relief and research regarding the causes of medical debt and (v) for reporting to government entities and private donors who fund Business Associate's debt relief efforts. The de-identified data used for purposes described in (iv) and (v) of the preceding sentence shall not include the name of the creditor or source of the data. Other than these uses, Business Associate shall not use Covered Entity's de-identified information for its own purposes, except on a case-by-case basis with Covered Entity's separate prior written agreement for a proposed use. De-identification must comply with 45 C.F.R. § 164.502(d), and any such de-identified information must meet the standard and implementation specifications for de-identification under 45 C.F.R. § 164.514(a) and (b), or as they may be amended from time to time.

## ARTICLE IV
## RESPONSIBILITIES OF COVERED ENTITY

With regard to the use or disclosure of PHI by Business Associate, the Covered Entity hereby agrees to do the following:

a.   Provide the Business Associate with access to the PHI as maintained by Covered Entity and its agents and to assist and cooperate with the Buiness Associate in reviewing and having access to the PHI.

b.   Inform Business Associate of any changes in, or revocation of, an Individual's consent or authorization to use or disclose PHI, if such changes affect Business Associate's permitted or required uses and disclosures.

c.   Notify Business Associate of any restriction to the use or disclosure of PHI in the Covered Entity's notice of privacy practices to the extent that such restriction may affect Business Associate's use or disclosure of PHI.

d.   Request Business Associate to use or disclose PHI only in a manner permissible under the Privacy Rule or Security Rule if done by Covered Entity.

## ARTICLE V
## TERM AND TERMINATION

5.1     ***Term***.  This Agreement shall become effective as of the last signature date of this Agreement and shall continue in effect until all of the PHI provided by the Covered Entity to Business Associate, or created or received by Business Associate on behalf of the Covered Entity, is (i) destroyed and documentation of such destruction is provided to the Covered Entity, (ii) returned to the Covered Entity or (iii) if it is infeasible to return or destroy such PHI, until protections are extended to such information in accordance with **Section 5.3**.

5.2     ***Termination by the Covered Entity for Cause***.  Upon the Covered Entity's knowledge of a material breach of this Agreement by Business Associate with respect to the Privacy Rule, the Covered Entity shall provide Business Associate an opportunity to cure the breach or end the violation and terminate this Agreement and the underlying agreement between the Parties if Business Associate does not cure the breach or end the violation within the time period specified by the Covered Entity, or immediately terminate this Agreement and the underlying agreement if Business Associate has breached a material term of this Agreement and cure is not possible.

5.3     ***Effect of Termination***.  Except as otherwise provided in this **Section 5.3**, Business Associate agrees to return or destroy all PHI received from the Covered Entity, or created or received by Business Associate on behalf of the Covered Entity, upon termination of this Agreement for any reason.  Business Associate also agrees to provide the Covered Entity with documentation of the destruction of PHI.  This provision shall also apply to PHI that is in the possession of subcontractors or agents of Business Associate.  In the event that Business Associate determines that returning or destroying PHI is infeasible, Business Associate shall extend the protections of this Agreement to such PHI and limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such PHI.

## ARTICLE VI
## MISCELLANEOUS

7.1     ***Regulatory References.***  References in this Agreement to a section in the Privacy Rule, Security Rule and/or Breach Notification Rule shall refer to the section in effect or as amended.

7.2     ***Survival***.  The respective rights and obligations of Business Associate and the Covered Entity under the provisions of this Agreement shall survive termination of this Agreement.

7.3     ***Changes, Modifications or Alterations***.  The Parties agree to take such action to amend this Agreement from time to time as is necessary for the Parties to comply with the Privacy Rule, Security Rule and/or Breach Notification Rule.  No changes or modifications of this Agreement shall be valid unless the same shall be in writing and signed by both Covered Entity and Business Associate.

7.4     ***Counterparts***.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute one and the same instrument.  Facsimile copies hereof shall be deemed to be originals.

7.5     ***Interpretation.***  Any ambiguity in this Agreement shall be resolved in favor of a meaning that permits the Parties to comply with HIPAA, the Privacy Rule, the Security Rule, the Breach Notification Rule and the HITECH Act, as applicable.

7.6     ***Governing Law.***  This Agreement shall be interpreted, construed and enforced pursuant to and in accordance with the laws of the State of New York, without regard to its conflicts of law principles.  Any disputes between the P:arties concerning or arising out of this Agreement shall be heard by the Bankruptcy Court and the Parties agree that the Bankruptcy Court is the exclusive venue for the resolution of any such disputes.

7.7     ***Incorporation.***  Any provisions now or hereafter required to be included in this Agreement by applicable state or federal law, including without limitation, the Privacy Rule, the Security Rule, the Breach Notification Rule and the HITECH Act, or by the Department of Health and Human Services or the Centers for Medicare and Medicaid Services shall be binding upon and enforceable against the Parties and be deemed incorporated herein, irrespective

of whether or not such provisions are expressly set forth in this Agreement or elsewhere in the underlying agreement between the Parties.

**7.8**   ***Severability.*** The provisions of this Agreement shall be deemed severable, and, if any portion shall be held invalid, illegal or unenforceable for any reason, the remainder of the Agreement shall be effective and binding upon the Parties.

**7.9**   ***Waiver.*** A waiver of any provision of this Agreement must be in writing, signed by the Parties hereto. The waiver by either Party of any provision of this Agreement or the failure of any Party to insist on the performance of any of the terms or conditions of this Agreement shall not operate as, nor be construed to be, a waiver or the relinquishment of any rights granted hereunder and the obligation of the Parties with respect thereto shall continue in full force and effect.

**7.10**  ***Force and Effect.*** The Parties acknowledge and agree that this Agreement shall be of no force and effect unless and until a duly authorized representative of each Party has signed the following signature page where indicated.

**7.11**  ***Notices and Points of Contact.*** Any notice or other communication provided for herein or given hereunder to a Party hereto shall be (i) via email, (ii) in writing and shall be delivered in person to such Party or mailed by first class registered or certified mail, or (iii) by courier service such as Federal Express, postage prepaid, addressed as follows, or to such other address, or to the attention of such other person(s) or officer(s), as either Party may designate by written notice to the other Party.

| As to Covered Entity: | As to Business Associate: |
|---|---|
| **ARC Management Group, LLC** | **Medical Debt Resolution, Inc. dba Undue Medical Debt aka RIP Medical Debt** |
| c/o S. Gregory Hays, Trustee | 28-07 Jackson Ave 5th Fl |
| Suite 555 | Long Island City, NY 11101 |
| 2964 Peachtree Road NW | |
| Atlanta, Georgia 30305 | Allison Sesso |
| (404)-926-0051 | President/CEO |
| ghays@haysconsulting.net | (917) 768-6150 |
| | Allison.sesso@unduemedicaldebt.org |
| w/copy to | |
| | David Reynolds |
| Henry F. Sewell, Jr. | V.P. of Information Systems |
| Suite 555 | (917) 768-5279 |
| 2964 Peachtree Road NW | David.reynolds@unduemedicaldebt.org |
| Atlanta, Georgia 30305 | |
| (404)-822-1785 | www.unduemedicaldebt.org |
| hsewell@sewellfirm.com | |
| | w/copy to (Solely For Notices Related to Bankruptcy Proceedings) |
| | |
| | Christopher M. Candon |
| | Sheehan Phinney Bass & Green |
| | 1000 Elm Street, 17th Floor |
| | Manchester, NH 03101 |
| | (603) 627-8168 |
| | ccandon@sheehan.com |

**IN WITNESS WHEREOF,** each Party has executed this Business Associate Agreement as of the Party's signature date, below.

| COVERED ENTITY | BUSINESS ASSOCIATE |
|---|---|

By: _____

**S. Gregory Hays, Trustee**
**Solely in his capacity as Court-**
**Appointed Trustee for the**
**Covered Entity**

Date: March 19, 2025

By: _____

**Allison Sesso**
**President & CEO**

Date: _____

**IN WITNESS WHEREOF,** each Party has executed this Business Associate Agreement as of the Party's signature date, below.

| COVERED ENTITY | BUSINESS ASSOCIATE |
|---|---|

By: _____

**S. Gregory Hays, Trustee**
**Solely in his capacity as Court-**
**Appointed Trustee for the**
**Covered Entity**

By: _____

*Allison Sesso*

**Allison Sesso**
**President & CEO**

Date: _____

Date: 3/19/2025 | 3:25 PM EDT

**EXHIBIT B**

# SCHEDULES TO ACCOUNTS PURCHASE AND MASTER SALE AGREEMENT

**(Executed Separately)**



Medical Debt Resolution, Inc.
dba Undue Medical Debt
28-07 Jackson Ave 5th Floor
Long Island City, NY 11101
www.unduemedicaldebt.org

# SCHEDULE TO ACCOUNTS PURCHASE AND MASTER SALE AGREEMENT
## SCHEDULE 01

This **SCHEDULE 01** ("SCHEDULE") to the **ACCOUNTS PURCHASE AND MASTER SALE AGREEMENT**, dated, **02/01/2024**, ("Agreement") is made by and between **Medical Debt Resolution, Inc. dba Undue Medical Debt aka RIP Medical Debt,** ("Purchaser") and **S. Gregory Hays**, not individually, but as Chapter 7 Trustee ("Trustee") for the bankruptcy estate (the "Estate") of ARC Management Group, LLC, Debtor (the "Debtor") in the Bankruptcy Case No. 23-61742 – BEM (the "Bankruptcy Case") in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court") (hereinafter collectively referred to as "Seller")and is effective as of the last signature date of this **SCHEDULE**.  Terms not defined in this **SCHEDULE** shall have the meaning set forth in the Agreement.

Pursuant to this **SCHEDULE**, Seller sells the accounts listed on the return report (the "Accounts") to Purchaser.  On the Closing Date listed in Appendix A to this **SCHEDULE**, Purchaser shall pay the price indicated in Appendix A to Seller.

Purchaser represents and warrants to Seller that, to the best of its knowledge and belief, as of the Closing Date, the representations and warranties set forth in Section 8 of the Agreement are accurate.

Seller represents and warrants to Purchaser that, to the best of its knowledge and belief, as of the Closing Date, the representations and warranties set forth in Section 3 of the Agreement are accurate.

**IN WITNESS WHEREOF**, each party has executed this **SCHEDULE** as of the party's signature date, below.

**SELLER:**

**S. Gregory Hays, Trustee for the Bankruptcy Estate of ARC Management Group, LLC**
Suite 555
2964 Peachtree Road NW
Atlanta, Georgia 30305

**PURCHASER:**

**Medical Debt Resolution, Inc. dba Undue Medical Debt aka RIP Medical Debt**
28-07 Jackson Avenue, 5th Floor
Long Island City, NY 11101

By: _____
**S. Gregory Hays, not individually, but as Trustee for the Bankruptcy Estate of ARC Management Group, LLC**

By: _____
**Allison Sesso**
President & CEO

Date: _____

Date: _____

## Appendix A

## CLOSING STATEMENT
## Schedule 01

This transaction consists of Accounts being purchased by **Medical Debt Resolution, Inc. dba Undue Medical Debt aka RIP Medical Debt** ("Purchaser") from **S. Gregory Hays**, not individually, but as Chapter 7 Trustee ("Trustee") for the bankruptcy estate (the "Estate") of ARC Management Group, LLC, Debtor (the "Debtor") in the Bankruptcy Case No. 23-61742 – BEM (the "Bankruptcy Case") in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court") (hereinafter collectively referred to as "Seller")pursuant to an **ACCOUNTS PURCHASE AND MASTER SALE AGREEMENT** effective as of the last signature date of this **SCHEDULE** between Purchaser and Seller**.**

| CONTRACT PRICE LIST | |
|---|---|
| **QUALIFIED ACCOUNTS:** | 44,512 |
| **QUALIFIED BALANCE:** | **REDACTED** |
| **PURCHASE PRICE FACTOR:** | **REDACTED** |
| **PURCHASE PRICE:** | $406,116.39 |

**A.**    Purchaser shall pay to Seller, by wire transfer or otherwise immediately available funds, an amount which equals **$406,116.39**, no later than two (2) business days after the Sale Order becomes a final, non-appealable order (the "Closing Date")

**B.**    Seller agrees to transfer the Accounts to Purchaser on the Closing Date.

| ALL FUNDS MUST BE BY WIRE TRANSFER AS FOLLOWS: | | | |
|---|---|---|---|
| **Bank Name:** | WESTERN ALLIANCE BANK | **ABA (Routing) Number for WIRE TRANSFERS:** | **REDACTED** |
| **Account Name:** | ARC MANAGEMENT GROUP, LLC | **Bank Account Number for WIRE TRANSFERS:** | **REDACTED** |
| **Confirmed by: (Full Name)** | S. GREGORY HAYS | **Signature:** | |

**SELLER:**

**S. Gregory Hays, Trustee for the Bankruptcy Estate of ARC Management Group, LLC**
Suite 555
2964 Peachtree Road NW
Atlanta, Georgia 30305

By: _____
    **S. Gregory Hays, not individually, but as Trustee for the Bankruptcy Estate of ARC Management Group, LLC**

Date: _____

**PURCHASER:**

**Medical Debt Resolution, Inc. dba Undue Medical Debt aka RIP Medical Debt**
28-07 Jackson Avenue, 5th Floor
Long Island City, NY 11101

By: _____
    **Allison Sesso**
President & CEO

Date: _____

## Appendix B

## ASSIGNMENT AND BILL OF SALE
## Schedule XX

**S. Gregory Hays**, not individually, but as Chapter 7 Trustee ("Trustee") for the bankruptcy estate (the "Estate") of ARC Management Group, LLC, Debtor (the "Debtor") in the Bankruptcy Case No. 23-61742 – BEM (the "Bankruptcy Case") in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court") (hereinafter collectively referred to as "Seller") and **Medical Debt Resolution, Inc. dba Undue Medical Debt aka RIP Medical Debt** (hereinafter called "Purchaser") have entered into an **ACCOUNTS PURCHASE AND MASTER SALE AGREEMENT**, effective as of _____ (the "Agreement"), and now enter into Schedule 01 to the Agreement ("Schedule"), dated as of the last signature to the Schedule, to effectuate the sale of the Accounts, upon the terms and conditions set forth in the Agreement.

NOW, THEREFORE, for good and valuable consideration, Seller hereby sells, assigns, and transfers to Purchaser, its successors and assigns, all of Seller's rights, title, and interest in each and every one of the Accounts.

Purchaser and Seller agree that the Purchase Price shall be as stated in Appendix A of this Schedule.

IN WITNESS WHEREOF, Seller has signed and delivered this instrument as of the date listed below.


**SELLER:**

**S. Gregory Hays, Trustee for the Bankruptcy Estate of ARC Management Group, LLC**
Suite 555
2964 Peachtree Road NW
Atlanta, Georgia 30305


By: _____
**S. Gregory Hays, not individually, but as Trustee for the Bankruptcy Estate of ARC Management Group, LLC**


Date: _____



Medical Debt Resolution, Inc.
dba Undue Medical Debt
28-07 Jackson Ave 5th Floor
Long Island City, NY 11101
www.unduemedicaldebt.org

## SCHEDULE TO ACCOUNTS PURCHASE AND MASTER SALE AGREEMENT
## SCHEDULE 02

This **SCHEDULE 02** ("SCHEDULE") to the **ACCOUNTS PURCHASE AND MASTER SALE AGREEMENT**, dated, **02/01/2024**, ("Agreement") is made by and between **Medical Debt Resolution, Inc. dba Undue Medical Debt aka RIP Medical Debt,** ("Purchaser") and **S. Gregory Hays**, not individually, but as Chapter 7 Trustee ("Trustee") for the bankruptcy estate (the "Estate") of ARC Management Group, LLC, Debtor (the "Debtor") in the bankruptcy Case No. 23-61742 – BEM (the "Bankruptcy Case") in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court") (hereinafter collectively referred to as "Seller"), and is effective as of the last signature date of this **SCHEDULE**.  Terms not defined in this **SCHEDULE** shall have the meaning set forth in the Agreement.

Pursuant to this **SCHEDULE**, Seller sells the accounts listed on the return report (the "Accounts") to Purchaser.  On the Closing Date listed in Appendix A to this **SCHEDULE**, Purchaser shall pay the price indicated in Appendix A to Seller.

Purchaser represents and warrants to Seller that, to the best of its knowledge and belief, as of the Closing Date, the representations and warranties set forth in Section 8 of the Agreement are accurate.

Seller represents and warrants to Purchaser that, to the best of its knowledge and belief, as of the Closing Date, the representations and warranties set forth in Section 3 of the Agreement are accurate.

**IN WITNESS WHEREOF**, each party has executed this **SCHEDULE** as of the party's signature date, below.

**SELLER:**

**S. Gregory Hays, Trustee for the Bankruptcy Estate of ARC Management Group, LLC**
Suite 555
2964 Peachtree Road NW
Atlanta, Georgia 30305

**PURCHASER:**

**Medical Debt Resolution, Inc. dba Undue Medical Debt aka RIP Medical Debt**
28-07 Jackson Avenue, 5th Floor
Long Island City, NY 11101

By: _____
**S. Gregory Hays, not individually, but as Trustee for the Bankruptcy Estate of ARC Management Group, LLC**

By: _____
**Allison Sesso**
President & CEO

Date: _____

Date: _____

Appendix A

## CLOSING STATEMENT
### Schedule 02

This transaction consists of Accounts being purchased by **Medical Debt Resolution, Inc. dba Undue Medical Debt aka RIP Medical Debt** ("Purchaser") **S. Gregory Hays**, not individually, but as Chapter 7 Trustee ("Trustee") for the bankruptcy estate (the "Estate") of ARC Management Group, LLC, Debtor (the "Debtor") in the Bankruptcy Case No. 23-61742 – BEM (the "Bankruptcy Case") in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court") (hereinafter collectively referred to as "Seller") pursuant to an **ACCOUNTS PURCHASE AND MASTER SALE AGREEMENT** effective as of the last signature date of this **SCHEDULE** between Purchaser and Seller**.**

| CONTRACT PRICE LIST | |
|---|---|
| **QUALIFIED ACCOUNTS:** | 478,351 |
| **QUALIFIED BALANCE:** | **REDACTED** |
| **PURCHASE PRICE FACTOR:** | **REDACTED** |
| **PURCHASE PRICE:** | $2,606,306.55 |

**A.**     Purchaser shall pay to Seller, by wire transfer or otherwise immediately available funds, an amount which equals **$2,606,306.55**, no later than two (2) business days after the Sale Order becomes a final, non-appealable order (the "Closing Date")

**B.**     Seller agrees to transfer the Accounts to Purchaser on the Closing Date.

| ALL FUNDS MUST BE BY WIRE TRANSFER AS FOLLOWS: | | | |
|---|---|---|---|
| **Bank Name:** | WESTERN ALLIANCE BANK | **ABA (Routing) Number for WIRE TRANSFERS:** | **REDACTED** |
| **Account Name:** | ARC MANAGEMENT GROUP, LLC | **Bank Account Number for WIRE TRANSFERS:** | **REDACTED** |
| **Confirmed by: (Full Name)** | S. GREGORY HAYS | **Signature:** | |

**SELLER:**

**S. Gregory Hays, Trustee for the Bankruptcy Estate of ARC Management Group, LLC**
Suite 555
2964 Peachtree Road NW
Atlanta, Georgia 30305

By: _____
    **S. Gregory Hays, not individually, but as Trustee for the Bankruptcy Estate of ARC Management Group, LLC**

Date: _____

**PURCHASER:**

**Medical Debt Resolution, Inc. dba Undue Medical Debt aka RIP Medical Debt**
28-07 Jackson Avenue, 5th Floor
Long Island City, NY 11101

By: _____
    **Allison Sesso**
President & CEO

Date: _____

## Appendix B

## ASSIGNMENT AND BILL OF SALE
### Schedule XX

**S. Gregory Hays**, not individually, but as Chapter 7 Trustee ("Trustee") for the bankruptcy estate (the "Estate") of ARC Management Group, LLC, Debtor (the "Debtor") in the Bankruptcy Case No. 23-61742 – BEM (the "Bankruptcy Case") in the United States Bankruptcy Court for the Northern District of Georgia (the "Bankruptcy Court") (hereinafter collectively referred to as "Seller") and **Medical Debt Resolution, Inc. dba Undue Medical Debt aka RIP Medical Debt** (hereinafter called "Purchaser") have entered into an **ACCOUNTS PURCHASE AND MASTER SALE AGREEMENT**, effective as of _____ (the "Agreement"), and now enter into Schedule 02 to the Agreement ("Schedule"), dated as of the last signature to the Schedule, to effectuate the sale of the Accounts, upon the terms and conditions set forth in the Agreement.

NOW, THEREFORE, for good and valuable consideration, Seller hereby sells, assigns, and transfers to Purchaser, its successors and assigns, all of Seller's rights, title, and interest in each and every one of the Accounts.

Purchaser and Seller agree that the Purchase Price shall be as stated in Appendix A of this Schedule.

IN WITNESS WHEREOF, Seller has signed and delivered this instrument as of the date listed below.


**SELLER:**

**S. Gregory Hays, Trustee for
the Bankruptcy Estate of ARC
Management Group, LLC**
Suite 555
2964 Peachtree Road NW
Atlanta, Georgia 30305


_____
**S. Gregory Hays, not
individually, but as Trustee for
the Bankruptcy Estate of ARC
Management Group, LLC**


_____
Date

**EXHIBIT B**
**(Procedures Order)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | **:** | |
| | **:** | **CHAPTER 7** |
| **ARC MANAGEMENT GROUP, LLC,** | **:** | |
| | **:** | **Case No. 23-61742 - BEM** |
| _____Debtor._____ | **:** | |

**ORDER (A) AUTHORIZING AND SCHEDULING AN AUCTION AT WHICH THE
TRUSTEE WILL SOLICIT THE HIGHEST OR BEST BID FOR THE SALE OF
ASSETS; AND (B) APPROVING BID PROCEDURES GOVERNING THE PROPOSED
SALE INCLUDING PAYMENT OF EXPENSE REIMBURSEMENT AND BREAKUP
FEE**

This matter is before the Court on the _Motion (A) for Authority to Sell Assets Free and Clear_

_of Liens, Claims, and Encumbrances; (B) to Establish Procedures With Respect to Such Sale; (C)_

_Consider Approval of Breakup Fee and Expense Reimbursement; and (D) to Shorten and Limit_

_Notice_ (the "**Motion**")[1] that was filed by S. Gregory Hays, as Chapter 7 Trustee ("**Trustee**" or

"**Seller**") for the bankruptcy estate (the "**Estate**") of ARC Management Group, LLC, Debtor (the

_____

[1] Capitalized terms not defined herein shall have the meanings ascribed to such terms in the Motion.

"**Debtor**") in the above captioned case (the "**Case**"). In the Motion, the Trustee seeks the entry of (i) an order approving a sale and bidding process to be used in connection with the proposed sale of certain identified assets (the "**Identified Assets**"), and (ii) an order approving the sale by the Seller of the Identified Assets to Medical Debt Resolution, Inc. dba Undue Medical Debt (collectively with its affiliates, "**Undue**") or to the bidder submitting the highest or best bid for the Identified Assets in connection with the sale and bidding process. Upon an interim hearing regarding the Motion having been held on _____ (the "**Bid Procedures Hearing**") and consideration of the Motion and based upon all of the evidence proffered or adduced at the Bid Procedures Hearing; and after consideration of any memoranda, objections, or other pleadings filed in connection with the Bid Procedures Hearing; and after consideration of the arguments of counsel made at the Bid Procedures Hearing; and upon the entire record of the Case; and it appearing that the approval of the bid procedures (collectively, the "**Bid Procedures**") as requested in the Motion is in the best interests of the Debtor, the Estate and creditors; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby FOUND AND DETERMINED THAT:

      A.     The form and manner of notice of the Bid Procedures and the Bid Procedures Hearing shall be, and hereby are, approved as sufficient and adequate notice. No other or further notice in connection with the entry of this Order is or shall be required.

      B.     The Bid Procedures were proposed by the Trustee in good faith with the goal of maximizing the value of the Portfolios and the Identified Assets for the benefit of all creditors of the estate.

      C.     Undue has negotiated and entered into a definitive asset purchase agreement with the Trustee setting forth the terms and conditions pursuant to which Undue proposes to acquire

the Identified Assets (the "**Sale Agreement**") and to consummate the transactions contemplated

thereby that constitutes an initial offer that will serve as a "floor" for further bidding.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED

THAT:

1.      The Motion is granted to the extent set forth in this Order. Any objections to the

Motion that have not been resolved or withdrawn are hereby overruled on the merits. The following

"**Bid Procedures**" are hereby approved and shall be used in connection with the proposed sale of

the Identified Assets:

a.   <u>Initial Overbid</u>. Any third party (other than Undue) that is interested in acquiring the Identified Assets must submit an "Initial Overbid" in conformance with the Bid Procedures by not later than 5:00 p.m. local time in Atlanta, Georgia on July 15, 2025 (the "**Overbid Deadline**"). Any such Initial Overbid must:

i.   Contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from the Sale Agreement with Undue) with, at a minimum, the following requirements: (1) having substantially identical terms and conditions as the Sale Agreement with Undue, except with higher and better consideration; (2) containing terms and conditions otherwise no less favorable to the Estate than the terms and conditions in the Sale Agreement (provided that no Initial Overbid shall provide for the payment to the overbidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement); (3) provide for consideration to the Trustee in an amount equal to or greater than the sum of (a) the consideration payable by Undue under the Sale Agreement, <u>plus</u> (b) an additional amount of $185,000 in cash; (4) not be subject to any (a) financing contingency, (b) contingency relating to the completion of unperformed due diligence, (c) contingency relating to the approval of the overbidder's board of directors or other internal approvals or consents, or (d) any conditions precedent to the overbidder's obligation to purchase the Identified Assets other than those included in the Sale Agreement with Undue; and (5) provide that the overbidder shall purchase all of the Identified Assets;

ii.  Include a cashiers' or certified check as a deposit in the aggregate amount of $100,000.00, payable to an independent escrow agent to be designated by the Seller (it being understood that deposits may also be sent by wire transfer of immediately available funds);

     iii.  To the extent not previously provided to the Trustee, be accompanied by evidence satisfactory to the Trustee that the Purchaser can complete the transaction;

     iv.  Remain open and irrevocable until one hundred (100) days after the entry of an order by the Court approving a definitive agreement providing for the sale of the Identified Assets; and

     v.  Be submitted to (1) counsel to the Trustee, Law Offices of Henry F. Sewell Jr., LLC, Buckhead Centre, 2964 Peachtree Road NW, Suite 555, Atlanta, GA 30305 (Attn: Henry F. Sewell, Jr., Esq.) (hsewell@sewellfirm.com), (2) counsel to Undue, Sheehan Phinney Bass & Green PA, 1000 Elm Street, 17th Floor, Manchester, NH 03101, Attn: Christopher M. Candon (ccandon@sheehan.com), and (3) Office of the U.S. Trustee, 362 Richard Russell Bldg., 75 Spring Street, SW, Atlanta, Georgia 30303, in each case so as to be received not later than the Overbid Deadline.

b. <u>Auction</u>. In the event the Trustee timely receives a conforming Initial Overbid from a prospective purchaser as described above (a "**Qualified Bidder**"), then the Trustee will conduct an Auction with respect to the sale of the Identified Assets on July 16, 2025, beginning at 10:00 a.m. local time, at the offices of counsel for the Trustee, Law Offices of Henry F. Sewell Jr., LLC, Buckhead Centre, 2964 Peachtree Road NW, Suite 555, Atlanta, GA 30305 (Attn: Henry F. Sewell, Jr., Esq.), or at such other location as may be designated by the Trustee. In order to participate in the Auction, each prospective purchaser shall be required to comply with the requirements of the Bid Procedures and to submit an Initial Overbid that is timely and that complies in all respects with the Bid Procedures Order. At the Auction, Qualified Bidders and Undue (it being understood that Undue shall be deemed to be a Qualified Bidder) may submit successive bids in cash increments of at least One Hundred Thousand Dollars $100,000 greater than the prior bid for the purchase of the Identified Assets until there is only one offer that the Trustee determine (in the exercise of their sole discretion), subject to Court approval, is the highest or best offer for the Identified Assets (the "**Prevailing Bid**"). When bidding at the Auction, Undue shall receive a cash "credit" in an amount equal to the <u>sum</u> of the maximum Expense Reimbursement <u>plus</u> the Breakup Fee. All bidding for the Identified Assets will be concluded at the Auction and there will be no further bidding at the Sale Hearing. If no conforming Initial Overbid from a Qualified Bidder shall have been received at or prior to the Overbid Deadline, the Auction will not be held, Undue shall be designated as the highest and best bid, and the Sale Hearing will proceed with respect to the Sale Agreement with Undue on an expedited basis. In determining the Prevailing Bid, consideration will be given to, among other things: (i) the number, type and nature of any changes to the Sale Agreement with Undue requested by each bidder; (ii) the extent to which such modifications are likely to delay closing of the sale of the Identified Assets and the cost to the Trustee of such modifications or delay; (iii) the total consideration to be received by the Seller; (iv) the likelihood of the bidder's ability to close a transaction and the timing thereof; (v) the net benefit to the Estate; and (vi) the

4

amount of the bidder's experience acquiring, owning, rehabilitating and managing projects that are substantially similar to the Portfolios. At the Auction, Undue shall have the right to (i) submit further bids along with a markup of the Sale Agreement with Undue; and (ii) at any time, request that the Trustee announce, subject to any potential new bids, the then current Prevailing Bid and, to the extent Undue requests, use reasonable efforts to clarify any and all questions Undue may have regarding the Trustee' announcement of the then current Prevailing Bid. Only the persons who submitted Initial Overbids and Undue may participate in the Auction. After the Auction has concluded, the Trustee shall present the Prevailing Bid to the Court for consideration and approval at the Sale Hearing.

c. <u>Sale Hearing</u>. The Sale Hearing will be conducted at ____:___ a.m. local time, on , at the United States Bankruptcy Court, 75 Spring Street, S.W., Atlanta, Georgia 30303, at which time the Trustee intend to present the Prevailing Bid for approval by the Court pursuant to the provisions of Sections 105, 363(b), 363(f), 363(m), and 363(n) of the Bankruptcy Code. The Trustee shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing.

d. <u>Highest and/or Best Bid</u>. At all times during the proposed sale process, the Trustee shall retain the right to determine, in their reasonable discretion, which bid constitutes the highest or otherwise best offer for the purchase of the Identified Assets, and which bid should be selected as the Prevailing Bid, if any, all subject to final approval by the Court pursuant to the provisions of Section 363(b) of the Bankruptcy Code. Without limiting the generality of the foregoing, the Trustee may, at any time before entry of an order of the Court approving a Prevailing Bid, reject any bid (other than the Undue bid, as reflected in the Sale Agreement) that, in the reasonable discretion of the Trustee, is (i) inadequate or insufficient, (ii) contrary to the requirements of the Bankruptcy Code or the Bid Procedures, (iii) from a bidder that does not have substantial experience acquiring, owning, rehabilitating and managing projects that are substantially similar to the Portfolios, or (iv) otherwise contrary to the best interests of the Estate or its creditors.

e. <u>Sale Implementation</u>. Following the approval of the Prevailing Bid at the Sale Hearing, the Trustee will be authorized and directed to take all commercially reasonable and necessary steps to complete and implement the transaction(s) contemplated by the Prevailing Bid, including (but not limited to) seeking entry of one or more Sale Orders.

2.    Objections (if any) to approval of any Prevailing Bid or to approval of any proposed sale of the Identified Assets pursuant to any Prevailing Bid, shall be in writing, shall set forth the name of the objecting party, the basis for the objection and the specific grounds therefor, and shall be filed with the Court and served upon each of the following so as to be actually received on or

before 5:00 p.m. on _____: (a) counsel to the Trustee, Law Offices of Henry F. Sewell

Jr., LLC, Buckhead Centre, 2964 Peachtree Road NW, Suite 555, Atlanta, GA 30305 (Attn: Henry

F. Sewell, Jr., Esq.) (hsewell@sewellfirm.com), (b) counsel to Undue, Sheehan Phinney Bass &

Green PA, 1000 Elm Street, 17th Floor, Manchester, NH 03101, Attn: Christopher M. Candon

(ccandon@sheehan.com), and (c) Office of the U.S. Trustee, 362 Richard Russell Bldg., 75 Spring

Street, SW, Atlanta, Georgia 30303, (Facsimile: (404) 331-4464). Any objection not filed and

served in accordance with this paragraph 2 shall be deemed waived and shall be forever barred.

3.      The failure of any third party to file and serve an objection as ordered and directed

herein shall be deemed the consent of such party to the granting of the Motion and the sale and

transfer of the Identified Assets.

4.      In the event that the party submitting the Prevailing Bid is a party other than Undue

and the sale to such party is consummated, the Trustee are authorized to (a) pay to Undue an

agreed-upon "Breakup Fee" in an amount equal to $60,000 (the "**Breakup Fee**"); and (b)

reimburse Undue for its reasonable and documented actual out-of-pocket fees and expenses

(including legal, accounting, escrow and other fees and expenses) incurred in connection with, or

related to (directly or indirectly), the transactions contemplated by the Agreement, in an amount

not to exceed $100,000 (the "**Expense Reimbursement**"); provided, however, that such Breakup

Fee and Expense Reimbursement shall be due and payable only if the Trustee has consummated

an Alternative Transaction for the Identified Assets to a third party other than or related to the

Undue (the "**Alternative Transaction**") and Undue is ready, willing and able to close the

transaction and is not in default under the Agreement. For the avoidance of doubt, Seller shall not

be obligated to pay and Undue shall not be entitled to receive the Expense Reimbursement or the

Breakup Fee if no Alternative Transaction occurs or if the Seller terminates this Agreement as a result of breach of the Agreement by Undue.

5.      In the event that the Breakup Fee and Expense Reimbursement are payable pursuant to the preceding paragraph, (a) the Breakup Fee and Expense Reimbursement shall be treated as allowed administrative expense claims in the Case to be paid out of the sale proceeds at the closing of the Alternative Transaction for the Identified Assets to such third party; and (b) no lien of any third party shall attach to the portion of the sale proceeds representing the Breakup Fee and Expense Reimbursement.

6.      The Bid Procedures (including the Breakup Fee and Expense Reimbursement) are fair and reasonable, are reasonably calculated to produce the best and highest offers for the Identified Assets, and will confer actual benefits upon the Estate. The Bid Procedures (including payment of the Breakup Fee and Expense Reimbursement, if applicable) represent an exercise of the sound business judgment of the Trustee and will facilitate an orderly sale process.

7.      The Trustee shall serve a copy of this Order as contemplated in the Motion.

**END OF DOCUMENT**

Prepared and Presented By:

LAW OFFICES OF HENRY F. SEWELL JR., LLC

By: */s/ Henry F. Sewell, Jr.*
Henry F. Sewell, Jr.
Georgia Bar No. 636265
Counsel for the Trustee

Law Offices of Henry F. Sewell, Jr., LLC
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
 (404) 926-0053
hsewell@sewellfirm.com

**EXHIBIT C**
**(Proposed Order Approving Sale )**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | : | |
| | : | **CHAPTER 7** |
| **ARC MANAGEMENT GROUP, LLC,** | : | |
| | : | **Case No. 23-61742 - BEM** |
| _____Debtor._____ | : | |

**ORDER (I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING**
**THE SALE OF CERTAIN ASSETS OF THE DEBTOR; (II) AUTHORIZING THE SALE**
**OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND**
**INTERESTS; AND (III) GRANTING RELATED RELIEF**

This matter came before the Court pursuant to that certain *Motion (A) for Authority to Sell*

*Assets Free and Clear of Liens, Claims, and Encumbrances; (B) to Establish Procedures With*

*Respect to Such Sale; (C) Consider Approval of Breakup Fee and Expense Reimbursement; and*

*(D) to Shorten and Limit Notice* (DE No. _____, the "**Motion**") [1] that was filed by S. Gregory

Hays, as Chapter 7 Trustee ("**Trustee**" or "**Seller**") for the bankruptcy estate (the "**Estate**") of

_____

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in
the Motion.

ARC Management Group, LLC, Debtor (the "**Debtor**") in the above captioned case (the "**Case**"). Pursuant to sections 105 and 363 of Title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 2002, and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Trustee seeks through the Motion entry of an order that, among other things, (i) authorizes and approves the Trustee to sell certain assets of the Debtor, described in the Motion as the Identified Assets (the "**Purchased Assets**"), free and clear of all liens, claims, encumbrances, and other interests to Medical Debt Resolution, Inc. dba Undue Medical Debt (together with any permitted assignee, the "**Purchaser**") pursuant to the terms and conditions of that certain Accounts Payable Master Sale Agreement, a copy of which is attached to the Motion (together with all exhibits and schedules thereto, and as may be further amended, the "**Agreement**"); (ii) authorizing and approving the entry into, performance under and the terms and conditions of the Agreement (including all actions taken or required to be taken in connection with the implementation and consummation of the Agreement); and (iii) granting certain related relief, all as more fully described in the Motion and the Agreement; and the Court having entered an order on _____ [DE No. _____] (the "**Bidding Procedures Order**") approving procedures (the "**Bidding Procedures**") for (a) submitting bids for the purchase of the Purchased Assets and (b) conducting an auction for the Purchased Assets (the "**Auction**") and a hearing having been held on July__ 2025, at _____:00 a.m. Eastern Time to consider the relief requested in the Motion (the "**Sale Hearing**"); and upon the record of the Sale Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief requested in the Motion is in the best interests of the Debtor, its estate and creditors, and all other parties in interest and that the legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted in this Order; and after due deliberation and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS THAT:[2]**

## Jurisdiction and Venue

A.      The Court has jurisdiction over this matter and over the property of the Debtor and its bankruptcy estate pursuant to 28 U.S.C. §§ 157(a) and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157. Venue of this Case and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## Statutory Predicates

B.      The statutory predicates for the relief requested in the Motion are sections 105 and 363 of the Bankruptcy Code, and Bankruptcy Rules 2002, and 6004.

## Final Order

C.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rule 6004(h), and to any extent necessary under Bankruptcy Rule 9014 and Federal Rules of Civil Procedure 54(b), as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order and that waiver of any applicable waiting period is appropriate, and expressly directs entry of judgment as set forth in this Order.

## Compliance with Bidding Procedures Order

D.      As demonstrated by (i) the testimony and other evidence proffered or introduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Trustee has thoroughly and fairly marketed the Purchased Assets and conducted the related

---

[2] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

sale process in good faith and in compliance in all respects with the Bidding Procedures and the Bidding Procedures Order. All interested persons and entities have been afforded a full, fair, and reasonable opportunity to (i) conduct due diligence investigations, (ii) submit bids to purchase the Purchased Assets, and (iii) object or be heard with respect to the Motion and the relief granted by this Order. The Bidding Procedures were non-collusive, formulated and implemented in good faith, were substantively and procedurally fair to all parties, and obtained the highest or otherwise best value for the Purchased Assets for the Debtor and its estate and creditors.

E.      The Purchaser is the Successful Bidder (as defined in the Bidding Procedures) for the Purchased Assets in accordance with the Bidding Procedures Order, and the consideration provided by the Purchaser under the Agreement constitutes the highest or otherwise best offer and provides fair and reasonable consideration to the Trustee for the sale of all the Purchased Assets. The Purchaser has complied in all respects with the Bidding Procedures Order and any other applicable order of this Court in negotiating and entering into the Agreement, and the sale and the Agreement likewise comply with the Bidding Procedures Order and any other applicable order of this Court.

## **Notice**

F.      As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Auction, the Sale Hearing, the sale of the Purchased Assets (the "**Sale**") has been provided in accordance with Sections 102(1) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9007, and 9008, all applicable Local Rules, and the Bidding Procedures Order. Such notice was good, sufficient, and appropriate under the particular circumstances, and no other or further notice of the Motion, the Auction, the Sale Hearing, the Sale, or entry of this Order is required.

G.      Actual written notice of the Auction, the Sale Hearing, and the Sale and a fair and reasonable opportunity to object or otherwise be heard with respect to the Motion, the Sale and the relief granted by this Order has been afforded to all interested parties, including, without limitation, (i) the Office of the United States Trustee (the "**United States Trustee**"), (ii) all known creditors of the Debtor, (iii) all taxing authorities having jurisdiction over any of the Purchased Assets, including the Internal Revenue Service; (iv) all parties that have requested special notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Bidding Procedures Order; (v) all persons or entities known to the Trustee that have or have asserted a lien on, or security interest in, all or any portion of the Purchased Assets; (vi) counsel to the Purchaser; (vii) all Attorneys General for the states in which the Debtor conducts business; and (viii) all potential bidders previously identified or otherwise known to the Trustee.

H.      On July , 2025, the Trustee served notice of the selection of the Purchaser as the Successful Bidder for the Purchased Assets on (i) all parties receiving electronic notice in this Case and (ii) all parties requesting notice of the selection of the Purchaser as the Successful Bidder in accordance with the Bidding Procedures.

**Highest or Otherwise Best Offer**

I.      The offer of the Purchaser, upon the terms and conditions set forth in the Agreement, including the form and total consideration to be realized by the Debtor pursuant to the Agreement; (i) is the highest or otherwise best offer received by the Trustee; (ii) is fair and reasonable; (iii) is in the best interests of the creditors and estate of the Debtor; and (iv) constitutes fair value, fair, full and adequate consideration, reasonably equivalent value, and reasonable market value for the Purchased Assets.

**Authority**

J.      Upon the entry of this Order, the Trustee shall have full power and authority to execute and deliver the Agreement and all other documents contemplated thereby and shall have full power and authority to consummate the transactions contemplated by the Agreement. Except as otherwise set forth in the Agreement, no further consents or approvals are required for the Trustee to consummate the transactions contemplated by the Agreement.

**Good Faith Purchaser**

K.      The Purchaser is purchasing the Purchased Assets in good faith, and is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of that provision and any other applicable or similar bankruptcy or non-bankruptcy law. The Purchaser has at all times acted in good faith and shall continue to act in good faith within the meaning of Section 363(m) of the Bankruptcy Code in and through Closing of the Sale. Neither the Purchaser nor any of Purchaser's affiliates is an "insider" of the Debtor, as that term is defined in Section 101(31) of the Bankruptcy Code.

**Arm's-Length Sale**

L.  The Agreement was negotiated, proposed, and entered into by the Trustee and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions. No party has engaged in any action or conduct that would justify or permit the avoidance of the sale pursuant to the Sale Agreement, the recovery of excess value, or the imposition of punitive damages, under section 363(n) of the Bankruptcy Code.

**Business Justification**

M.    The Trustee has demonstrated good, sufficient, and sound business reasons and compelling circumstances to enter into the Agreement, sell the Purchased Assets under Section 363 of the Bankruptcy Code, and such actions are appropriate and reasonable exercises of the business judgment of the Trustee and in the best interests of the Debtor, its estate and creditors, and all other parties in interest. Such business reasons include, but are not limited to, the facts that (i) there is substantial risk of deterioration of the value of the Purchased Assets if the Sale is not consummated quickly, (ii) the Agreement constitutes the highest or otherwise best offer for the Purchased Assets, (iii) no other person or entity or group of persons or entities has offered to purchase the Purchased Assets for greater economic value to the estate of the Debtor than the Purchaser, and (iv) the Sale pursuant to the terms of the Agreement presents the best opportunity to realize the value of the assets of the Debtor. The determination of the Trustee that the Agreement constitutes the highest or otherwise best offer for the Purchased Assets constitutes a valid and sound exercise of the business judgment of the Trustee.

N.    The terms and conditions of the Agreement, including the consideration to be realized by the Trustee pursuant to the Agreement, are fair and reasonable, and the transactions contemplated by the Agreement are in the best interests of the Debtor, its estate and creditors, and all other parties in interest. Approval of the Motion, the Agreement, the Sale, and the consummation of the transactions contemplated thereby is in the best interests of the Debtor, its estate and creditors, and all other parties in interest.

**No Fraudulent Transfer; Not a Successor**

O.    The consideration provided by the Purchaser for the Purchased Assets pursuant to the Agreement (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Purchased

Assets, (iii) will provide a greater recovery for the estate and creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, any other laws of the United States, and the laws of any state, territory, possession, and the District of Columbia.

P.      The Purchaser is not a mere continuation of the Debtor or its estate and there is no continuity or common identity between the Purchaser and the Debtor. The Purchaser is not a successor to the Debtor or its estate, and the Sale does not amount to a consolidation, merger, or *de facto* merger of the Purchaser with or into the Debtor. Neither entry into the Agreement nor the Sale of the Purchased Assets to the Purchaser is being undertaken for the purpose of escaping liability for any debts or hindering, delaying, or defrauding the present or future creditors of the Debtor under the Bankruptcy Code, any other laws of the United States, or the laws of any state, territory, possession, or District of Columbia.

## Free and Clear

Q.      Except as otherwise expressly provided in the Agreement or this Order, the Purchased Assets shall be sold free and clear of all interests, obligations, rights, encumbrances, pledges, liens (including, without limitation, mechanic's, materialmen's, and other consensual and non-consensual liens and statutory liens), mortgages, deeds of trust, security interests, claims (including any "claim" as defined in Section 101(5) of the Bankruptcy Code), liabilities, debt obligations, losses, penalties, leases, charges, offsets, contracts, options, rights of first refusal, rights of first offer, rights of first sale, rights of notice, easements, servitudes, proxies, voting trusts or agreements, transfer restrictions under any agreement, conditional sale or other title retention agreements, judgments, hypothecations, demands, licenses, sublicenses, assignments, indentures, loan agreements, instruments, debts, rights of recovery, guaranties, contractual commitments,

restrictions, rights of recoupment, labor and employment rights and claims, employee benefit agreements and obligations, collective bargaining agreements and obligations, pension rights and claims, claims based on reimbursement, contribution, indemnity, exoneration, products liability, tortious conduct, property damage, personal injury, alter-ego or taxes, claims based on pension plan contributions and related liabilities, environmental liabilities or obligations (including, without limitation, toxic tort claims), options to purchase, regulatory violations, decrees of any court or foreign or domestic governmental entity, charges of any kind or nature, debts arising in any way in connection with any agreements, acts, or failures to act, reclamation claims, and obligation claims, in each case, of whatever kind, nature, or description in, against or with respect to any of the Purchased Assets, or the Debtor, having arisen, existed, or accrued prior to and through the Closing Date, whether direct or indirect, absolute or contingent, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, material or non-material, disputed or undisputed, known or unknown, matured or unmatured, liquidated or unliquidated, arising or imposed by agreement, understanding, law, equity, statute, or otherwise, and whether arising prior to, on or after the Petition Date, including claims or liabilities otherwise arising under doctrines of successor liability, *de facto* merger, or substantial continuity, or liabilities or obligations arising under any law or order (collectively, "**Interests**").

R.      The transfer of the Purchased Assets to the Purchaser free and clear of all Interests will not result in any undue burden or prejudice to any holders of any Interests, as such Interests shall attach to the net proceeds of the Sale that are ultimately attributable to the Purchased Assets when received by the Debtor, in the order of their priority, with the same validity, force, and effect

9

which they now have as against the Purchased Assets, and subject to any claims and defenses the Debtor, its estate, or other parties may possess with respect to such Interests.

S.    The Trustee may sell the Purchased Assets free and clear of all Interests because, in each case, one or more of the standards set forth in Section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. All holders of Interests who did not object or who withdrew their objections to the Sale or the Motion are deemed to have consented to the Sale and the relief requested in the Motion pursuant to Section 363(f)(2) of the Bankruptcy Code. All other holders of Interests, including those who maintained and did not withdraw objections to the Sale or the Motion, if any, fall within one or more of the other subsections of Section 363(f) of the Bankruptcy Code, including, without limitation, Section 363(f)(5) of the Bankruptcy Code, because such holders could be compelled in a legal or equitable proceeding to accept a money satisfaction on account of such Interests, and are adequately protected by having their Interests, if any, attach to the net proceeds of the Sale that are ultimately attributable to the Purchased Assets when received by the Debtor, in which such holders allege Interests, in the same order of priority, with the same validity, force, and effect that such holders had prior to the Sale, subject to any claims and defenses the Debtor, its estate, or other parties may possess with respect to such Interests.

T.    The Purchaser would not have entered into the Agreement and will not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, its estate, creditors, and other parties in interest, if the Sale were not free and clear of all Interests, or if the Purchaser, its affiliates, or their respective officers, directors or shareholders, or the Purchased Assets, would, or in the future could, be liable for any such Interests, or would have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff,

or otherwise, directly or indirectly, any Interests, including rights or claims based on any successor or transferee liability.

U.      Not selling the Purchased Assets free and clear of all Interests would adversely impact efforts to maximize the value of the estate, and a sale of the Purchased Assets that was not free and clear of all Interests would be of substantially less benefit to the estate.

**Validity of Transfer**

V.      The consummation of the Agreement and the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, Sections 105(a), 363(b), 363(f), and 363(m) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the transactions contemplated under the Agreement.

W.      The Purchased Assets constitute property of the estate, and good and indefeasible title to the Purchased Assets is vested in the Estate within the meaning of Section 541(a) of the Bankruptcy Code, and no other person has any ownership right or ownership interest therein or title thereto.

X.      The Purchaser is not acquiring any property of the Debtor other than the Purchased Assets as such assets are identified in the Agreement.

Y.      The transfer of the Purchased Assets to the Purchaser under the Agreement will be a legal, valid and effective transfer of all of the legal, equitable, and beneficial right, title, and interest in and to the Purchased Assets free and clear of all Interests. The transfer of the Purchased Assets to the Purchaser will vest the Purchaser with good and marketable title to the Purchased Assets.

**Compelling Circumstances for an Immediate Sale**

Z.       To maximize the value of the Purchased Assets, preserve the viability of the business to which the Purchased Assets relate, and avoid deterioration, erosion of value, and uncertainty with respect to the Purchased Assets, it is essential that the Sale of the Purchased Assets occur within the time constraints set forth in the Motion, the Bidding Procedures Order, and the Agreement. Time is of the essence in consummating the Sale. Accordingly, there is cause to waive the stay contemplated by Bankruptcy Rule 6004.

AA.     The Trustee has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the approval and consummation of the Sale.

BB.     Given all of the circumstances of this Case and the adequacy and fair value of the Purchase Price under the Agreement, the Sale of the Purchased Assets to the Purchaser constitutes a reasonable and sound exercise of the business judgment of the Trustee.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:**

**General Provisions**

1.       The Motion is granted and approved as provided in this Order.

2.       All objections and responses to the Sale or the Motion that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections and responses, are overruled on the merits and denied with prejudice. All persons and entities given notice of the Motion that failed to timely object thereto, including are deemed to have consented to the relief sought therein.

3.       This Court's findings of fact and conclusions of law set forth in the Bidding Procedures Order are incorporated in this Order by reference.

**Approval of the Agreement**

4.      The Agreement and all other ancillary documents, including, without limitation, all of the terms and conditions of the Agreement and such other ancillary documents, are approved in all respects.

5.      Pursuant to Section 363(b) of the Bankruptcy Code, the Trustee is authorized and directed (a) to take any and all actions necessary or appropriate to execute and deliver, perform under, consummate, implement, and effectuate the Agreement, together with any and all instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Agreement, this Order, and the Sale, and to take all further actions as may be reasonably requested by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser, or reducing to possession, the Purchased Assets, free and clear of all Interests to the Purchaser on the Closing Date pursuant to the terms of the Agreement, and (c) to take any and all actions as may be necessary or appropriate to the performance of obligations as contemplated by the Agreement, without any further action or order of this Court.

**Transfer of the Purchased Assets**

6.      Except as otherwise expressly provided in the Agreement or this Order, pursuant to Sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Trustee is authorized and directed to transfer the Purchased Assets to the Purchaser on the Closing Date pursuant to the terms and conditions of the Agreement and this Order, free and clear of all Interests, with all such Interests to attach to the net proceeds of the Sale that are ultimately attributable to the Purchased Assets when received by the Trustee, in the order of their priority, with the same validity, force, and effect

which they now have as against the Purchased Assets, and subject to any claims and defenses the Debtor, its estate, or other parties may possess with respect to such Interests.

7.      The transfer of the Purchased Assets to the Purchaser will be, as of the Closing Date, a legal, valid, binding, and effective transfer of the Purchased Assets, and, except as otherwise expressly provided in the Agreement or this Order, shall vest the Purchaser with all right, title, and interest of the Debtor in and to the Purchased Assets free and clear of all Interests accruing, arising, or relating to such Purchased Assets any time prior to and through the Closing Date. Except as otherwise expressly provided in the Agreement or this Order, the Purchaser shall not assume or become liable for any Interests relating to the Purchased Assets.

8.      Except as expressly permitted or otherwise specifically provided by the Agreement or this Order, all persons and entities (including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, vendors, employees, trade creditors, litigation claimants, and other creditors) and their respective successors and assigns holding Interests in all or any portion of the Purchased Assets arising under or out of, in connection with, or in any way relating to the Debtor, the Purchased Assets, or the transfer of the Purchased Assets to the Purchaser, are hereby forever barred, estopped, and permanently enjoined from asserting such Interests against the Purchaser, its successors and assigns, and their property, including, without limitation, the Purchased Assets. Following the Closing, no holder of any Interest shall interfere with Purchaser's title to or use and enjoyment of the Purchased Assets based on or related to any such Interest, or based on any action the Debtor may take in the Case.

9.     On the Closing Date, each holder of an Interest is authorized and directed to execute such documents and take all other actions as may be necessary to release such Interest, if any, as provided for in this Order, as such Interests may have been recorded or may otherwise exist.

10.     Upon consummation of the transactions contemplated in the Agreement and in this Order, the Purchaser shall be authorized to file termination statements or lien terminations in any required jurisdiction to remove any record, notice filing, or financing statement recorded to attach, perfect, or otherwise notice any lien or encumbrance that is extinguished or otherwise released pursuant to this Order under Section 363 and the related provisions of the Bankruptcy Code.

11.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Trustee to sell and transfer the Purchased Assets to the Purchaser in accordance with the terms of the Agreement and this Order.

12.     All persons and entities that are in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to the Purchaser on the Closing Date.

13.     If any person or entity which has filed statements or other documents or agreements evidencing Interests with respect to all or any portion of the Purchased Assets shall not have delivered to the Trustee prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to the Purchaser for the purpose of documenting the release of all Interests that the person or entity has or may assert with respect to all or any portion of the Purchased Assets, the Trustee and the Purchaser are hereby authorized to

execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Purchased Assets.

14.     This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks, or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

15.     This Order shall be effective as a determination that, as of the Closing, (i) no Interests will be capable of being asserted against the Purchaser or any of its respective assets (including the Purchased Assets), (ii) the Purchased Assets shall have been transferred to Purchaser free and clear of all Interests, and (iii) the conveyances described herein have been effected.

## No Successor or Transferee Liability

16.     Upon the Closing Date and except as otherwise expressly provided in the Agreement and this Order, all persons and entities are hereby forever prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Purchaser, its successors and assigns, or the Purchased Assets, with respect to any (a) Interest arising under, out of, in connection with or in any way relating to the Debtor, the Purchaser, or the Purchased

16

Assets prior to and including the Closing Date or (b) successor or transferee liability, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Purchaser, its successors or assigns, assets, or properties, (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Purchaser, its successors or assigns, assets or properties, (iii) creating, perfecting, or enforcing any Interest against the Purchaser, its successors or assigns, assets, or properties, (iv) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Purchaser or its successors or assigns, or (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect of this Order and such other orders.

## Good Faith of Purchaser

17.     The transactions contemplated by the Agreement are undertaken by the Purchaser and the Trustee without collusion and in good faith, as that term is defined in Section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided in this Order to consummate the Sale shall not affect the validity of the Sale, unless such authorization and consummation of such Sale are duly stayed pending such appeal.

18.     Neither the Debtor, the Trustee, nor Purchaser have engaged in any action or inaction that would cause or permit the Sale to be avoided or costs or damages to be imposed under Section 363(n) of the Bankruptcy Code. The consideration provided by the Purchaser for the Purchased Assets under the Agreement is fair and reasonable and the sale may not be avoided under Section 363(n) of the Bankruptcy Code.

**Related Relief**

19.     Notwithstanding the possible applicability of Bankruptcy Rules 6004, 7062, 9014, or Federal Rule of Civil Procedure 62(a), or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry. The Debtor is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order, and may, subject to the terms and conditions of the Agreement, and in their discretion and without further delay, close the transactions contemplated under the Agreement and take any action and perform any act authorized under this Order.

20.     Flock shall be entitled to receive a 5% finder's fee (the "**Finder's Fee**") for its efforts in locating the Purchaser and its efforts to conclude a Sale of the Purchased Assets to be paid from the proceeds of the Sale at closing. Except as otherwise expressly provided in the Agreement, no other brokers were involved in consummating the Sale, and no other brokers' commissions are due. Other than the Finder's Fee, the Purchaser is not and will not become obligated to pay any other fee or commission or like payment to any broker, finder, or financial advisor as a result of the consummation of the transaction contemplated by the Agreement based upon any arrangement made by or on behalf of the Trustee.

21.     The Trustee is authorized to pay the Finder's Fee from the paid proceeds of the Sale at closing. After the payment of the Finder's Fee and any other closing costs, the remaining balance (the "**Net Proceeds**") shall, pending further order of the Court, be distributed as follows: a) the Estate is entitled to 10% of the Net Proceeds pursuant to the Settlement to be used to be retained by the Chapter 7 Bankruptcy Estate; b) the Libertas Parties shall be entitled to 45% of the Net Proceeds; and c) Flock shall be entitled to 45% of the Net Proceeds. Incident thereto, the Trustee

is authorized to: a) retain 10% of the Net Proceeds; and b) distribute 45% of the Net Proceeds to the Libertas Parties and 45% of the Net Proceeds to Flock pursuant to the Settlement.

22.     The Purchaser shall have no obligation to proceed with Closing unless and until all conditions precedent to its obligations to do so, as set forth in the Agreement, have been met, satisfied, or waived in accordance with the terms of the Agreement; provided, however, that the Purchaser shall continue to act in good faith within the meaning of Section 363(m) of the Bankruptcy Code in and through Closing of the Sale.

23.     The failure specifically to include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Agreement be authorized and approved in its entirety.

24.     The Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof, without further order of this Court; provided, however, that any such modification, amendment, or supplement does not have a material adverse effect on the Estate.

25.     The terms and provisions of the Agreement and this Order shall be binding in all respects upon the Debtor, its respective affiliates, estate, and creditors, all holders of equity interests in the Debtor, all holders of any Interest, all interested parties in this case and their respective successors and assigns, the Purchaser and its successors and assigns, and any trustees, if any, subsequently appointed under the Bankruptcy Code in the Case. This Order and the Agreement shall inure to the benefit of the Trustee, the Debtor, its estate and creditors, the Purchaser, and its respective successors and assigns.

26.     This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Agreement, all amendments to this

Order and the Agreement, any waivers and consents under this Order and the Agreement, and each of the agreements executed in connection with this Order and the Agreement and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Agreement, the Sale, or this Order. This Court retains jurisdiction to compel delivery of the Purchased Assets, to protect the Purchaser and its assets, including the Purchased Assets, against any Interests and successor and transferee liability, and to enter orders, as appropriate, pursuant to Sections 105 or 363 (or other applicable provisions) of the Bankruptcy Code necessary to transfer the Purchased Assets.

27.     Each and every federal, state, and local governmental agency or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement and this Order.

28.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in this Case, the terms of this Order shall govern.

29.     To the extent there are any inconsistencies between the terms of this Order and the Agreement (including all ancillary documents executed in connection this Order and the Agreement), the terms of this Order shall govern.

30.     The provisions of this Order are nonseverable and mutually dependent.

***END OF DOCUMENT***

Prepared and Presented By:

LAW OFFICES OF HENRY F. SEWELL JR., LLC

By: */s/ Henry F. Sewell, Jr.*
Henry F. Sewell, Jr.
Georgia Bar No. 636265
Law Offices of Henry F. Sewell, Jr., LLC
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
 (404) 926-0053; hsewell@sewellfirm.com
Counsel for the Trustee

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this date I served a true and correct copy of the foregoing *Motion (A) for Authority to Sell Assets Free and Clear of Liens, Claims, and Encumbrances; (B) to Establish Procedures With Respect to Such Sale; (C) Consider Approval of Breakup Fee and Expense Reimbursement; and (D) to Shorten and Limit Notice* via the Court's ECF system, if such party is registered, or via first class U.S. Mail, with adequate postage prepaid, on the following persons or entities at the addresses stated:

Office of the United States Trustee
362 Richard B. Russell Federal Bldg.
75 Ted Turner Drive, SW # 362
Atlanta, Georgia 30303

Schumacher
c/o Brandon K. Stelly, J.D.
SVP of Litigation & Internal Counsel
200 Corporate Boulevard
Lafayette, Louisiana 70508

U.S. Attorney's Office
ATTN: Civil Process Clerk
75 Ted Turner Drive SW, Ste. 600
Atlanta, GA 30303

US Dept. of Health and Human Services
200 Independence Ave., SW
Washington, DC 20201

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346

Medicare Contact Operations Center
PO Box 1270
Lawrence, KS 66044

Centers for Medicare and Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244-1850

Thomas C. Wooldridge
Counsel for Bill Wilson
Georgia Federal Defense
1201 West Peachtree Street NE, Ste. 2300
Atlanta, GA 30309

Flock Financial, LLC
c/o GREGORY M TAUBE
NELSON MULLINS RILEY SCARBOROUGH LLP
201 17TH STREET NW, SUITE 1700
ATLANTA, GA 30363-1099

Libertas Parties
c/o Jeff Cianculli
Weir LLP
The Widener Building
1339 Chestnut Street, Ste. 500
Philadelphia, PA 19107

Undue Medical Debt
c/o Sheehan Phinney Bass & Green PA
1000 Elm Street, 17th Floor
Manchester, NH 03101
Attn: Christopher M. Candon

Attorney General's Office
40 Capital Square, SW
Atlanta, GA 30345-1300

Georgia Department of Revenue
Compliance Division–Central Collection
1800 Century BLVD NE, Ste. 9100
Atlanta GA 30345-3202

Christopher Candon
Sheehan Phinney
28 State Street
Boston, MA 02109
*Counsel for Buyer*

Ceci Christy
Rountree Leitman
2987 Clairmont Rd.
Suite 350
Atlanta, Georgia 30329
*Counsel for the Debtor*

Theodore Hertzberg, Esq.
United States Attorney
Richard B. Russell Federal Building
75 Ted Turner Dr. SW
Suite 600
Atlanta, GA 30303-3309

Dated: July 1, 2025.

Respectfully submitted,

LAW OFFICES OF HENRY F. SEWELL JR., LLC

*/s/ Henry F. Sewell, Jr.*
Henry F. Sewell, Jr.
Georgia Bar No. 636265
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
(404) 926-0053
hsewell@sewellfirm.com
COUNSEL FOR CHAPTER 7 TRUSTEE

3